# IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

STATE *ex rel* GERALD E. LANG, Ph.D.,

     Petitioner and Relator,

v.

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS, a West Virginia state
board; C. PETER MAGRATH, President of
West Virginia University; MARY ROBERTA
BRANDT, Vice President for Legal Affairs
and General Counsel at West Virginia
University; BEVERLY D. KERR, Deputy
General Counsel for West Virginia University;
and MARJORIE M. McDIARMID, Steptoe
and Johnson Professor of Law and Technology
and Academic Integrity Officer for West
Virginia University,

     Defendants.

Civil Action No. 09-C-114
Judge Susan B. Tucker

## RENEWED MOTION TO INTERVENE AND MOTION TO ALTER OR AMEND JUDGMENT UNDER RULE 59(e) BY R. STEPHEN SEARS AND CYRIL M. LOGAR

Pursuant to West Virginia Rules of Civil Procedure 24 and 59(e), R. Stephen Sears, Ph.D. and Cyril M. Logar, Ph.D., respectfully renew their motions to intervene in the above-captioned action and move to alter or amend the Court's judgment entered July 15, 2011 as described below. In support of these motions, Dr. Sears and Dr. Logar submit the following:

1.      On April 24, 2009, the Court entered a detailed 13-page Order (1) finding that the West Virginia University Board of Governors, C. Peter Magrath, Mary Roberta Brandt, Beverly Kerr, and Marjorie McDiarmid ("Respondents"), acting individually and in concert, have acted in an arbitrary and capricious manner in their investigation and handling of an academic integrity proceeding involving Petitioner Lang and others; (2) finding that Respondents have violated the constitutionally-protected due process rights of Petitioner Lang and the other individuals who are subject to the academic integrity proceeding, including Dr. Stephen Sears and Dr. Cyril Logar; and (3) granting Petitioner Lang's request that a Writ of Prohibition issue against the Respondents, terminating the academic integrity proceeding that is the subject of the Verified Petition.

2.      Although the Court did not permit Dr. Sears or Dr. Logar to intervene in the action because "time [was] of the essence" and allowing intervention would have delayed the Court's ruling on the Verified Petition, the April 24, 2009 Order made it very clear that Dr. Sears and Dr. Logar are parties to the same academic integrity proceeding as Petitioner Lang, and that their interests "are identical to Lang's interests." (April 24, 2009 Order at 8, 13.) The Court concluded that "the rights of all the accused have been violated" by Respondents in the manner set forth in the Order — and specifically "urge[d] the Respondents ... to remedy those accused's rights *without further duplicitous Court action.*" (*Id.* at 13 (emphasis added).)

3.      The Court further stated in its April 24, 2009 Order that; "given the similarity of the facts, Respondents should conclude that if Sears and Logar had filed petitions, this Court would have ruled consistently. Therefore, Respondents should elect to apply this Court's decision to Sears and Logar and any other similarly situated." (*Id.* at 8.)

4.      On January 24, 2011, following motions for reconsideration filed by the Respondents, the Court issued an Order denying those motions and stating that "[t]he rulings as set forth in the Court's Order dated April 24, 2009 are correct." (Jan. 24, 2011 Order at 2.)  The January 24, 2011 Order also stated that this Court's previous Order had "prohibited Respondents from proceeding with the instant academic integrity proceedings." (*Id.* at 1.)

5.      Dr. Sears and Dr. Logar, two of the "similarly situated individuals" that this Court referenced in its Orders, brought a lawsuit against Respondents West Virginia University Board of Governors, Magrath, McDiarmid, Brandt, and Kerr, among others, in the U.S. District Court for the Northern District of West Virginia alleging violation of their federal constitutional rights. *See* Compl., *Sears/Logar v. WVU Bd. of Governors et al.*, No. 10-cv-00201-JPB (N.D. W.Va. Dec. 10, 2010) (attached as Ex. 1).  Dr. Sears, Dr. Logar and their  attorneys only learned about the settlement agreement between Respondents and Petitioner Lang when they were served with a copy of the Board of Governors' and Magrath's supplement to their motion to dismiss the federal action. *See* WVU BOG Supp. Br. in Support of Mot. to Dismiss, *Sears/Logar v. WVU Bd. of Governors et al.*, No. 10-cv-00201-JPB (N.D. W.Va. July 18, 2011) (attached as Ex. 2).

6.      Instead of complying with the Court's April 24, 2009 Order, and the subsequent Order denying reconsideration, and taking affirmative steps to "remedy [the] accused's rights," as directed by the Court, Respondents represented in motions to the federal court that the Academic Integrity Proceedings in question were still ongoing, ***nearly two years after this***

3

*Court's order*.  The Board of Governors stated that the "Academic Integrity Process is not complete," and that "the remaining stages of the Academic Integrity process provide mechanisms through which any potential conflict of interest or bias can be adequately remedied."  WVU Bd. of Governors Mem. of Law In Support of Mot. to Dismiss at 16, 20, *Sears/Logar v. WVU Bd. of Governors et al.*, No. 10-cv-00201-JPB (N.D. W.Va. Jan. 31, 2011) (attached as Ex. 3). [1]  However, as of the date of that filing, nothing had been done to either "terminat[e] the instant academic integrity proceeding" or "initiate . . . alternative procedures to insure that Petitioner's due process rights" were protected.   (Apr. 24, 2011 Order at 13.) Respondent McDiarmid incorrectly represented to that court that the proceedings had been "stayed" by this Court's order, but were "between the second and third stages of a four-stage process."  McDiarmid Brief in Support of Mot. to Dismiss at 2, *Sears/Logar v. WVU Bd. of Governors et al.*, No. 10-cv-00201-JPB (N.D. W.Va. Jan. 31, 2011) (attached as Ex. 4).

7.     In addition to their direct failure to comply with this Court's Orders, Respondents engaged in settlement discussions with Petitioner Lang in order to void the effect of the Orders. Those settlement discussions did not include Dr. Sears, Dr. Logar or "any other similarly situated" person who was subject to the conflict of interest in the Respondents' proceedings. (Apr. 24, 2011 Order at 8.)

8.     Although the parties did not provide notice to Dr. Sears, Dr. Logar or their attorneys, Respondents and Petitioner Lang reached an agreement to request that this Court's orders be improperly vacated *nunc pro tunc*.

---

[1] The Board of Governors and Dr. Magrath also incorrectly stated to the federal court that "[e]ven if this Court views the allegations of a conflict of interest or bias in a light most favorable to Plaintiffs, the effect of that conflict of interest or bias, if any, cannot be alleged, yet alone determined by this Court or a jury, until the administrative process reaches a final decision."

9.      As the Court determined, "Petitioner Lang and the others [including Drs. Sears and Logar] are either current or former clients of General Counsel Macia and his legal staff under Rules 1.7 or 1.9 of the *West Virginia Rules of Professional Conduct*." (April 24, 2009 Order at 10.) Respondents were well aware of the Court's ruling in this regard. Under the circumstances, therefore, Respondents' surreptitious efforts to settle their dispute with Petitioner Lang, ***without providing notice to Dr. Sears, Dr. Logar, or the other similarly situated individuals,*** is highly questionable at best, and at worst a further violation of the ethical rules and a violation of the Court's April 24, 2009 Order.

10.     In their supplemental brief to the federal court, the Board of Governors and Dr. Magrath misrepresented the nature of this Court's vacatur order informing the federal court that this Court had vacated with prejudice its prior orders relating to the Academic Integrity Proceedings, but omitting the fact that the Court did so solely because of an agreement by the parties, and not due to an error of fact or law. *Compare* Ex. 2 at 2 *with* July 15, 2011 Order at 2. The Respondents' desire to settle with Dr. Lang was clearly motivated solely by an intent to attempt to diminish their potential liability in the federal lawsuit against them as evidenced by the terms of the settlement agreement (attached as Ex. 5).[2]

11.     The Respondents and Petitioner also acted improperly when they requested that this Court vacate its orders *nunc pro tunc*. As the West Virginia Supreme Court has long made clear, *nunc pro tunc* orders are available in only two instances, neither of which is applicable here. First, a *nunc pro tunc* order may be entered where the parties have done everything in their power to permit the court to rule, but the court has still neglected to enter an order in a timely fashion. *See Vance v. Ravenswood*, 44 S.E. 461, 462 (W. Va. 1903). Second, a *nunc pro tunc*

---

[2] Dr. Sears and Dr. Logar strongly disagree with the analysis contained in Respondents' filing with regard to the supposed impact of the vacatur of this Court's Orders on their 1983 action, but that will be addressed separately in a response filed in that federal action.

order may be issued in "those cases in which judgments, though pronounced by the court, have, from accident or mistake of the officers of the court, never been entered on the records of the court." *Id.*; *see also West Virginia Jud. Inquiry Comm'n v. Casto*, 263 S.E.2d 79, 81 (W. Va. 1979) ("*Nunc pro tunc* entries are usual only in situations where something that actually occurred on a prior date was omitted from the record by inadvertence or mistake, but such an order may not be made where the entry does not reflect something that actually occurred on the date indicated.").

12.     It is clear that neither of these circumstances was present in this case. There was no delay by this Court, as the Court's initial April 24, 2009 Order was issued only three days after oral argument and reflected an oral ruling that was made at that hearing. (*See* Apr. 24, 2009 Order at 1.) Nor is there any evidence that the Court intended to make a different ruling or concluded that it was wrong on the facts or the law. In fact, in its January 24, 2011 Order, the Court specifically stated that "[t]he rulings as set forth in the Court's Order dated April 24, 2009 are correct." (Jan. 24, 2011 Order at 2.)

13.     Additionally, a party whose interests may be adversely affected must be given notice before the court enters an order *nunc pro tunc*. *See Chaney v. State Comp. Comm'r*, 33 S.E.2d 284, 286 (W. Va. 1945). This is true even where the adversely affected party was not a party to the initial order. *See Brooks v. Zakaib*, 609 S.E.2d 861, 866-67 (W. Va. 2004). Based on the actions of Respondents the Board of Governors and Dr. Magrath, who rushed to inform the federal court that this Court's Orders were no longer in place, it is clear that here, as in *Brooks,* the specific purpose of their actions in this Court was to negatively affect the rights of Drs. Sears and Logar without giving them an opportunity to be heard. *See id.* at 867. Given these circumstances, and under West Virginia law, Drs. Sears and Logar should have been given

6

notice of the parties' intention to request, and this Court's intention to consider entering, an order to vacate its previous Orders *nunc pro tunc*.

14.     Dr. Sears and Dr. Logar regret that Respondents' conduct has made it necessary for them to renew their motions to intervene in this proceeding. Drs. Sears and Logar renew their motions to intervene in order to protect their procedural and substantive rights (as declared in the April 24, 2009 Order) from further violations by the Respondents.  Respondents made it clear through their counsel that they did not believe the April 24, 2009 Order affected Dr. Sears's or Dr. Logar's rights when in June 2011, they stated that they did not believe the April 29, 2009 Order applied to Drs. Sears or Logar and further stated their intention to move forward with the Academic Misconduct Proceedings, in direct contravention of the April 24, 2009 Order.  At the same time, however, Respondents have taken the contradictory position that the vacatur of the April 24, 2009 Order affects Drs. Sears and Logar and the legal rights declared in that Order. Moreover, Respondents clearly had no intention of providing the two with any notice (or opportunity to object).  In fact, it appears that Respondents' intention was to keep Dr. Sears and Dr. Logar from intervening and notifying this Court of their disagreement with the terms of the settlement agreement.

15.     Based on these facts, it is clear that the interests of Dr. Sears and Dr. Logar are no longer adequately represented by Dr. Lang.  He and his counsel have reached an agreement with Respondents Board of Governors, Dr. Magrath, Ms. Brandt, and Ms. Kerr that purportedly eliminates the effect of this Court's previous Orders not only on him, but also on Drs. Sears and Logar, and he did so without providing notice or demonstrating any regard for the interests and rights of Drs. Sears and Logar.  Dr. Sears and Dr. Logar therefore need to be included as interveners in this action so that they may adequately protect their own rights.

16.     This motion is timely filed.  The Court vacated its Orders on July 15, 2011, and this renewed motion to intervene and to alter or amend the court's judgment is filed on July 25, 2011 — as soon as was practicable given the lack of notice received by Dr. Sears and Dr. Logar and within the ten-day time limit for Motions to Alter or Amend Judgment under W. Va. R. Civ. P. Rule 59(e).

17.     For these reasons, Dr. Sears and Dr. Logar respectfully renew their motions to intervene in the above-captioned action.

18.     Dr. Sears and Dr. Logar also respectfully request, under Rule 59(e), that this Court reinstate is April 24, 2009 and January 24, 2011 Orders, or, in the alternative, amend its July 15, 2011 judgment to clarify that the Orders are only vacated with respect to Petitioner Lang, and still apply to those "similarly situated" to Dr. Lang, including Dr. Sears and Dr. Logar, who were not involved in settlement discussions with the Respondents or parties to their agreement.

19.     In addition, because this Renewed Motion to Intervene was made necessary by Respondents' failure and refusal to comply with the Court's April 24, 2009 Order, the January 24, 2001 Order, and the equitable requirement to notify him prior to seeking vacatur of those Orders, Drs. Sears and Logar seek a further Order requiring Respondents to pay all attorneys' fees and costs incurred in connection with this Motion and any subsequent proceedings.

Dated: July 25, 2011

Respectfully submitted,

R. STEPHEN SEARS

By:  THE TINNEY LAW FIRM, PLLC

John H. Tinney (WV State Bar #3766)
John H. Tinney, Jr. (WV State Bar #6970)
Wesley M. Jarrell II (WV State Bar #10544)
222 Capitol Street, Suite 500
P. O. Box 3752
Charleston, WV 25337-3752
(304) 720-3310 (voice)
(304) 720-3315 (facsimile)

and

Thomas A. Clare, P.C.
(admitted pro hac vice)
Kirkland & Ellis LLP
655 15th Street, N.W. -- 12th Floor
Washington, D.C. 20005
(202) 879-5000 (voice)
(202) 879-5200 (facsimile)


CYRIL M. LOGAR

By: THORP REED & ARMSTRONG, LLP

Robert Ridge (w/ permission)
Robert Ridge (WV State Bar #7674)
1233 Main St
Suite 4000
Wheeling, WV 26003
(412) 394-2440 (voice)
(412) 394-2555 (facsimile)

9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CYRIL M. LOGAR,
R. STEPHEN SEARS,

       Plaintiffs,

                                  Civil Action No. 1:10-cv-201

       v.

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS, including members from
2008 through the present, a West Virginia state
board; MARY ROBERTA BRANDT,
individually and as former Vice President for
Legal Affairs and General Counsel at West
Virginia University and adjunct professor of
law; BEVERLY D. KERR, individually and as
Deputy General Counsel for West Virginia
University; MARJORIE A. MCDIARMID,
individually and as the Steptoe and Johnson
Professor of Law and Technology and
Academic Integrity Officer for West Virginia      **JURY TRIAL DEMANDED**
University; MICHAEL S. GARRISON,
individually and as former President of West
Virginia University; C. PETER MCGRATH,
individually and as former interim President of
West Virginia University; JAMES P.
CLEMENTS, individually and as current
President of West Virginia University; and E.
JANE MARTIN, individually and as former
Provost of West Virginia University,

       Defendants.

## COMPLAINT

    AND NOW COME the Plaintiffs, Cyril M. Logar ("Dr. Logar") and R. Stephen Sears

("Dr. Sears") (together, "Plaintiffs"), by and through their counsel, Robert J. Ridge, Esq.

(Logar), and John H. Tinney, Esq. and Thomas A. Clare, Esq. (Sears), and for their Complaint

against the Defendants do hereby aver and allege as follows:

{01183113}



## INTRODUCTION

1.      This is a civil rights action brought under 42 U.S.C. § 1983 to redress the deprivation of Plaintiffs' liberty and property rights by Defendants without due process as required by the Fourteenth Amendment to the United States Constitution and Article III, Section 10 of the West Virginia Constitution. Defendants knowingly and intentionally sabotaged Plaintiffs' reputations, deprived them of certain benefits and privileges commensurate with their positions as administrators and tenured faculty members at West Virginia University, and failed to adhere to West Virginia University's established procedures for conducting academic misconduct investigations, all without affording Plaintiffs due process. Plaintiffs seek damages and declaratory and injunctive relief for the constitutional violations committed by Defendants, including recovery for the damage Defendants have caused to Plaintiffs' professional reputations and to their positions at West Virginia University.

## THE PARTIES

1.      Plaintiff Cyril M. Logar is an individual residing at 175 Lone Pine Drive, Masontown, West Virginia 26542. At all times material to the claims asserted in this Complaint, Dr. Logar was and continues to be a tenured faculty member at West Virginia University ("WVU"). Dr. Logar also formerly was the Associate Dean of the College of Business and Economics at WVU, a position that he no longer holds.

2.      Plaintiff R. Stephen Sears is an individual residing at 220 Lake Powell Drive, Laredo, TX 78041. At all times material to the claims asserted in this Complaint, Dr. Sears was a tenured faculty member at WVU and the Dean of the College of Business and Economics. Dr. Sears no longer holds any positions at West Virginia University.

{01193113}                              2

3.      Defendant West Virginia University Board of Governors ("WVU Board of Governors"), is the institutional governing board appointed by the Governor of the State of West Virginia, as authorized by W. Va. Code § 18B-2A-1.

4.      At certain times material to the allegations set forth in this Complaint, Defendant Mary Roberta Brandt ("Brandt") was the Vice President of Legal Affairs and General Counsel at WVU and was employed by West Virginia University. She was directly controlled, managed, and supervised by the President of WVU. Brandt is a lawyer who is licensed in the State of West Virginia by the West Virginia State Bar, and, upon information and belief, her license currently is in the active status. Brandt became Vice President for Legal Affairs and General Counsel at WVU when Alexander Macia resigned his position as Vice President for Legal Affairs and General Counsel in 2008.

5.      Defendant Beverly D. Kerr ("Kerr") is the Deputy General Counsel for WVU and is an employee of West Virginia University. Kerr is a lawyer who is licensed in the State of West Virginia by the West Virginia State Bar, and, upon information and belief, her license currently is in the active status. At certain times material to the allegations in this Complaint, Kerr was directly supervised, controlled, and managed by Defendant Brandt as part of the WVU office of the Vice President for Legal Affairs and General Counsel.

6.      Defendant Marjorie A. McDiarmid ("McDiarmid") is the Steptoe and Johnson Professor of Law and Technology and is serving as the Academic Integrity Officer for WVU, and she is an employee of West Virginia University. McDiarmid is a lawyer who is licensed in the State of West Virginia by the West Virginia State Bar, and, upon information and belief, her license currently is in the active status.

7.     Defendant Michael S. Garrison ("Garrison") is the former President of West Virginia University.  Garrison is a lawyer who is licensed in the State of West Virginia by the West Virginia State Bar, and, upon information and belief, his license currently is in the active status.  Upon information and belief, his current business address is 48 Donley Street, Suite 800, Morgantown, WV 26501.

8.     Defendant C. Peter McGrath ("McGrath") is the former interim President of West Virginia University.  Upon information and belief, his current business address is Binghamton University, SUNY, P.O. Box 6000, Binghamton, NY 13902-6000.

9.     Defendant James P. Clements ("Clements") is the current President of West Virginia University.  Upon information and belief, his current business address is 103 Stewart Hall, P.O. Box 6201, Morgantown, WV 26506-6201.

10.    Defendant E. Jane Martin is the former Provost of West Virginia University.  Upon information and belief, her current address is 222 Zimmer Lane, Waynesburg, PA 15370.

11.    Defendants are "persons" as that term is used in 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

12.    The claims made in this Complaint are brought pursuant to 42 U.S.C. § 1983, and the jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.  This court has jurisdiction to hear any additional state law claims set forth herein pursuant to 28 U.S.C. § 1367.

13.    A substantial portion of the events giving rise to the claims asserted in this Complaint occurred in this federal district, in Morgantown, West Virginia, and therefore venue lies in this District pursuant to 28 U.S.C. § 1391.

{01183113}                                        4

## BACKGROUND FACTS

### The Disputed eMBA Degree

14.     As reported publically in the media, on or about October 11, 2007, a regional media outlet contacted WVU for the purpose of inquiring as to whether a particular student (referred to here and throughout the remainder of this Complaint as "Student A") completed and earned an "eMBA" degree at WVU.

15.     From the time the media outlet made its initial inquiry concerning Student A on October 11, 2007, through at least October 23, 2007, Alexander Macia ("Macia"), then Vice President for Legal Affairs and General Counsel at WVU, and members of his office, were directly involved in the events and participated in the meetings and communications among the various WVU personnel, including Plaintiffs, who were requested by the WVU Administration to respond to the media outlet's inquiry.

16.     The office of the Vice President for Legal Affairs and General Counsel at WVU is responsible for providing in-house legal counsel for West Virginia University and its several branches across the state of West Virginia.

17.     Moreover, at all times relating to this specific time period from October 11, 2007, through October 23, 2007, Macia was asked to and did provide specific legal advice and direction to Plaintiffs and others who were requested by WVU administration to respond to the media outlet's inquiry concerning Student A.

18.     Specifically, on or around October 12, 2007, then-Provost of WVU Gerald Lang requested that several WVU administrators, faculty, and staff investigate the issue of whether Student A had, in fact, earned her degree at WVU. Among others, both Dr. Logar and Dr. Sears were recruited by Lang to conduct the investigation. At this point, Lang had already reviewed

Student A's grade records at WVU and had discovered several discrepancies regarding course completion.

19.     After conducting the investigation, Plaintiffs concluded that Student A had not, in fact, completed the necessary coursework to earn the eMBA degree.

20.     On October 15, 2007, then-President Garrison's chief of staff Craig Walker ("Walker") called a meeting to review the issues concerning Student A and whether she had earned her eMBA degree at WVU. The meeting was led by Walker, and Plaintiffs were required to attend. Also in attendance were a number of other individuals from WVU Administration and the College of Business and Economics, including Macia, Lang, Jerry Blakely, then-Director of the MBA program ("Blakely"), and Paul Speaker, the director of the MBA program during Student A's attendance at WVU ("Speaker").

21.     At the October 15, 2007 meeting, the attendees determined that Student A had been told by Speaker that she had earned her eMBA degree, although the review of the program's records showed a number of significant discrepancies. Based on the statements made by Speaker and Walker at the meeting, Macia told the attendees at the meeting that Student A had earned her degree. Based on Macia's conclusion and his accompanying legal advice, it was determined to acknowledge Student A's belief that she had, in fact, earned her degree. Macia also advised the attendees at the meeting of the potential adverse legal consequences of not awarding the degree to Student A.

22.     After the October 15, 2007 meeting, Dr. Sears charged Dr. Logar and Blakely with conducting a complete and thorough review and audit of the WVU eMBA Program and each of its students and their records from the program's inception. WVU personnel assisted in conducting the audit where appropriate.

23.     Acting upon the legal advice provided by Macia and at Lang's direction, on October 23, 2007, Dr. Sears sent a letter to the inquiring media outlet, responding to its recent inquiry and advising that Student A had earned her degree at WVU.

24.     The media outlet subsequently submitted the first of three specific Freedom of Information Act (FOIA) requests to WVU for all documentation and communications among WVU personnel concerning Student A, whether she had earned an eMBA degree, and WVU's inquiry in that regard.

25.     The media outlet's FOIA requests were handled by Macia and the lawyers and staff in his office who were directly under his control, management, and supervision.

26.     As reported publicly by the media, Lang, after consultation with WVU's President and in accordance with Macia's advice, called for the creation of a team of independent educators to investigate, audit and attest to the accuracy of WVU's recent decision regarding a retroactively-issued degree to Student A ("Special Investigative Panel").

27.     Lang, also on Macia's advice, prepared and submitted a Charge to the Special Investigative Panel selected in accordance with the demands of the WVU Faculty Senate.

28.     WVU's *Policy and Procedures for Responding to Allegations of Academic Misconduct* (attached hereto as Exhibit "A") provide the procedures by which investigations into allegations of academic misconduct are performed. The *Policy and Procedures* include a very specific set of steps through which the investigation must go, including the appointment of a "Screening Subcommittee" and "Discovery Subcommittee." *See* Exhibit "A," p. 5.

29.     The Charge to the Special Investigative Panel for Review of Executive MBA (eMBA) Program Records encouraged and called for the Panel to utilize and consult with the University's Academic Integrity Officer, Defendant McDiarmid, and others as the Panel deemed

necessary.  McDiarmid provided legal counsel to the Panel, and also made many important decisions affecting the investigation.

30.     In April 2008, the Special Investigative Panel completed its work and issued the "Report of the Special investigative Panel for Review of Executive MBA Program Records," which has been reported publicly and made available in the public domain.

31.     As reported publicly in the media, on or about April 24, 2008, the WVU Board of Governors disclosed to the public the Report of the Special Investigative Panel for Review of Executive MBA Program Records called for by Lang.

32.     On May 27, 2008, Garrison spoke with McDiarmid regarding his purported concerns over how the Student A matter was handled by the administrators he had requested to examine the matter following the media outlet's inquiry.

33.     On May 30, 2008, the then-President submitted a letter to McDiarmid in which he requested an investigation of the "potential academic misconduct committed by Stephen Sears . . ., or any others who might have been involved."

34.     On June 6, 2008, the President submitted his resignation, effective August 31, 2008.

35.     On June 16, 2008, the Office of General Counsel sent a memorandum to Dr. Logar and Dr. Sears, stating that the Academic Integrity Committee had requested the cooperation of the General Counsel's office in the Student A investigation.  The memorandum instructed Dr. Logar and Dr. Sears to make available any and all documents relevant to the Student A investigation, thus giving Dr. Logar and Dr. Sears specific legal advice and direction.

36.     McDiarmid, acting as the Academic Integrity Officer and as Chairperson of the Screening Subcommittee, named a number of individuals, including Defendant Kerr, then-Deputy General Counsel at WVU, to serve as members of the Screening Subcommittee.

37.     As evidenced from a careful review of the July 17, 2008 report of the Screening Subcommittee, Macia and other persons acting in the General Counsel's office submitted certain documents for review by the Screening Subcommittee, which included Defendant Kerr, who was also employed in the General Counsel's office at that very same time.

38.     In spite of the fact that Macia, the then-Vice President for Legal Affairs and General Counsel, had actively participated in the meeting of October 15, 2007, as noted above, and provided legal advice and counsel to Plaintiffs and others who attended the meeting, and in spite of the fact Macia also was involved in other communications concerning the Student A matter during the period from October 11, 2007 to October 23, 2007, the Screening Subcommittee found that "there is no testimony or documentary evidence known to the subcommittee at this time that indicates Mr. Macia or Mr. Garrison knew of or were involved with the generation of the records sent to admissions and records."

39.     No reference at all was made by the Screening Subcommittee to the fact that Macia, as WVU's General Counsel, had given legal advice and actively participated in the meeting of October 15, 2007, and also participated in communications regarding the Student A matter both before and after that meeting.

40.     Following the submission of the Screening Subcommittee Report, Defendant McDiarmid, still acting as Academic Integrity Officer, named a Discovery Subcommittee Hearing Panel under the applicable *Policy and Procedures*.

41.     Defendant Kerr attended the hearings of the Discovery Subcommittee and served

as its legal counsel.

42.     The Discovery Subcommittee stated in its Final Report, among other things, that:

> Logar was copied on emails about searching through the records
> with Blakely . . . and received a "Plan of Study" reflecting
> proposed modifications . . . . He did not physically prepare grade
> modifications but as associate dean for academic affairs and as a
> senior faculty member would have known the steps that were being
> taken . . . .

43.     The Discovery Subcommittee further stated, in reference to Macia, that:

> Based upon review of the evidence the Discovery Subcommittee
> concurs with the conclusion of the Screening Subcommittee and
> did not find evidence sufficient to justify the inclusion of Counsel
> Macia as a respondent.

It made the same conclusion with regard to President Garrison.

44.     The Discovery Subcommittee stated, in reference to Dr. Sears, that:

> Sears acknowledged signing the grade modification forms and a memo
> that he states were prepared for him.

45.     Thus, Plaintiffs both communicated and counseled with, and were advised and

assisted by, members of WVU's General Counsel's office throughout the entire Student A

matter.

46.     Despite this fact, in December 2008, McDiarmid sent letters to both Dr. Logar

and Dr. Sears informing them that they, as well as several other individuals, including Lang,

were being charged with academic misconduct.

### Gerald Lang's Verified Petition for Writ of Prohibition

47.     On February 24, 2009, Lang filed a Verified Petition for Writ of Prohibition in the

Circuit Court of Monongalia County, West Virginia.  In his Verified Petition, Dr. Lang alleged

that, by actively advising and counseling the faculty members present at the October 15, 2007

meeting, and then directly participating in the investigation and academic misconduct proceedings brought against those individuals, Defendants Brandt, Kerr, and McDiarmid arbitrarily and capriciously perpetuated a clear conflict of interest in violation of those faculty members' constitutionally-protected rights to due process.

48.    These Defendants filed Motions to Dismiss Dr. Lang's verified petition, and Plaintiffs also moved to intervene in the petition.

49.    A hearing on Dr. Lang's petition was held before Judge Susan B. Tucker on April 22, 2009. Judge Tucker then issued an Order on April 24, 2009, in which she granted Dr. Lang's request for a Writ of Prohibition, denied the Defendants' Motions to Dismiss, and denied Plaintiffs' Motions to Intervene. *See* Order, attached as Exhibit "B."

50.    Specifically, Judge Tucker held as follows:

(a)    An inherent conflict of interest existed in the academic misconduct proceedings that deprived several WVU faculty members, Plaintiffs, of their due process rights (Exhibit "B," pp. 9-10);

(b)    Plaintiffs and the other participants in the October 15, 2007 meeting "had the right to expect that Mr. Macia was then acting as their lawyer in this specific matter and that his legal advice to them could naturally form the basis for their subsequent actions—the very same actions for which they are now being investigated and prosecuted for academic misconduct." (Exhibit "B," p. 10);

(c)    Defendants' actions directly violated WVU's *Policy and Procedures for Responding to Allegations of Academic Misconduct*, which requires that WVU take reasonable precautions to avoid bias and conflicts of interest. (Exhibit "B," pp. 10-11).

(d)    Defendants, "acting individually and in concert, have acted in an arbitrary and capricious manner and have violated Petitioner's constitutionally-protected due process rights in the manner in which they have conducted the investigation and handling of the complaint of academic misconduct filed against Lang and others." (Exhibit "B," p. 12).

(e)    Although the Court denied Plaintiffs' motions to intervene, "the interests of [Plaintiffs] accused of wrongdoing in this matter are identical to Lang's interests. Having fully considered the circumstances of the accusations

and the AIC procedures thus far implemented, the Court is of the opinion that the rights of all the accused have been violated . . . ." (Exhibit "B," p. 13).

51.   Judge Tucker therefore granted Lang's Petition and terminated the academic misconduct proceedings against Plaintiffs and others, and required the respondents to initiate, if they cared to do so, alternative procedures to insure that Plaintiffs' due process rights were protected. (Exhibit "B," p. 10).

## Defendants' Subsequent Refusal to Comply with WVU's Policy and Procedures for Responding to Allegations of Academic Misconduct

52.   After Judge Tucker issued her Order of April 24, 2009, the respondents filed Motions to Amend the Order. Briefs in support and in opposition to those Motions were filed with the court, but the Motions have remained undecided.

53.   WVU's *Policy and Procedures for Responding to Allegations of Academic Misconduct* provide as follows:

(a)   "Inquiries and investigations will be conducted in a manner that will ensure fair treatment of the respondent, and confidentiality to the extent possible without compromising public health and safety or an unbiased and thorough investigation. While an inquiry or investigation is underway, the Academic Integrity Officer will ensure that the respondent does not suffer retaliation from other members of WVU in the terms and conditions of employment, academic standing, or other status at the University, and will review instances of alleged retaliation for appropriate action." Exhibit "A," pp. 3-4.

(b)   "If no misconduct is found, the Academic Integrity Officer, after consulting with the respondent and the Deciding official, will undertake diligent efforts to restore the respondent's reputation." Exhibit "A," p. 4

(c)   "The [Academic Integrity] Officer will ensure that the [Hearing] Panel is free of bias and real or apparent conflicts of interest . . . ." Exhibit "A," p. 10.

(d)   "The [Academic Integrity] Officer will ensure that individuals involved in cases of academic misconduct do not suffer retaliation from other members of WVU in the terms and conditions of their employment, academic standing, or other status at the University. The Officer will

review instances of alleged retaliation for appropriate action." Exhibit "A," p. 11.

(e) "The Officer will ensure that inquiries, investigations, and hearings are conducted in a manner that will ensure fair treatment of the respondent, and confidentiality to the extent possible without compromising public health and safety or an unbiased and thorough investigation." Exhibit "A," p. 11.

54.     Despite the fact that a clear conflict of interest existed during the entire investigative process regarding the charges of academic misconduct brought against Plaintiffs and others, and despite the fact that Judge Tucker terminated WVU's academic misconduct proceedings because of this conflict of interest, Defendants have continued to fail to provide due process to Plaintiffs in violation of WVU's own established policies and procedures regarding charges of academic misconduct.

55.     The entire matter regarding Student A and Plaintiffs' involvement has been highly publicized by local, regional, and national media since October 2007. Since that time, thousands of articles, stories, and other references to this matter have been published, many of which identify Plaintiffs by name. These include national media outlets like the Associated Press, USA Today, the New York Times and msnbc.com.

56.     Due to the highly-publicized proceedings and the absence of due process, Plaintiffs have been deprived of property and liberty interests in their employment at WVU.

57.     Specifically, Dr. Logar lost his position as Associate Dean of the College of Business and Economics and the benefits and salary commensurate with that position.

58.     Dr. Logar also has suffered damage to his reputation that has rendered him an outcast in the WVU community. Because of the damage to his reputation, Dr. Logar also has lost prospective consulting opportunities in the academic community which would have produced significant income for Dr. Logar.

59.     Dr. Sears lost his position as Dean of the College of Business and Economics.  Dr. Sears also was the only individual involved in this matter that was initially denied a merit raise to which he was entitled, in direct violation of the WVU *Policy and Procedures*, a fact that was publicized in the media.  Dr. Sears is no longer a faculty member or administrator at WVU, and has lost all the salary, benefits, and privileges that accompany his former positions.

60.     Dr. Sears also has suffered damage to his professional reputation and has been prevented from finding employment with several universities specifically because of the allegations made against him at WVU.  For example, Dr. Sears was a finalist for the position of Dean at Marquette University when the story of Student A broke, and he was forced to withdraw from consideration.  Other schools also expressed their interest in Dr. Sears, but were unable to consider him because of the media surrounding the WVU incident.

### COUNT I – Denial of Procedural Due Process (42 U.S.C. § 1983)

61.     Plaintiffs incorporate herein by reference Paragraphs 1 through 60 of this Complaint.

62.     By investigating and bringing charges of academic misconduct against Plaintiffs and others while a clear and flagrant conflict of interest existed with WVU's Office of General Counsel, Defendants knowingly and willfully violated Plaintiffs' Due Process rights guaranteed by the Fourteenth Amendment of the United States Constitution and Article III, Section II of the West Virginia Constitution.

63.     Further, in conducting the investigation and bringing charges against Plaintiffs, Defendants violated and continue to violate their own *Policy and Procedures* related to academic misconduct proceedings by failing to ensure that the process was free of conflicts of interest and was conducted in a fair and impartial manner.  Defendants also have failed to rehabilitate

Plaintiffs' reputations and prevent any impermissible retaliation against Plaintiffs. Plaintiffs had a protected property interest in their expectation that Defendants would comply with these procedures.

64.     As a direct and proximate result of Defendants' actions, as described above, Plaintiffs have been deprived of liberty and property interests without due process, including 1) damage to their professional reputations, 2) loss of consulting and other professional opportunities that would have produced significant future income, 3) loss of employment/professional status; and 4) loss of salary and benefits.

65.     Because Plaintiffs were not permitted to intervene in Lang's state court Petition, Plaintiffs have no other adequate remedy at law and must seek redress for the violation of their constitutional rights in this Court.

WHEREFORE, Plaintiffs Cyril M. Logar and R. Stephen Sears respectfully request that the Court:

(a)     Enter judgment in their favor and against Defendants on Count I of the Complaint;

(b)     Enter any appropriate declaratory or equitable relief required to prevent the continued violation of Plaintiffs' constitutional rights, including, but not limited to, ordering Defendants to comply with WVU's *Policy and Procedures* and restore Plaintiffs' reputations;

(c)     Award all provable compensatory damages to Plaintiffs, as is appropriate;

(d)     Award Plaintiffs the reasonable costs and fees associated with bringing this action to enforce their federally-protected rights to due process; and

(e)     Make any other award that the Court deems just and proper.

### COUNT II – Denial of Substantive Due Process (42 U.S.C. § 1983)

66.     Plaintiffs incorporate herein by reference Paragraphs 1 through 65 of this Complaint.

67.     By investigating and bringing charges of academic misconduct against Plaintiffs

and others while a clear and flagrant conflict of interest existed with WVU's Office of General

Counsel, Defendants arbitrarily and capriciously violated Plaintiffs' substantive due process

rights guaranteed by the Fourteenth Amendment of the United States Constitution.

68.     Because of Defendants' conduct, Plaintiffs' were deprived of their

constitutionally-protected rights to fundamental fairness in the proceedings brought against them

by Defendants, and have been damaged as a result.

WHEREFORE, Plaintiffs Cyril M. Logar and R. Stephen Sears respectfully request that

the Court:

(a)     Enter judgment in their favor and against Defendants on Count II of the
Complaint;

(b)     Enter any appropriate declaratory or equitable relief required to prevent
the continued violation of Plaintiffs' constitutional rights, including, but
not limited to, ordering Defendants to comply with WVU's *Policy and
Procedures* and restore Plaintiffs' reputations;

(c)     Award all provable compensatory damages to Plaintiffs, as is appropriate;

(d)     Award Plaintiffs the reasonable costs and fees associated with bringing
this action to enforce their federally-protected rights to due process; and

(e)     Make any other award that the Court deems just and proper.

Respectfully submitted,

/s/ Robert J. Ridge

Dated:  December 3, 2010                      Robert J. Ridge
                                              W. Va. Bar No. 7674
                                              Daniel Tomassetti
                                              W. Va. Bar No. 4367
                                              THORP REED & ARMSTRONG, LLP
                                              301 Grant Street
                                              One Oxford Centre, 14th Floor
**JURY TRIAL DEMANDED**                       Pittsburgh, PA  15219
                                              (412) 394-7711 (phone)

{01183113}                              16

(412) 394-2500 (facsimile)

1233 Main Street, Suite 4000
Wheeling, WV  26003-2839
(412) 394-7711

*Counsel for Cyril M. Logar*


/s/ John H. Tinney, Jr.
John H. Tinney, Jr.
W. Va. Bar No. 6970
THE TINNEY LAW FIRM PLLC
222 Capitol Street, Suite 500
Charleston, WV  25301
(304) 720-3310 (phone)
(304) 720-3315 (facsimile)

/s/ Thomas A. Clare
Thomas A. Clare, P.C.
(application for admission *Pro Hac Vice*
pending)
KIRKLAND & ELLIS LLP
655 15th Street, N.W., 12th Floor
Washington, D.C. 20005
(202) 879-5000 (phone)
(202) 879-5200 (facsimile)

*Counsel for R. Stephen Sears*

1

Policy and Procedures
for Responding to Allegations
of Academic Misconduct
at West Virginia University


The following pages constitute the current policy on Academic Misconduct.
The "original" version of this text, following the format of the "Track Changes" feature of MS Word, is the document which
was approved by the Integrity Committee, vetted through the Senate and the Administration, and is the policy of record.
For identification purposes, this document is referenced as

## Current AIC Policy 2000



2

# Policy and Procedures
# for Responding to Allegations
# of Academic Misconduct
# at West Virginia University

April 10, 2000

3

This document is based on two earlier ones.  The first, *Policy and Procedures for Review of Alleged Misconduct in Research and/or Scholarship*, lists an approval date of June 28, 1990.  The second document, *Policy and Procedures for Responding to Allegations of Misconduct in Research and Scholarship at West Virginia University,* was developed by WVU's Senate Research Integrity Committee in the 1995-96 and 1996-97 academic years.  It was approved by the WVU Faculty Senate on May 12, 1997, and by the federal Office of Research Integrity of the U.S. Department of Health and Human Services on October 14, 1997.  The present document was developed by the WVU Research Integrity Policy Committee in the 1998-99 and 1999-2000 academic years, approved by the Faculty Senate on April 10, 2000, and by the federal Office of Research Integrity on _____.  Portions of the last two documents are based, with permission, on the federal Office of Research Integrity's Advisory Document of April 1995.

# Table of Contents

*Part One: Overview*....................................................................*1*

    **Introduction**................................................................................. 1
        How to Use this Document ........................................................ 1

    **General Principles** ..................................................................... 1
        Definition of Academic Misconduct............................................ 2
        Scope........................................................................................ 2
        Responsibility to Report Misconduct ......................................... 3
        Confidentiality .......................................................................... 3
        Protection of the Complainant.................................................... 3
        Protection of the Respondent .................................................... 3
        Responsibility to Cooperate with Inquiries and Investigations ................. 4

    **Responding to Academic Misconduct**.......................................... 4
        Stage 1: Review of the Allegation ............................................. 4
        Stage 2: Discovery of Evidence ................................................ 6
        Stage 3: Hearing ...................................................................... 7
        Report and Decision ................................................................. 8
        Time Limits .............................................................................. 9

*Part Two: Rights and Responsibilities* .........................................*10*

    **Academic Integrity Officer**......................................................... 10
        Appointment and Qualifications ................................................ 10
    Responsibilities ............................................................................ 10

    **Executive Secretary** .................................................................. 14
        Appointment and Qualifications ................................................ 14
        Responsibilities ........................................................................ 14

    **Academic Integrity Committee**................................................... 16
        Appointment and Qualifications ................................................ 16
        Responsibilities of the Chair .................................................... 16

    **Screening Subcommittee** .......................................................... 17
        Appointment and Qualifications ................................................ 17
        Responsibilities ........................................................................ 17

    **Discovery Subcommittee**........................................................... 19
        Appointment and Qualifications ................................................ 19
        Responsibilities ........................................................................ 20

ii

**Hearing Panel** ...................................................................................... 22
          Appointment and Responsibilities ............................................. 22
          Hearing .................................................................... ..... .. 22
          Responsibilities of the Panel ................................................... 23

**Deciding Official** ................................................................. **23**

**Respondent** ..................................................................... **25**

**Complainant** .................................................................... **26**

**Academic Integrity Policy Committee** ............................................. **27**

*Part Three: Other Administrative Issues* ...................................... **28**

**Termination of Respondent's Employment
Before Completing the Process** ...................................................... 28

**Interim Administrative Actions** ...................................................... 28

*Glossary* ............................................................................ **29**

*Appendices*

**Composition of Campus Academic Integrity Committees**
        WVU at Morgantown
        WVU at Parkersburg
        Potomac State College of WVU
        WVU Institute of Technology
        Charleston Division, Robert C. Byrd Health Sciences Center

        [These sections omitted to avoid dating the document]

# Part One
# Overview

## Introduction

The policy and procedures described in this document govern West Virginia University's response to allegations of misconduct in research and other forms of scholarship on all of its campuses, regardless of the discipline the work represents; whether the work is by faculty, students, staff, or guests; and whether the work is funded by external agencies or supported internally. Thus, all members of the University should become familiar with the policy and procedures.

### How to Use this Document

This document is organized to accommodate readers with varying degrees of interest. Everyone at WVU should read Part One, which summarizes the major features of the University's policy and procedures. Individuals who find themselves involved in a case of academic misconduct, or others with a keen interest in the process, should read the details presented in Parts Two and Three. Separate sections are devoted to each of the individuals or committees with major involvement in cases of academic misconduct, and to some of the general administrative issues that must be addressed.

To ease the reader's burden, only essential terms are defined in the text. Other important terms — presented in *bold italics* — are defined in the Glossary.

## General Principles

Integrity is an obligation of all who engage in the acquisition, application, and dissemination of knowledge. Scholars are bound to maintain honesty and avoid deception in all aspects of their work. This duty, rooted in personal and professional ethics, is shared by all members of the University community. The duty to safeguard academic integrity at WVU includes:

- Promulgating and reinforcing standards for the conduct of research and other forms of scholarship;
- Reporting potential instances of misconduct;
- Examining allegations of misconduct; and
- Imposing sanctions when appropriate.

Several individuals and committees share official responsibility for the University's policy and procedures in these matters. The *Academic Integrity Officer* is charged with overall responsibility for ensuring that the policy and procedures are followed. The policy and procedures themselves are developed by a committee of faculty, staff, and student representatives, the *Academic Integrity Policy Committee*. The initial procedures for responding

to allegations of academic misconduct are implemented by a committee of faculty and staff, the *Academic Integrity Committee*. This committee is responsible for conducting an inquiry into each allegation and, if warranted by the preliminary evidence, a full-fledged investigation. High-level administrative support for these functions is provided by an *Executive Secretary* on each campus. If the investigation uncovers substantial evidence of misconduct, the case is decided by an impartial *Hearing Panel*. The University's final response to a case of academic misconduct — for example, the nature of any institutional sanctions — is the responsibility of the *Deciding Official*.

## Definition of Academic Misconduct

The present policy and procedures are informed largely, but not exclusively, by the federal *Office of Research Integrity*'s concern with *scientific misconduct*, which is defined as "fabrication, falsification, plagiarism, or other practices that seriously deviate from those that are commonly accepted within the scientific community for proposing, conducting, or reporting research. It does not include honest error or honest differences in interpretations or judgments of data." The University's concern is broader than that of the federal Office of Research Integrity, however, and extends beyond scientific work to all forms of scholarship, including activities classified as *research, teaching, learning,* or *service*. This concern is in keeping with the University's broad missions in research, teaching, and service, and the responsibilities and duties imposed on the University by external agencies and organizations that regulate various aspects of these missions.

The present document, therefore, is concerned with academic misconduct regardless of the specific context in which it occurs. *Academic misconduct* is defined as fabrication, falsification, plagiarism, or other practices that *seriously* deviate from those that are commonly accepted within the scholarly community for: (a) proposing, conducting, or reporting research; (b) teaching; (c) learning, and (d) providing institutional, community, or professional service. This definition of misconduct does not include honest error or honest differences of opinion in interpretations or judgments of data, pedagogy, or professional practices. But it does include material failure to comply with federal, state, or institutional requirements related to research, teaching, learning, and service. This includes, but is not limited to, any material failure to meet relevant requirements of the *Institutional Review Board for the Protection of Human Subjects*, the *Animal Care and Use Committee*, the *Institutional Biohazards Committee*, or the *Office of Radiation Safety*. Also included is *retaliation* against individuals who in good faith allege misconduct or who cooperate in inquiries or investigations in cases of misconduct.

## Scope

The policy and procedures described herein apply to all individuals at WVU. Thus, the policy applies to any person paid by, under the control of, or affiliated with any campus of WVU, including faculty, trainees, technicians and other staff members, students, fellows, guest researchers, and collaborators. This document refers to these individuals collectively as "members of WVU" or "members of the University community."

Charges of sexual harassment normally will not adjudicated under the terms of the present policy, but rather according to the WVU *Policy on Sexual Harassment*. Likewise, charges

against students whose alleged misconduct takes place in the context of coursework normally will be governed by the WVU *Code of Student Rights and Responsibilities*. In some cases, the present policy may overlap with other University policies, for example, if a person sexually harasses an assistant as retaliation for reporting misconduct or if a student publishes plagiarized coursework. In such cases, the present policy may or may not be applied in addition to the others. Findings under the present policy do not limit the application of other pertinent policies.

## Responsibility to Report Misconduct

All members of the University community have an obligation to report observed, suspected, or apparent instances of academic misconduct. Reports should be made to the University's Academic Integrity Officer. The Officer is available for confidential discussions about possible cases of misconduct, and will provide information about appropriate procedures for reporting an **allegation**. Individuals who are unsure whether a case falls within the definition of academic misconduct should call the Officer to discuss the incident informally. If the circumstances described by the individual do not meet the definition of academic misconduct, the Officer may refer the individual or allegation to other offices or officials with responsibility for resolving the problem.

## Confidentiality

Members of WVU who make, receive, or learn of an allegation of academic misconduct will protect, to the maximum extent possible, the confidentiality of information regarding the individual who reports the allegation (the **complainant**), the individual who is suspected of misconduct (the **respondent**), and other affected individuals. The Academic Integrity Officer may establish reasonable conditions to ensure the confidentiality of such information.

## Protection of the Complainant

The Executive Secretary will monitor the treatment of individuals who bring allegations of misconduct. The Academic Integrity Officer will ensure that they do not suffer retaliation from other members of WVU in the terms and conditions of their employment, academic standing, or other status. The Officer will review instances of alleged retaliation for appropriate action.

The Academic Integrity Officer will ensure that the University protects, to the maximum extent possible, the privacy, positions, and reputations of complainants who make a **good faith allegation** of misconduct. For example, if the complainant requests anonymity, University officials will honor the request within applicable policies and regulations and state and local laws. The complainant will be advised that if the matter is referred to a committee for **inquiry** or **investigation** and the complainant's testimony is required, anonymity may no longer be guaranteed.

## Protection of the Respondent

Inquiries and investigations will be conducted in a manner that will ensure fair treatment of the respondent, and confidentiality to the extent possible without compromising public health and safety or an unbiased and thorough investigation. While an inquiry or investigation is underway,

the Academic Integrity Officer will ensure that the respondent does not suffer retaliation from other members of WVU in the terms and conditions of employment, academic standing, or other status at the University, and will review instances of alleged retaliation for appropriate action.

If no misconduct is found, the Academic Integrity Officer, after consulting with the respondent and the Deciding Official, will undertake diligent efforts to restore the respondent's reputation. Depending on the particular circumstances, the Officer may notify those individuals aware of or involved in the case of the final outcome, publicize the final outcome in forums in which the allegation of misconduct was previously publicized, or expunge all references to the misconduct from the respondent's personnel file.

## Responsibility to Cooperate with Inquiries and Investigations

Members of WVU have an obligation to cooperate with the Academic Integrity Officer and other institutional officials in the review of allegations and the conduct of inquiries and investigations. The Officer will ensure that these individuals do not suffer retaliation from other members of WVU in the terms and conditions of their employment, academic standing, or other status at the University, and will review instances of alleged retaliation for appropriate action.

The University may impose administrative sanctions against individuals who fail to participate when requested by the committees or officials having jurisdiction over the case, or who fail to act in good faith.

# Responding to Academic Misconduct

This section outlines the steps that are followed when an allegation of academic misconduct is received by the Academic Integrity Officer. The basic process, depicted in Figure 1, is divided into three stages. If, at any stage, there is insufficient evidence that misconduct has occurred, a report to that effect is submitted to the Officer. Otherwise, the process advances to the next stage. The Officer presents the report to the Deciding Official, who determines whether to impose sanctions or take other administrative actions.

Each stage of the University's response to an allegation of academic misconduct will be conducted in a timely, objective, and competent manner. The committees and panels charged with conducting inquiries, investigations, and hearings will have the necessary expertise to carry out a thorough and authoritative evaluation of the evidence. In forming the committees and panels, reasonable precautions will be taken to avoid bias and real or apparent *conflict of interest*.

## Stage 1: Review of the Allegation

The Academic Integrity Officer receives the allegation, decides which campus's Academic Integrity Committee will address the matter (most likely the campus on which the misconduct allegedly occurred), and forwards the allegation to the Executive Secretary on that campus. The Secretary presents the allegation to the Chair of the Academic Integrity Committee, and takes



**Figure 1.** Flow chart of the basic process for responding to an allegation of academic misconduct. After the Academic Integrity Officer accepts the report and any written comments on it by the respondent, the case is in the hands of the Deciding Official, who has 15 days to determine the University's final course of action. The process should be completed within 210 days.

steps to provide the Committee with the administrative resources needed to carry out its responsibilities. The Chair arranges a review of the allegation by the ***Screening Subcommittee***. If the allegation merits it, the Screening Subcommittee conducts a preliminary exploration of the facts in the case — an inquiry — to decide whether a full-fledged investigation is warranted.

The Review Stage consists of these steps:

1.  The Screening Subcommittee notifies the respondent of the allegation.

2.  A Screening Subcommittee consisting of the Chair of the Academic Integrity Committee and at least two other members assesses the allegation to decide whether it falls within the definition of academic misconduct and provides sufficient information to proceed with an inquiry.

3.  If an inquiry is appropriate, the Subcommittee initiates it immediately. The Subcommittee obtains and considers pertinent evidence in sufficient detail to decide whether an investigation is warranted. Depending on the circumstances of the individual case, the Screening Subcommittee may need to sequester ***research records*** or other records, either to review them or to safeguard them as evidence that may be needed in subsequent stages of the case. The Subcommittee also may interview the complainant, the respondent, or other witnesses. The Screening Subcommittee does *not* conduct a full-fledged investigation, nor is it necessarily obligated to conduct interviews, sequester records, and so forth.

4.  If the Screening Subcommittee decides that the allegation does *not* merit an investigation, then the Subcommittee prepares a report to that effect, and submits it to the Academic Integrity Officer.

5.  If the Subcommittee decides that the allegation *does* merit investigation, then the Subcommittee writes a report to that effect and the case advances to the Discovery Stage.

6.  The respondent is given a copy of the Subcommittee's report and the opportunity to write comments for the record.

## Stage 2: Discovery of Evidence

If an investigation is warranted, the Chair of the Academic Integrity Committee forms a ***Discovery Subcommittee***. The Discovery Subcommittee conducts a thorough investigation and forms an opinion about whether the ***preponderance of the evidence*** is sufficient to warrant a hearing. The Discovery Stage consists of these steps:

1.    The Chair of the Academic Integrity Committee forms the Discovery Subcommittee by selecting individuals from the pool of talent in the Academic Integrity Committee and by appointing any *ad hoc* members that may be needed to ensure appropriate expertise.

2.    The Chair of the Academic Integrity Committee sends the respondent a list of the proposed membership of the Discovery Subcommittee, and gives the respondent a reasonable amount of time to raise objections about the membership. The Chair may, but is not obligated to, replace members based on the respondent's objections.

3.    When the membership of the Discovery Subcommittee is established, the Chair of the Academic Integrity Committee presents the Subcommittee with the Screening Subcommittee's report and a formal charge indicating the allegation to be explored.

4.    The Discovery Subcommittee is obligated to obtain the information needed to establish, by the standard of a preponderance of the evidence, whether misconduct occurred.

   ■ When the Subcommittee reaches a preliminary decision, it reports this decision and the evidence supporting it to the respondent, so that the respondent may offer comments for the Subcommittee's final deliberations.

   ■ If the Subcommittee decides that misconduct did *not* occur, or that there is insufficient evidence that misconduct occurred, then the Subcommittee writes a report to that effect, and submits it to the Academic Integrity Officer. The respondent is given a copy of the Subcommittee's report and the opportunity to write comments for the record.

   ■ If the Subcommittee decides that there is sufficient evidence of misconduct to warrant a hearing, then the Subcommittee: (a) calls on the Academic Integrity Officer to form a Hearing Panel and arrange a hearing; (b) notifies the respondent of its decision; and (c) shares with the respondent the evidence obtained and considered in reaching this decision.

## Stage 3:  Hearing

In this stage the Academic Integrity Officer names a Hearing Panel that reaches a final decision about whether misconduct has occurred. The Hearing Stage completes the investigation process, and consists of these steps:

1.    The Academic Integrity Officer names a Hearing Panel consisting of at least five members whose seniority and experience qualify them to judge the evidence to be introduced.

   ■ At least one member will be from the respondent's college, school, or major administrative unit, and at least two will be from outside the college, school, or unit. Members may be appointed from outside WVU.

   ■ The Academic Integrity Officer gives the Discovery Subcommittee and the respondent an opportunity to review the proposed membership of the Hearing Panel and to raise

objections.  The Officer may, but is not obligated to, replace challenged members of the Panel.

2.    The Academic Integrity Officer schedules the hearing.

3.    The hearing is not adversarial in nature, and the formal rules of evidence do not apply.

- The Discovery Subcommittee presents its evidence first; the respondent's defense follows.

- Witnesses may be called by either side.  If either side calls witnesses, the other side is entitled to cross-examine them.

- The respondent may be represented by legal counsel or a non-legal adviser who may consult with the respondent during the hearing and speak on the respondent's behalf.

- If evidence comes to light that, in the opinion of the Hearing Panel, requires additional investigation, then the Panel may suspend the hearing to allow such investigation, either on its part or on the part of some other party it designates.

- The hearing is recorded and a written summary is prepared.

4.    After considering the evidence in the case, the Hearing Panel reaches a decision about whether a preponderance of the evidence indicates that academic misconduct occurred and reports its decision in writing. The respondent is given a copy of the Panel's report and the opportunity to write comments for the record.

## Report and Decision

The final report — whether it is prepared by the Screening Subcommittee, the Discovery Subcommittee, or the Hearing Panel — is submitted to the Academic Integrity Officer, who forwards it to the Deciding Official along with any written comments provided by the respondent.

If academic misconduct has been found, the Deciding Official may impose a range of sanctions consistent with applicable policies, procedures, and regulations.  Included among them are the following:

- withdrawal or correction of relevant publications;

- removal of the responsible person from the  project, a letter of reprimand, special monitoring of future work, probation, suspension, salary reduction, or initiation of steps leading to possible reduction in rank or termination of employment;

- restitution of funds as appropriate; and

- notification of professional or other organizations regarding credentials or other revocations resulting from the action taken by the University.

In addition, if the misconduct occurred in activity supported by an external agency, the agency may impose sanctions of its own. Among the options available to federal agencies, for example, are these:

- conditions on future funding;

- restrictions on funded activities;

- suspension of funding; and

- debarring the responsible individual or WVU from receiving funds from *any* federal agency.

If no misconduct is found, the Academic Integrity Officer, after consulting with the respondent and the Deciding Official, will undertake diligent efforts to restore the respondent's reputation as described previously (see the section entitled *Protection of the Respondent*).

## Time Limits

Unless mitigating circumstances are encountered, the entire process — from the initial meeting of the Screening Subcommittee to the final actions by the Deciding Official — should be completed within 210 calendar days. In cases involving activity sponsored by federal agencies, the federal Office of Research Integrity requires final action within this time frame (although extensions might be granted upon request).

Adherence to the following schedule will ensure timely progress:

- The Screening Subcommittee should complete its work within 60 days.

- The Discovery Subcommittee should assemble and begin its investigation no more than 30 days after the Screening Subcommittee completes its inquiry. Thereafter, the Discovery Subcommittee may take 60 calendar days to gather evidence and decide whether to call for a hearing . If the Subcommittee decides that no hearing is warranted, then it may take up to 45 more calendar days to prepare its report.

- If a hearing is required to complete the investigation process, the hearing should be arranged and the Hearing Panel should complete its work within 45 days of the Discovery Subcommittee's call.

- Upon receiving the report of the Screening Subcommittee, the Discovery Subcommittee, or the Hearing Panel, the Deciding Official will have 15 calendar days in which to determine the University's course of action and to arrange for the transmission of the report and decision to the respondent and other relevant parties, including any external funding agencies.

Part Two
# Rights and Responsibilities

This part provides detailed information about the specific rights and responsibilities of the individuals and committees with major involvement in cases of academic misconduct. Efforts have been taken to make the section on each individual and committee as comprehensive as possible. Still, Part Two should be regarded as a *supplement* to Part One, not a replacement for it.

# Academic Integrity Officer

The Academic Integrity Officer is a high-level administrator charged with overall responsibility for ensuring that the University's policy and procedures on academic misconduct are followed.

## Appointment and Qualifications

1.    The President of WVU will appoint the Academic Integrity Officer.

2.    The Officer will be a University administrator whose personal qualifications and access to resources will be sufficient to accommodate the complex procedural requirements of academic misconduct cases. The Officer will be sensitive to the varied demands made on members of the University community including those who are accused of misconduct and those who report apparent misconduct in good faith.

## Responsibilities

1.    The Officer will ensure that the University's policy and procedures on academic misconduct are followed by the individuals, committees, and panels so charged on each campus.

2.    The Officer will appoint an Executive Secretary on each campus to provide high-level administrative support and guidance to the campus's Academic Integrity Committee, and to serve any other campus functions related to academic integrity as may be practical or efficient. The Officer will maintain contact with the Secretary during the course of any case of academic misconduct.

3.    The Officer, in consultation with the Executive Secretary, will appoint the members of each campus's Academic Integrity Committee. The members of the Committee will serve as a pool of talent for the Screening and Discovery Subcommittees. The Officer will ensure that the Committee has the expertise to carry out its responsibilities and access, via the Executive Secretary, to any administrative resources it may require.

4.    The Officer, in consultation with the Executive Secretary, will appoint the members of any Hearing Panel that may become necessary. The Officer will ensure that the Panel is free of bias and real or apparent conflicts of interest, that it has the expertise to conduct a thorough

and authoritative evaluation of the relevant evidence, and that it has access, via the Executive Secretary, to any administrative resources it may require.

5.   The Officer will be available for informal, confidential discussions with individuals who contemplate making an allegation of academic misconduct, and to advise such individuals about how to proceed.

6.   The Officer will receive allegations of academic misconduct in written or oral form, decide the campus on which each allegation will be addressed, and transmit the allegation to the Executive Secretary on that campus.

7.   The Officer will take steps to ensure that members of WVU who make, receive, or learn of an allegation of academic misconduct protect, to the maximum extent possible, the confidentiality of information regarding the complainant, the respondent, and other affected individuals. The Officer may establish reasonable conditions to ensure the confidentiality of such information.

8.   The Officer will ensure that the University protects, to the maximum extent possible, the privacy, positions, and reputations of complainants who make a good faith allegation of academic misconduct. If the complainant requests anonymity, University officials will honor the request within applicable policies and regulations and state and local laws. The complainant will be advised that if the matter is referred to an investigation committee and the complainant's testimony is required, anonymity may no longer be guaranteed.

9.   The Officer will undertake diligent efforts to protect the reputation of the complainant and other individuals involved in the case who have acted in good faith.

10   The Officer will ensure that individuals involved in cases of academic misconduct do not suffer retaliation from other members of WVU in the terms and conditions of their employment, academic standing, or other status at the University. The Officer will review instances of alleged retaliation for appropriate action.

11.   During a case of academic misconduct, the Officer will ensure that University officials take interim administrative actions, as appropriate, to protect any federal funds that may be involved and to ensure that the purposes of any federal financial assistance are carried out.

12.   The Officer will ensure that inquiries, investigations, and hearings are conducted in a manner that will ensure fair treatment of the respondent, and confidentiality to the extent possible without compromising public health and safety or an unbiased and thorough investigation.

13.   When the appropriate committee or panel brings an inquiry or investigation to a conclusion and prepares a report of the findings (see Figure 1), the Officer will receive the report and transmit it to the Deciding Official. The Officer will be available to consult with the Deciding Official and the authors of the report, to facilitate communication between the authors and the Deciding Official, and to assist the Deciding Official in determining the University's course of action.

14. The Officer will transmit the inquiry report (prepared by the Screening Subcommittee) or the investigation report (prepared by either the Discovery Subcommittee or, if the investigation process incorporates a hearing, by the Hearing Panel) to the respondent and provide the respondent with a reasonable amount of time (typically one week) in which to submit written comments about the report. Any such comments will be included in the record of the case. The Officer will transmit the comments to the Deciding Official so they can be considered in determining the University's course of action.

15. If the report indicates that no misconduct was found, the Officer, after consulting with the respondent and the Deciding Official, will undertake diligent efforts to restore the respondent's reputation. Depending on the particular circumstances, the Officer may notify those individuals aware of or involved in the case of the final outcome, publicize the final outcome in forums in which the allegation of misconduct was previously publicized, or expunge all references to the misconduct from the respondent's personnel file.

16. The Officer will provide the complainant with a summary of the report.

17. When the Deciding Official makes a final determination on the University's course of action in a case, the Official may direct the Academic Integrity Officer to send the report, or written information about the outcome of the case, or both, to various individuals, committees, or agencies deemed appropriate by the Deciding Official, the Officer, and the Chair of the Academic Integrity Committee. In cases where the activity was funded by an external agency, the Officer will ensure that the agency receives the report and the Official's decision in the form required by the agency.

18. If the activity in question was funded by a federal agency, the Officer will ensure that the University meets any requirements to keep the federal Office of Research Integrity and the agency informed. The requirements include the following:

   a. The federal Office of Research Integrity will be informed of any developments that may affect current or potential funding for the respondent or that the agency needs to know to ensure appropriate use of grant funds and otherwise protect the public interest.

   b. The federal Office of Research Integrity will be notified at any stage of the inquiry or investigation if any of the following circumstances arise: there is an immediate health hazard involved; there is an immediate need to protect federal funds or equipment; there is an immediate need to protect the interests of the complainant, the respondent, or the respondent's co-investigators and associates, if any; it is probable that the alleged incident is going to be reported publicly; the allegation involves a sensitive issue of public health; or there is a reasonable indication of possible criminal violation. In the last case, the University must inform the federal Office of Research Integrity and other pertinent federal offices within 24 hours of obtaining information about the possible criminal violation.

   c. The federal Office of Research Integrity will be notified about an investigation on or before the date the Discovery Subcommittee begins the investigation. The notification will include the name of the respondent, the general nature of the allegation as it

relates to the definition of misconduct, and the numbers of the grant applications or grant awards involving agencies of the Public Health Service.

d.  In cases where an investigation is warranted, the investigation must yield a final report accepted by the Deciding Official within 120 days of the initiation of the investigation. This time frame incorporates the efforts of the Discovery Subcommittee and the Deciding Official and, in some cases, a Hearing Panel as well. If the 120-day limit cannot be met, the Officer will request an extension from the federal Office of Research Integrity. The request will include an explanation for the delay, an interim report on the progress to date, an outline of what remains to be done, and an estimated time of completion.

e. If, for any reason, an inquiry or investigation cannot be completed according to the requirements described herein, the federal Office of Research Integrity will be notified of the planned termination. The notification will include the reasons for such termination.

f.  The federal Office of Research Integrity will receive a final written report when the University decides on a final action in a case in which the allegation of misconduct warranted investigation. The University's report to the federal Office of Research Integrity will include: a summary of the University's policies and procedures for responding to allegations of misconduct; the investigation report prepared by the Discovery Subcommittee or Hearing Panel; the actual written comments of any respondent found to have engaged in misconduct, or an accurate summary of the respondent's views; and a description of any sanctions imposed by the Deciding Official.

19. The Officer will consider written requests for departures from the standard procedures for responding to allegations of academic misconduct. The Officer may permit such departures as long as the basic spirit of the University's policy is maintained. Permission, and the justification for it, will be communicated in writing to the affected individuals and the Academic Integrity Policy Committee. Copies of the request and permission should be maintained as a part of the record of the case.

20. The Officer is responsible for securely maintaining files of all documents and evidence in cases of academic misconduct. After completion of a case and all ensuing related actions, the Officer will prepare a complete file, including the records of any inquiry or investigation and copies of all documents and other materials furnished to the Officer, committees, or panel. The Officer will keep the file for three years after completion of the case to permit later assessment of the case. The federal Office of Research Integrity or other authorized personnel of the Department of Health and Human Services will be given access to the records upon request.

21. The Officer will serve as a non-voting *ex officio* member of the Academic Integrity Policy Committee.

22. The Officer will report to the President.

# Executive Secretary

Each campus has its own Executive Secretary who provides administrative support for the campus's Academic Integrity Committee and acts as a liaison between the Committee and the Academic Integrity Officer.

## Appointment and Qualifications

1. The Academic Integrity Officer will appoint an Executive Secretary on each campus of WVU.

2. The Executive Secretary will be an administrator whose personal qualifications and access to resources will be sufficient to accommodate the complex procedural requirements of academic misconduct cases. The Secretary will be sensitive to the varied demands made on members of the University community including those who are accused of misconduct and those who report apparent misconduct in good faith.

## Responsibilities

1. The Executive Secretary will assist the Academic Integrity Officer in ensuring that the University's policy and procedures on academic misconduct are followed by the individuals, committees, and panels so charged on the Secretary's campus.

2. The Executive Secretary will serve as a non-voting *ex officio* member of the Academic Integrity Committee in general, and of the Discovery Subcommittee in particular.

3. The Executive Secretary will relay allegations of academic misconduct from the Academic Integrity Officer to the Chair of the Academic Integrity Committee. If the Secretary receives an oral allegation, the Secretary will reduce it to writing before presenting it to the Chair of the Academic Integrity Committee.

4. If a hearing is called by the Discovery Subcommittee, the Executive Secretary, in consultation with the Chair of the Academic Integrity Committee, will prepare a formal written charge listing the allegations of misconduct against the respondent. The Hearing Panel will decide if the respondent committed misconduct as charged.

5. The Executive Secretary will provide any administrative support or access to resources needed by the Screening Subcommittee, the Discovery Subcommittee, the Hearing Panel, and any other relevant committees, officials, or individuals in complying with the University's policy and procedures and with applicable standards imposed by state or federal governments or external sources of funding.

6.  If the activity in question was funded by an external agency, the Executive Secretary will assist the Academic Integrity Officer in ensuring that the University meets any requirements to keep the agency, or associated offices such as the federal Office of Research Integrity, informed.

7.  If the activity in question was funded by an external agency, the Executive Secretary will work with the Chair of the Academic Integrity Committee to ensure that any report prepared by the Screening Subcommittee, the Discovery Subcommittee, or the Hearing Panel meets the reporting requirements of the agency or associated offices such as the federal Office of Research Integrity.

8.  The Executive Secretary will review any report prepared for the Academic Integrity Officer by the Screening Subcommittee, Discovery Subcommittee, or the Hearing Panel for adherence to the University's requirements as set forth in this document (see the sections pertaining the subcommittees and the Hearing Panel), as well as the requirements of any external agency or office that may be involved in the case (e.g., in the case of federally supported activity, the federal Office of Research Integrity). After the report passes this review, the Secretary will submit it to the Academic Integrity Officer.

9.  The Executive Secretary will monitor the treatment of individuals involved in cases of misconduct, including the complainant, respondent, witnesses, and members of the Screening Subcommittee, Discovery Subcommittee, and Hearing Panel. The Secretary will report to the Academic Integrity Officer any instances or allegations of retaliation from other members of WVU in the terms and conditions of their employment, academic standing, or other status at the University.

10.  The Executive Secretary will ensure that the respondent is kept informed of the progress of the respondent's case, from the initial work of the Screening Subcommittee through the final action of the Deciding Official.

11.  The Executive Secretary will take steps to ensure that confidentiality is maintained throughout a case of academic misconduct.

12.  The Executive Secretary will serve as a member of the Academic Integrity Policy Committee.

13.  The Executive Secretary will report to the Academic Integrity Officer. In addition to the duties listed above, the Secretary will perform any other duties related to academic integrity assigned by the Officer.

# Academic Integrity Committee

The Academic Integrity Committee is a standing committee on each campus whose members are available for appointment to the Screening Subcommittee responsible for conducting inquiries into alleged cases of academic misconduct and the Discovery Subcommittee responsible for initiating investigations in such cases.

## Appointment and Qualifications

1.  Members of the Academic Integrity Committee will be appointed by the Academic Integrity Officer. Members will be selected so that the committee has the necessary expertise to identify, collect, and evaluate evidence related to allegations of academic misconduct, interview the principals and key witnesses, consider pertinent issues, and so forth. The members will include: (a) representatives of the faculty, one of whom will serve as the committee's chair; (b) representatives of the staff; (c) the campus's Executive Secretary who will serve as a non-voting *ex officio* member; and (d) a legal counselor who will serve as a non-voting *ex officio* member.

2.  Each campus will have its own Academic Integrity Committee. However, depending on the size of the campus, the diversity of the activity there, and thus the expertise available, it may not be possible for all members of the Committee to be employed on that campus. Therefore, to ensure that the necessary range of expertise is represented on the Committee, some members may be from other campuses.

3.  The rules for composing each campus's Academic Integrity Committee will be decided on that campus, subject to the approval of the Academic Integrity Policy Committee (the specific responsibilities of the Policy Committee are listed separately; see the section entitled *Academic Integrity Policy Committee*). The approved rules will be included as an appendix to this document.

## Responsibilities of the Chair

1.  The Chair of the Academic Integrity Committee is responsible for appointing the members of the Screening Subcommittee and the Discovery Subcommittee. In making the appointments, the Chair will ensure that these subcommittees are free of bias and real or apparent conflicts of interest, and that they have the expertise necessary to carry out a thorough and authoritative evaluation of the relevant evidence. Whenever possible, the Chair will form the subcommittees by drawing on the pool of talent in the Academic Integrity Committee. The Chair may, however, appoint other individuals whose experience or expertise is needed. (The specific responsibilities of the subcommittees are listed separately; see the sections entitled *Screening Subcommittee* and *Discovery Subcommittee*.)

2.  The Chair will serve as a member of the Screening Subcommittee.

3.  If the Screening Subcommittee decides that there is sufficient evidence to warrant an investigation, the Chair will form the Discovery Committee to begin conducting the investigation. The Chair will give the respondent an opportunity (typically one week) to

object to the membership of the Discovery Subcommittee before making the appointments final. (For specific information about the appointment of the Discovery Subcommittee, see the section entitled *Discovery Subcommittee*.)

4. When the membership of the Discovery Subcommittee is established, the Chair will present the Discovery Subcommittee with the Screening Subcommittee's findings and will define the subject matter of the investigation in a written charge that describes the allegations and related issues identified by the Screening Subcommittee, defines academic misconduct, and identifies the respondent. (For additional details, see the section entitled *Discovery Subcommittee*.)

5. If the activity in question is funded by an external agency, the Chair will work with the Executive Secretary to inform the Screening Subcommittee and Discovery Subcommittee of any reporting requirements that might be imposed by the agency or an associated office such as the federal Office of Research Integrity.

6. The Chair will serve as a member of the Academic Integrity Policy Committee.

7. The Chair will keep the Executive Secretary informed about cases of academic misconduct under inquiry or investigation.

# Screening Subcommittee

The Screening Subcommittee is a standing committee consisting of the Chair of the Academic Integrity Committee and at least two other members of the Committee who review each allegation of academic misconduct to decide whether the allegation falls under the purview of this policy and, if so, whether it merits investigation.

## Appointment and Qualifications

1. The Chair of the Academic Integrity Committee will serve as the Chair of the Screening Subcommittee. The Chair will appoint two additional voting members, drawing from the pool of available faculty and staff members in the Academic Integrity Committee, to serve on the standing Screening Subcommittee. If, in any particular case, the standing Subcommittee lacks sufficient expertise to review the allegation and conduct a thorough and authoritative evaluation of the relevant evidence, the Chair may appoint additional *ad hoc* voting members. The *ad hoc* appointments may be scientists, artists, musicians, or other scholars, subject matter experts, administrators, lawyers, or other qualified persons including students, and they may be from inside or outside the University.

## Responsibilities

1. The Executive Secretary will present any allegation of academic misconduct in writing to the Chair of the Academic Integrity Committee. The Screening Subcommittee's work begins when the Chair convenes a meeting to consider the allegation.

2.  The Chair of the Screening Subcommittee will notify the respondent of the allegation within one week of the Subcommittee's initial meeting.

3.  The Subcommittee will assess the allegation to decide whether it falls within the definition of academic misconduct and provides sufficient information to proceed with an inquiry. If the Subcommittee decides that the allegation falls within the purview of this policy, then it will initiate the inquiry process immediately.

4.  The purpose of the Screening Subcommittee's inquiry is to make a preliminary evaluation of the available evidence and, if appropriate, the testimony of the respondent, complainant, and key witnesses to determine whether there is sufficient evidence of possible academic misconduct to warrant a full-fledged investigation. The purpose of the inquiry is *not* to reach a final conclusion about whether misconduct definitely occurred or who was responsible.

5.  The Screening Subcommittee will obtain and consider pertinent evidence in sufficient detail to decide whether an investigation is warranted. Depending on the circumstances of the individual case, the Screening Subcommittee may need to sequester research records, either to review them or to safeguard them as evidence that may be needed in subsequent stages of the case. The Subcommittee also may interview the complainant, the respondent, or other witnesses. The Screening Subcommittee will *not* conduct a full-fledged investigation, nor is it necessarily obligated to conduct interviews, sequester records, and so forth.

6.  The scope of the inquiry may be expanded from the original allegation as warranted by information obtained by the Screening Subcommittee.

7.  If the Screening Subcommittee decides that the allegation does *not* merit an investigation, then the Subcommittee will prepare a report to that effect. The report will state: (a) the name and title of the Subcommittee members and the respondent; (b) the allegation; (b) the extent and source of any external funding; (c) a summary of the inquiry process, including any departures from the prescribed procedures and the reasons for them; (d) a list of the records reviewed; (e) summaries of any interviews; (f) a description of the evidence in sufficient detail to demonstrate whether an investigation is warranted; (g) the Subcommittee's reasons why an investigation is not warranted; (h) recommendations about whether any other actions should be taken; and (i) if the activity in question was funded by an external agency, any additional information required by that agency. The report may contain minority opinions written by members of the Subcommittee. The Academic Integrity Committee's legal counselor will be given one week to review the report for legal sufficiency. The Executive Secretary will review the report for adherence to the requirements listed above, as well as the requirements of any external agency that may be involved in the case, before submitting it to the Academic Integrity Officer.

8.  If the Screening Subcommittee decides that the allegation *does* merit investigation, then the case will advance to the Discovery Stage. In such a case, the Subcommittee will prepare a report of its findings to guide the investigation to be conducted by the Discovery Subcommittee. The report will state: (a) the name and title of the Subcommittee members and the respondent; (b) the allegation; (c) the extent and source of any external funding; (d) a summary of the inquiry process, including any departures from the prescribed procedures

and the reasons for them; (e) a list of the records reviewed; (f) summaries of any interviews; (g) a description of the evidence in sufficient detail to demonstrate whether an investigation is warranted; and (h) the Subcommittee's reasons why an investigation is warranted. The report may contain minority opinions written by members of the Subcommittee. The Academic Integrity Committee's legal counselor will be given one week to review the report for legal sufficiency. The Chair of the Academic Integrity Committee will incorporate the Screening Subcommittee's findings into a formal written charge for the Discovery Subcommittee and transmit the charge to the Discovery Subcommittee (see the section entitled *Discovery Subcommittee*).

9.   If the Screening Subcommittee decides that the allegation *does* merit investigation, then the Chair of the Academic Integrity Committee may take steps to sequester any additional pertinent records that were not previously sequestered during the inquiry. This sequestration should occur before or at the time the respondent is notified that an investigation will be conducted. The need for additional sequestration of records may occur for any number of reasons, including the University's decision to investigate additional allegations not considered during the inquiry stage or the identification of records during the inquiry process that had not been previously secured.

10.  The Screening Subcommittee will complete its report within 60 calendar days of its first meeting. If this time limit is exceeded, the Subcommittee will document the reasons as part of the record of the case.

# Discovery Subcommittee

If an investigation is warranted, the Chair of the Academic Integrity Committee will form a Discovery Subcommittee to conduct a thorough investigation and form an opinion about whether the preponderance of the evidence is sufficient to warrant a hearing. If the evidence is sufficient, the Subcommittee calls for a hearing and a Hearing Panel completes the investigation process and writes an investigation report; otherwise, the Subcommittee writes the report and submits it to the Academic Integrity Officer.

## Appointment and Qualifications

1.   The Chair of the Academic Integrity Committee will name at least three voting members of the Discovery Subcommittee, drawing from the pool of available faculty and staff members in the Academic Integrity Committee. In addition, the Chair may appoint as many *ad hoc* voting members as may be needed to ensure appropriate expertise. The *ad hoc* members may be scientists, artists, musicians, or other scholars, subject matter experts, administrators, lawyers, or other qualified persons including students, and they may be from inside or outside the University. The Executive Secretary and the Academic Integrity Committee's legal counselor will serve as non-voting *ex officio* members.

2.   Before the appointments are final, the Chair of the Academic Integrity Committee will send the respondent a list of the proposed membership of the Discovery Subcommittee, and will give the respondent a reasonable amount of time (typically one week) to raise objections

about the membership. The Chair may, but is not obligated to, replace members based on the respondent's written objections.

3. The Discovery Subcommittee will select one of its members to serve as chair.

## Responsibilities

1. When the membership of the Discovery Subcommittee is established, the Chair of the Academic Integrity Committee will present the Subcommittee with the Screening Subcommittee's findings and will define the subject matter of the investigation in a written charge that describes the allegations and related issues identified by the Screening Subcommittee, defines academic misconduct, and identifies the respondent. The charge will state that the Subcommittee is to evaluate the evidence and testimony of the respondent, complainant, and key witnesses to form an opinion whether, based on a preponderance of the evidence, academic misconduct occurred and, if so, to what extent, who was responsible, and its seriousness. The Chair also will review the prescribed procedures and standards for the conduct of the investigation, including the necessity for confidentiality and for developing a specific investigation plan. Where appropriate, the instructions also will include any requirements of external agencies, for example, agencies that may have granted financial support for the activity in question. The Chair of the Academic Integrity Committee will provide the Discovery Subcommittee with a copy of these instructions.

2. During the investigation, if additional information becomes available that substantially changes the subject matter of the investigation or would suggest additional respondents, the Discovery Subcommittee will notify the Chair of the Academic Integrity Committee, who will determine whether it is necessary to notify the respondent of the new subject matter or to provide notice to additional respondents.

3. The investigation normally will involve examination of all relevant documentation including, but not necessarily limited to, research records, computer files, proposals, manuscripts, publications, correspondence, memoranda, notes of telephone calls, works of art, or records of artistic performances. Whenever possible, the Discovery Subcommittee should interview all individuals who might have information regarding aspects of the alleged misconduct. The Discovery Subcommittee will provide the respondent with an opportunity to be interviewed by, and present evidence to, the Subcommittee. If appropriate, the Discovery Subcommittee also may provide the complainant with this opportunity. Interviews of the respondent should be tape recorded or transcribed. All other interviews should be transcribed, tape recorded, or summarized. Summaries or transcripts of the interviews should be prepared, provided to the interviewed party for comment or revision, and included as part of the record of the case.

4. When the Discovery Subcommittee reaches a preliminary decision, it will give the respondent a report of this decision and a summary of the evidence supporting it. The Subcommittee will give the respondent an opportunity (typically one week) to offer written comments for the Subcommittee's consideration before reaching a final decision.

5.  If the Discovery Subcommittee finds no academic misconduct (either because it decides that no misconduct occurred or because there is insufficient evidence to support a finding of misconduct), then the Subcommittee writes a report to that effect and submits it to the Academic Integrity Officer. The report will state: (a) the name and title of the Subcommittee members and the respondent; (b) the allegation; (c) the extent and source of any external funding; (d) a summary of the investigation process, including any departures from the prescribed procedures and the reasons for them; (e) a list of the records reviewed; (f) the names of persons who were interviewed and summaries of the interviews; (g) summaries of the evidence; (h) the Subcommittee's decision; (i) the Subcommittee's reasons for its decision; (j) recommendations about whether any other actions should be taken; and (k) if the activity in question was funded by an external agency, any additional information required by that agency. The report may contain minority opinions written by members of the Discovery Subcommittee. The Academic Integrity Committee's legal counselor will be given one week to review the report for legal sufficiency. The Executive Secretary will review the report for adherence to the requirements listed above, as well as the requirements of any external agency that may be involved in the case, before submitting it to the Academic Integrity Officer.

6.  If the Discovery Subcommittee decides that there is sufficient evidence of academic misconduct to warrant a hearing, then the Subcommittee will: (a) call on the Academic Integrity Officer to form a Hearing Panel and arrange a hearing; (b) inform the respondent in writing of the Subcommittee's decision and the justification for it; and (c) provide the respondent with full access to the evidence assembled or considered by the Subcommittee.

7.  The Discovery Subcommittee will be informed of the proposed members of the Hearing Panel and given an opportunity (typically one week) to raise objections about the membership. The Subcommittee will provide any objections in writing to the Academic Integrity Officer, including a justification for the objections, for the Officer's consideration

8.  If a hearing is called, the Discovery Subcommittee will prepare a case for presentation to the Hearing Panel. The Subcommittee may elect to have the Academic Integrity Committee's legal counselor present the case on the Subcommittee's behalf, or one or more members of the Subcommittee may present the case.

9.  The Chair of the Academic Integrity Committee will have 30 days after the completion of the Screening Subcommittee's inquiry to appoint the Discovery Subcommittee and present the Subcommittee with its charge.

10. The Discovery Subcommittee will decide whether to call for a hearing within 60 calendar days of receiving the written charge from the Chair of the Academic Integrity Committee. If the Subcommittee finds no academic misconduct, the Subcommittee may take another 45 calendar days before submitting its report to the Academic Integrity Officer.

# Hearing Panel

Upon request of the Discovery Subcommittee, the Academic Integrity Officer will name a Hearing Panel that will reach a final decision about whether academic misconduct has occurred. The Hearing Panel is the only body that can decide that a respondent committed academic misconduct.

## Appointment and Qualifications

1.  The Academic Integrity Officer will name a Hearing Panel consisting of at least five members whose seniority and experience qualify them to judge the technical evidence to be introduced. The Officer will ensure that the Panel is free of bias and real or apparent conflict of interest. The members of the Panel should have had no substantive involvement in any review, inquiry, or investigation related to the allegation of misconduct. At least one member will be from the respondent's college, school, or major administrative unit, and at least two will be from outside the college, school, or unit. Members may be appointed from outside WVU.

2.  Before the appointments are final, the Academic Integrity Officer will send the respondent and the Discovery Subcommittee a list of the proposed membership of the Hearing Panel, and will give the respondent and the Subcommittee a reasonable amount of time (typically one week) to raise objections about the membership. The Officer may, but is not obligated to, replace members based on any written objections.

## Hearing

1.  The Academic Integrity Officer, in consultation with the Chair of the Academic Integrity Committee, will prepare a formal written charge listing the allegations of misconduct against the respondent.

2.  The Academic Integrity Officer will schedule the hearing.

3.  The hearing is not adversarial in nature, and the formal rules of evidence do not apply. Each side will be given an opportunity to present opening arguments at the outset of the hearing. The Discovery Subcommittee then will present its case; the respondent's defense will follow. Witnesses may be called by either side. If either side calls witnesses, the other side is entitled to cross-examine them. Each side may present evidence. Each side will be given an opportunity to present closing arguments. Members of the Hearing Panel may question the principals in the case or their witnesses.

4.  The hearing will be recorded, and a written summary will be prepared. The recording and the summary will be maintained as part of the record of the case.

5.  The Discovery Subcommittee may be represented by the Academic Integrity Committee's legal counselor or by one or more members of the Subcommittee. The respondent may be represented by legal counsel or a non-legal adviser who may consult with the respondent during the hearing and speak on the respondent's behalf.

6. The burden of proof is on the Discovery Subcommittee. Any finding of misconduct by the Hearing Panel will be established by a preponderance of the evidence. This means that the evidence shows that it is more likely than not that the respondent committed academic misconduct.

## Responsibilities of the Panel

1. The Hearing Panel will act as impartial judges, hearing the evidence and arguments presented by the Discovery Subcommittee and the respondent, and then deciding whether the respondent committed misconduct as charged.

2. If evidence comes to light that, in the opinion of the Hearing Panel, requires additional investigation, then the Panel may suspend the hearing to allow such investigation, either on its part or on the part of some other party it designates.

3. After considering the testimony, evidence, and arguments presented at the hearing, the Hearing Panel will decide whether the alleged misconduct has occurred, report its decision in writing, and submit the report to the Academic Integrity Officer. The report will state: (a) the name and title of the members of the Hearing Panel, the Discovery Subcommittee, the Screening Subcommittee, and the respondent; (b) the allegation; (c) the extent and source of any external funding; (d) a summary of the procedures followed by the Screening Subcommittee and Discovery Subcommittee, as well as by the Hearing Panel; (e) a description of any departures from the prescribed procedures and the reasons for them; (f) the names of persons providing testimony and summaries of the testimony; (g) summaries of the evidence; (h) the Panel's decision; (i) the Panel's reasons for its decision; (j) recommendations about whether any other actions should be taken; and (k) if the activity in question was funded by an external agency, any additional information required by that agency. The report may contain minority opinions written by members of the Panel. A summary of the hearing will be part of the report, along with any documentary evidence deemed appropriate by the Panel. The University Counsel or designee will review the report for legal sufficiency. The Executive Secretary will review the report for adherence to the requirements listed above, as well as the requirements of any external agency that may be involved in the case, before submitting it to the Academic Integrity Officer.

4. The Hearing Panel should complete its work in 45 calendar days.

# Deciding Official

The Deciding Official is responsible for determining the institution's final course of action in response to an allegation of academic misconduct. At WVU, the Deciding Official is the President or the President's designee.

1. The Deciding Official should have no substantive involvement in any review, inquiry, investigation, or hearing related to the allegation of misconduct.

2.  At the conclusion of the proceedings, the Deciding Official will receive the pertinent report written by the Screening Subcommittee, the Discovery Subcommittee, or the Hearing Panel, as well as any written comments about the report provided by the respondent. The Deciding Official will review and evaluate the report and comments, and determine whether to impose sanctions and whether to take other appropriate administrative actions pertinent to the case or with respect to other matters uncovered by the proceedings. The Official may consult with the Academic Integrity Officer, the Chair of the Academic Integrity Committee, or other appropriate individuals in reaching a decision.

3.  If academic misconduct has been found, the Deciding Official may impose a range of sanctions. Included among them are the following: withdrawal or correction of relevant publications; removal of the responsible person from the  project, a letter of reprimand, special monitoring of future work, probation, suspension, salary reduction, or initiation of steps leading to possible reduction in rank or termination of employment; restitution of funds as appropriate; and notification of professional or other organizations regarding credentials or other revocations resulting from the action taken by the University.

4.  The Deciding Official will direct the Academic Integrity Officer or other institutional officer to send copies of the report and any other appropriate information about the outcome of the case to the respondent, the Chair of the Academic Integrity Committee, and others deemed appropriate. In cases where the activity was funded by an external agency, the Academic Integrity Officer will ensure that the agency receives the report and the Official's decision in the form required by the agency.

5.  The Deciding Official will direct the Academic Integrity Officer or other institutional officer to provide appropriate information about the outcome of the case in writing to the respondent's personnel file, the complainant, as well as to other committees, agencies, or individuals deemed appropriate by the Official, the Academic Integrity Officer, and the Chair of the Academic Integrity Committee. For example, if misconduct has been found, notices might be sent to law enforcement agencies, professional societies, licensing boards, editors of journals in which falsified reports may have been published, collaborators of the respondent, or University committees that regulate research. If misconduct has not been found, the Deciding Official will direct the Academic Integrity Officer to undertake, in consultation with the respondent, diligent efforts to restore the respondent's reputation. Depending on the particular circumstances, the  Officer may notify those individuals aware of or involved in the case of the final outcome, publicize the final outcome in forums in which the allegation of misconduct was previously publicized, or expunge all references to the misconduct from the respondent's personnel file.

6.  If relevant, the Deciding Official will determine whether the complainant's allegations of academic  misconduct were made in good faith. If an allegation was not made in good faith, the Official will determine whether any administrative action should be taken against the complainant.

7.  The Deciding Official should carry out these responsibilities in a timely fashion. The Deciding Official should have at least 15 calendar days in which to complete the responsibilities listed in Items 2 through 4.

# Respondent

The respondent is the person against whom an allegation of academic misconduct is directed or the person whose actions are the subject of the inquiry or investigation. (There can be more than one respondent in a given case, but for simplicity the singular form is used throughout this document.)

1.  The respondent will be kept informed of the progress of the respondent's case, from the initial work of the Screening Subcommittee through the final action of the Deciding Official.

2.  If appropriate, the respondent may have the opportunity to be interviewed by, and present evidence to, the Screening Subcommittee during its inquiry.

3.  If an investigation is warranted, the respondent will be informed of the proposed members of the Discovery Subcommittee that will conduct the investigation. The respondent will be given an opportunity (typically one week) to raise objections about the membership. The respondent will provide the objections in writing to the Chair of the Academic Integrity Committee, including a justification for the objections for the Chair's consideration.

4.  The respondent will have an opportunity to be interviewed by, and present evidence to, the Discovery Subcommittee.

5.  When the Discovery Subcommittee reaches a preliminary decision about the respondent's case, the respondent will be given a report of this decision and a summary of the evidence supporting it. The respondent will be given an opportunity (typically one week) to offer written comments for the Subcommittee's consideration before the Subcommittee reaches a final decision.

6.  If the Discovery Subcommittee decides to call for a hearing, the respondent will be informed in writing of the Subcommittee's decision and the justification for it, and provided full access to the evidence assembled or considered by the Subcommittee.

7.  The respondent will be informed of the proposed members of the Hearing Panel. The respondent will be given an opportunity (typically one week) to raise objections about the membership. The respondent will provide the objections in writing to the Academic Integrity Officer, including a justification for the objections for the Officer's consideration

8.  The respondent will be given a reasonable opportunity to prepare a defense for the Hearing Panel.

9.  At the hearing, the respondent has the right to testify, present arguments and evidence, call witnesses, and cross-examine witnesses called by the Discovery Subcommittee.

10. The respondent may secure legal counsel or a non-legal adviser for advice and assistance throughout the case. The counselor or adviser may accompany the respondent in interviews by the Screening Subcommittee, Discovery Subcommittee, and Hearing Panel, and in other meetings regarding the case. In a hearing, the counselor or adviser may present the respondent's case to the Hearing Panel, examine and cross-examine witnesses, and so forth. The counselor or adviser may not, however, testify in place of the respondent or participate directly in the work of the Screening Subcommittee or the Discovery Subcommittee.

11. The respondent has the right to a copy of any inquiry or investigation report in the case, and a reasonable amount of time (typically one week) in which to prepare written comments about the report. The comments will be retained in the records of the case.

12. The respondent is responsible for cooperating with the conduct of an inquiry or investigation, and for maintaining confidentiality.

13. If academic misconduct is not found, the respondent has the right to receive the University's assistance in restoring his or her reputation.

14. The respondent will be protected from retaliation.

# Complainant

The complainant is the person who makes an allegation of academic misconduct. (There can be more than one complainant in a given case, but for simplicity the singular form is used throughout this document.)

1. The complainant is responsible for making allegations in good faith, maintaining confidentiality, and cooperating with an inquiry or investigation.

2. If appropriate, the complainant may have an opportunity to be interviewed by the Screening Subcommittee or the Discovery Subcommittee, or to testify before the Hearing Panel. If the complainant is interviewed by the Discovery Subcommittee, the Subcommittee will give the complainant an opportunity (typically one week) to review a summary or transcript of the interview for comment or revision.

3. The complainant will be informed of the results of the case. However, the complainant will not necessarily be given a full report of the procedures used in any inquiry, investigation, or hearing; the evidence considered; and so forth.

4. The complainant will be protected from retaliation.

5. Regardless of whether misconduct is found, a complainant who has acted in good faith has the right to receive the University's assistance in protecting his or her reputation.

# Academic Integrity Policy Committee

The Academic Integrity Policy Committee is a standing committee that informs the University community about the institution's policy and procedures for responding to academic misconduct, monitors the implementation of the policy and procedures, and, when appropriate, recommends changes in the policy and procedures.

1.  The Policy Committee will consist of: (a) The chair of each campus's Academic Integrity Committee; (b) each campus's Executive Secretary; (c) a liaison to the Faculty Senate, designated by the Faculty Senate; (d) a liaison to the Staff Council, designated by the Staff Council; (e) a graduate student appointed by the Academic Integrity Officer; (f) a representative from the Office of Sponsored Programs; (g) a legal counselor; and (h) the Academic Integrity Officer who will serve as a non-voting *ex officio* member.

2.  The Policy Committee will elect as its chair one of the voting members of the campus Academic Integrity Committees. The chair of the Policy Committee will serve a two-year term, and may *not* be elected to more than two consecutive terms.

3.  The Policy Committee will meet as a whole at least once annually, and more often if business demands. The Committee may appoint subcommittees to perform specific functions. Members of the subcommittees need not be members of the Policy Committee.

4.  The Policy Committee will review, at least annually, the operation of the Academic Integrity Committees on each campus.

5.  The Policy Committee will be responsible for the promulgation of the University's policy and procedures on academic misconduct to faculty, staff, students, administrators, and other members of the University community

6.  The Policy Committee will write an annual report on the status of academic integrity issues at WVU. The report will be presented to the President of the University, the president of each campus, the Faculty Senate, the Staff Council, organizations dealing with research or teaching protocols (such as the Office of Sponsored Programs, the Animal Care and Use Committee, and the Institutional Review Board for the Protection of Human Subjects), other research units, and the University community at large.

7.  As needed, the Policy Committee will propose revisions to the University's policy or procedures on academic misconduct.

# Part Three
# Other Administrative Issues

This part addresses miscellaneous issues that may arise in cases of misconduct.

## Termination of Respondent's Employment Before Completing the Process

The termination of the respondent's institutional employment, by resignation or otherwise, before or after an allegation of academic misconduct has been reported, will not preclude or terminate the misconduct procedures.

If the respondent, without admitting to the misconduct, elects to resign his or her position prior to the initiation of an inquiry, but after an allegation has been reported, or during an inquiry, investigation, or hearing, the process will continue. If the respondent refuses to participate in the process after resignation, the committee or panel will make its best effort to carry out its responsibilities, noting in its report the respondent's failure to cooperate and its effect on the review of the evidence.

## Interim Administrative Actions

At the direction of the Academic Integrity Officer, University officials will take interim administrative actions, as appropriate, to protect federal funds and ensure that the purposes of the federal financial assistance are carried out.

Once a matter related to academic integrity has been presented to the Academic Integrity Officer and an inquiry has been initiated, the process described in this document will carry on to its logical conclusions independent of any interim administrative actions taken by persons in the chain of command of the participants in the allegation.

# Glossary

*Academic Integrity Committee*.  A standing committee appointed by the Academic Integrity Officer whose members compose the Screening Subcommittee responsible for conducting inquiries into alleged cases of academic misconduct and the Discovery Subcommittee responsible for conducting investigations in such cases.  Each WVU campus has its own Academic Integrity Committee; the rules for forming each committee are described in appendices to this document.

*Academic Integrity Officer*.  Institutional official responsible for oversight of all matters pertaining to academic integrity on all WVU campuses.  The Academic Integrity Officer is appointed by the President of WVU and reports to the President.

*Academic Integrity Policy Committee*.  A standing committee that informs the University community about this policy, monitors the implementation of the policy, and, when appropriate, recommends changes in the policy.

*Academic misconduct*.  Fabrication, falsification, plagiarism, or other practices that seriously deviate from those that are commonly accepted within the scholarly community for: (a) proposing, conducting, or reporting research; (b) teaching; (c) learning, and (d) providing institutional, community, or professional service.  "Academic misconduct" does not include honest error or honest differences of opinion in interpretations or judgments of data, pedagogy, or professional practices.  It does, however, include material failure to comply with federal, state, or institutional requirements related to research, teaching, learning, and service.

*Allegation*.  Any written or oral statement or other indication of possible academic misconduct made to an institutional official.

*Animal Care and Use Committee*.  A standing committee responsible for reviewing and approving or disapproving work involving live, vertebrate, nonhuman organisms in research, instruction, testing, or exhibition, and for ensuring institutional compliance with federal regulations.  The Animal Care and Use Committee ensures that the use of animals is necessary and justified; that the animals do not suffer unnecessary discomfort, pain, or injury; and that the animals receive proper maintenance and husbandry.

*Complainant*.  A person who makes an allegation of academic misconduct.  (There can be more than one complainant in a given case, but for simplicity the singular form is used throughout this document.)

*Conflict of interest*.  Interference of one person's interests with the interests of another person, where potential bias may occur due to prior or existing personal or professional relationships.

*Deciding Official*.  The individual responsible for deciding the institution's final actions in response to an allegation of academic misconduct.  At WVU, this is the President or the

President's designee. The Deciding Official should have no substantive involvement in any review, inquiry, investigation, or hearing related to the allegation.

*Discovery Subcommittee*. A subcommittee of the campus Academic Integrity Committee responsible for investigating potential instances of academic misconduct. If the evidence suggests that misconduct occurred, the Discovery Subcommittee presents the evidence to a Hearing Panel for a final decision.

*Executive Secretary*. A high-level administrator who provides support for the campus Academic Integrity Committee and acts as a liaison between the Committee and the Academic Integrity Officer. Each WVU campus has its own Executive Secretary.

*Good faith allegation*. An allegation made with the honest belief that academic misconduct may have occurred. An allegation is not in good faith if it is made with reckless disregard for or willful ignorance of facts that would disprove the allegation, or if relevant prior relationships between the complainant and the respondent are suppressed in the allegation.

*Hearing Panel*. An *ad hoc* committee responsible for hearing cases of alleged academic misconduct brought by a Discovery Subcommittee and reaching a final decision about whether misconduct has occurred.

*Inquiry*. Gathering information and initial fact-finding to determine whether an allegation or apparent instance of academic misconduct warrants an investigation.

*Institutional Biohazards Committee*. University committee established by mandate of the federal government. To help ensure a safe working environment, the University has charged the Committee with overseeing all activities that pose a biohazard, not just those involved in recombinant DNA research as required by federal regulations. Accordingly, the Committee must approve all activities that involve recombinant DNA; infectious agents of plants, animals, and humans; or use of serum or tissue from humans or subhuman primates.

*Institutional Review Board for the Protection of Human Subjects*. A standing committee responsible for reviewing and approving or disapproving research involving humans. The Institutional Review Board protects the rights and welfare of individuals who serve as subjects of research conducted by faculty, staff, and students, and ensures institutional compliance with federal regulations.

*Investigation*. Formal examination and evaluation of all relevant facts to determine if misconduct has occurred, and, if so, to determine the responsible person and the seriousness of the misconduct.

*Learning*. Acquisition of knowledge, understanding, or skill by study, instruction, research, or experience.

*Misconduct*. See *academic misconduct*. In this document, the unqualified term "misconduct" refers to academic misconduct.

*Office of Radiation Safety*. University office responsible for promoting the safe use of ionizing radiation and radioactive materials at WVU and at West Virginia University Hospitals, Inc.

The Office oversees compliance with federal and state regulations regarding the use of radiation; provides support through training and inventory management; and must approve all uses of radiation and radioactive materials.

***Office of Research Integrity.***  An office of the Public Health Service within the U.S. Department of Health and Human Services.  The Office of Research Integrity is responsible for protecting the integrity of research programs funded by the Public Health Service.  It fulfills its responsibility, in part, by developing and promulgating policies, procedures, rules, and regulations, and by ensuring that universities and other institutions comply with them.

***Preponderance of the evidence.***  The level of proof required to establish the occurrence of academic misconduct.  The requirement is met if the evidence shows that it is more likely than not that the respondent committed academic misconduct.

***Research.***  Creation and synthesis of knowledge, creation of new approaches to understanding and explaining phenomena, development of new insights, critical appraisal of the past, artistic creation and performance, and application of knowledge and expertise to address needs in society and in the professions.  In this document, then, the term "research" is defined broadly.

***Research record.***  Any data, document, computer file, computer diskette, production, record of a performance, or any other written or non-written account or object that reasonably may be expected to provide evidence or information regarding the proposed, conducted, or reported research that constitutes the subject of an allegation of academic misconduct.  A research record includes, but is not limited to, grant or contract applications, whether funded or unfunded; grant or contract progress and other reports; laboratory notebooks; notes; correspondence; videos; photographs; X-ray film; slides; biological materials; computer files and printouts; manuscripts and publications; equipment use logs; laboratory procurement records; animal facility records; human and animal subject protocols; consent forms; medical charts; patient files, works of art, and records of artistic performances.

***Respondent.***  Person against whom an allegation of academic misconduct is directed or the person whose actions are the subject of the inquiry or investigation.  (There can be more than one respondent in a given case, but for simplicity the singular form is used throughout this document.)

***Retaliation.***  Any action that adversely affects the employment or other institutional status of an individual that is taken by an institution or an employee because the individual has, in good faith, made an allegation of academic misconduct, or of inadequate institutional response thereto, or has cooperated in good faith with a review, inquiry, or investigation of such an allegation.

***Scientific misconduct.***  Fabrication, falsification, plagiarism, or other practices that seriously deviate from those that are commonly accepted within the scientific community for proposing, conducting, or reporting research.  "Scientific misconduct" does not include honest error or honest differences in interpretations or judgments of data.

*Screening Subcommittee.* A subcommittee of the campus Academic Integrity Committee responsible for the initial inquiry in a case of academic misconduct. The Screening Subcommittee reviews each allegation of misconduct and decides whether the allegation merits a full investigation by a Discovery Subcommittee.

*Service.* Application of the benefits and products of teaching and research to address the needs of society and the profession. "Service" includes activities on behalf of the University, the state, and the nation.

*Teaching.* The dissemination of knowledge, the stimulation of critical thinking, and the development of artistic expression. "Teaching" includes not only traditional modes of instruction such as the classroom lecture, but also modes such as clinical, laboratory, and practicum instruction; thesis and dissertation direction; evaluation and critique; advising; and various forms of continuing education and non-traditional instruction.

APR-24-2009 16:36 From:MON CIR CLK          304+2917273          To:914123942555          P.1/13

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

STATE *ex rel.* GERALD E. LANG, Ph.D.,

<div style="margin-left:2em">Petitioner and<br>Relator,</div>

vs.                                                     Petition No. 09-C-114

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS; a West Virginia state
board; C. PETER MAGRATH, President
of West Virginia University;
MARY ROBERTA BRANDT, Vice President
for Legal Affairs and General Counsel
at West Virginia University; BEVERLY
D. KERR, Deputy General Counsel for
West Virginia University; and MARJORIE
ANNE McDIARMID, Steptoe and Johnson
Professor of Law and Technology and
Academic Integrity Officer for West
Virginia University,

<div style="text-align:center">Respondents.</div>

<div style="text-align:center"><u>ORDER</u></div>

This matter came before the Court on April 22, 2009, pursuant to Petitioner's Verified

Petition for Writ of Prohibition filed February 24, 2009. The Petitioner was present in person

and represented by counsel, J. Michael Benninger. Respondents, Mary Roberta Brandt, and

Beverly D. Kerr, were present in person, and represented by counsel, Debra Scudiere.

Respondent, Marjorie McDiarmid, was present in person, and represented by counsel, Scott

Curnutte. Respondents West Virginia University Board of Governors (hereinafter "WVU

BOG"), and President C. Peter Magrath ("Magrath"), were not present in person, but were

represented by counsel, Samuel Spatafore. In addition, Cyril M. Logar, was not present in



person, but represented by counsel, Robert Ridge. Mr. R. Stephen Sears was not present in person, but represented by counsel, John H. Tinney, Thomas A. Clare, and John H. Tinney, Jr.

The Court advised the parties that it had reviewed the evidence presented in the pleadings, and the sworn affidavits in this case in light of the relevant legal authorities, based upon which the Court GRANTS the Petitioner's Request for Writ of Prohibition, DENIES the Respondents' Motions to Dismiss, and DENIES the Motions to Intervene filed by R. Stephen Sears and Cyril M. Logar.

## PROCEDURAL HISTORY

On February 24, 2009, the Petitioner filed a Verified Petition for Writ of Prohibition with the Court. The Petitioner, Gerald E. Lang, Ph.D., is a tenured professor at West Virginia University. From 1995 to 2008, the Petitioner served as the Provost of West Virginia University. The Petitioner is currently involved in a proceeding involving allegations of academic misconduct.[1] In his Petition, the Petitioner requests the Court, in Count One, to prevent the Academic Integrity Council (hereinafter "AIC") from conducting the final hearing over the Spring Break period. In Count Two, the Petitioner requests that the Court prevent the Respondents from conducting the final hearing in order to protect the Petitioner's due process rights.

On March 31, 2009, Respondent, Marjorie McDiarmid filed a Motion to Dismiss. Respondent McDiarmid contends that the Petition must be dismissed since it fails to state a claim upon which relief can be granted. She also argues that the Petitioner has failed to prove the necessity of an extraordinary writ such as prohibition. In addition, she states that the Petitioner waived his ability to object to the participation of Respondents Kerr and McDiarmid in the AIC proceedings since he failed to state those objections pursuant to the

---

[1] Academic Integrity Council Hearing.

2

requirements set forth in the Policy and Procedures for Responding to Allegations of Academic Misconduct at West Virginia University, April 10, 2000 (hereinafter "Policy.")

On the same day, counsel on behalf of WVU BOG and Magrath, filed a Combined Motion to Dismiss. The Respondents state that their Motion must be granted because the Petitioner failed to provide them with the prerequisite notice pursuant to W.VA. CODE ANN. § 55-17-3, that Count One is moot, since the final hearing was not set during the Spring Break period, and lastly, that Respondent McDiarmid is the state official responsible for administering the University's Policy, not the Board of Governors, nor Mr. Magrath.

Respondents, Mary Roberta Brandt and Beverly D. Kerr, filed a Motion to Dismiss on April 3, 2009. In their Motion, the Respondents contend that a writ of prohibition is not the appropriate tool to utilize in regard to an internal, administrative hearing. Rather, the Respondents believe that the Petitioner is merely attempting to stop a legitimate internal academic integrity investigation. These Respondents state that the appropriate method in handling the matter is to permit the hearing to be conducted, and if the Petitioner is dissatisfied with the ruling, to appeal the Level III decision to the Circuit Court.

The Petitioner filed his Response to Motions to Dismiss on April 6, 2009. The Petitioner addressed the issues set forth by the numerous Respondents.

On April 20, 2009, Cyril M. Logar and R. Stephen Sears, independently through counsel, filed separate Motions to Intervene in the matter.[2] Both these parties request the Court to permit them to intervene, contending they are parties to the same Academic Misconduct hearing and their interests are identical to that of the Petitioner.

---

[2] The Court notes that counsel for R. Stephen Sears, John H. Tinney, filed a Motion for Admission *Pro Hac Vice* of Thomas A. Clare, P.C., which was granted by this Court on April 21, 2009.

## FACTUAL HISTORY

Petitioner Lang was requested by the administration to participate in a meeting involving the media inquiry into a student's eMBA degree.[3]  After hearing the nature of the inquiry and that he and others would be involved in the discussion concerning the student's eMBA degree, Petitioner Lang requested that the Vice President for Legal Affairs and General Counsel, Alex Macia, attend and participate in a meeting to discuss the inquiry on October 15, 2007.

General Counsel's office employed a number of staff lawyers and other personnel, including, Respondent Kerr and Respondent Brandt. Respondent Brandt became Vice President for Legal Affairs and General Counsel at West Virginia University upon the resignation of Mr. Macia in 2008. Respondent Kerr is the Deputy General Counsel for West Virginia University and is directly supervised by Respondent Brandt.

President Garrison filed a written complaint on May 30, 2008, with the Academic Integrity Officer, Respondent McDiarmid.[4]  She then sent a letter dated June 12, 2008, to President Garrison requesting that he take certain steps to assist the AIC in the investigation of his complaint. By Memorandum dated June 16, 2008, Mr. Macia, acting in his capacity as General Counsel and in compliance with Respondent McDiarmid's request to President Garrison in her letter of June 12, 2008, directed Petitioner Lang and others on the Distribution List (including Sears, Logan and others who attended and participated in the October 15, 2007 meeting, some of whom are now charged with academic misconduct) to fully cooperate in the

---

[3] For purposes of this Order, the student will not be named.

[4] An allegation of academic misconduct brought before the University goes through four (4) stages. Stage One (1) is the review of the initial allegation, Stage Two (2) is the discovery of evidence, Stage Three (3) is the hearing stage, and Stage Four (4) is the decision stage. The issues presented before this Court involve Stage Three (3), and the integrity of that hearing.

investigation of the eMBA student's academic record, specifically to retain and preserve all written and electronic evidence "relevant to this matter" for evidentiary purposes. Mr. Macia also directed Petitioner Lang and others to advise Respondent McDiarmid of the existence of all evidence and whether any of the evidence had been discarded. Mr. Macia sent a copy of the June 16, 2008 Memorandum to Respondent McDiarmid.

After the Screening Subcommittee made its findings, the next step in the AIC due process procedure was for the case to "advance" to the "Discovery Stage." Under the specific AIC due process procedures titled, "Stage II: Discovery of Evidence," the Chair of the Academic Integrity Committee forms and selects the three members of the Discovery Subcommittee. The Chair of the Academic Integrity Committee was Respondent McDiarmid.

After the Discovery Subcommittee was chosen by Respondent McDiarmid, its three members and Respondent Kerr, acting as legal counsel to the Discovery Subcommittee, interviewed Petitioner Lang and all other persons charged with academic misconduct and received substantial evidence concerning the allegations made against them. The Discovery Subcommittee, together with advice and assistance of its counsel, Respondent Kerr, acting as quasi-judicial tribunal, decided, by the standard of "the preponderance of the evidence," that a "Stage III: Hearing" should occur. The Discovery Subcommittee reported its investigation and factual and legal conclusions in its Discovery Subcommittee Final Report Amended February 3, 2009.

The matter was scheduled for a Panel Hearing over Spring Break, March 16-20, 2009. This action gave rise to Count One (now moot). The hearing was rescheduled for April 27, 2009. Petitioner Lang's Petition was filed on February 24, 2009, and the instant hearing was scheduled.

5

## DISCUSSION

### A.  A Writ of Prohibition is the proper remedy in this matter.

A writ of prohibition restrains judicial and quasi-judicial bodies. *Cowie v. Roberts*, 173 W.Va. 64, 67, 312 S.E.2d 35, 38 (1984). A writ of prohibition from a superior court affects not only an inferior judicial tribunal but inferior ministerial tribunals also know as quasi-judicial tribunals when they usurp an attempt to exercise judicial functions. *See Id.* at 67, 38.  In the case before the Court, the AIC has acted within the parameters of a quasi-judicial administrative body, therefore bringing themselves within the jurisdiction of the extraordinary relief sought by Petitioner.

Writs of prohibition provide a drastic remedy and are invoked in extraordinary situations; therefore the remedy is tightly circumscribed. *See Health Management Inc. v. Lindell*, 207 W.Va. 68, 72, 528 S.E.2d 762, 766 (1999). In order to obtain such relief the party seeking such relief must demonstrate certain qualifications, such as:

1.  Whether the parties seeking the writ has no other adequate means to obtain the desired relief;

2.  Whether the Petitioner will be damaged or prejudiced in a way that is not correctable on appeal;

3.  Whether the lower tribunal's action is clearly erroneous as a matter of law;

4.  Whether the lower tribunal's action is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and

5.  Whether the lower tribunal's action raises new and important issues of law of first impression.

*State ex. re. Hoover v. Berger*, Syl. Pt. 4, 199 W. Va. 12, 483 S.E.2d 12 (1996).

6

The Court in *Hoover* noted that these factors are guidelines and all factors need not be satisfied, but great consideration must be given to factor three. The Court finds that the facts in this case satisfy the above factors set forth in *Hoover* and merit the use of an extraordinary remedy, to wit:

(1)     Petitioner Lang has no other adequate remedy of law available to him at this juncture;

(2)     Petitioner Lang will be prejudiced by the AIC's action;

(3)     AIC's action in this matter has created an error as a matter of law;

(4)     AIC's action in this matter has the absolute potential of being repeated, and disregards procedural or substantial law; and

(5)     The AIC's action has created an issue of first impression.

**B.  W.VA. CODE ANN. § 55-17-3 is not applicable in this matter.**

Various Respondents assert that this Court has no jurisdiction because the Petitioner has not complied with the provisions of W.VA. CODE ANN. § 55-17-3.   Where the Court finds that irreparable harm would have occurred if the institution of the action was delayed by the provisions of this subsection, the pre-suit provisions of § 55-17-3 do not apply. *See* W.VA. CODE ANN. § 55-17-3. The provisions of § 55-17-3 do not apply to actions seeking injunctive relief. Therefore this action is appropriately before the Court.

**C.  R. Stephen Sears and Cyril M. Logar's Motions to Intervene are not timely made.**

R. Stephen Sears' (hereinafter "Sears") Motion to Intervene was filed on April 20, 2009. Cyril M. Logar's (hereinafter "Logar") Motion to Intervene was likewise filed on April 20.  The Petition was filed on February 24, 2009.  The hearing to consider the Petition was scheduled for April 22, 2009. Sears and Logar seek an Order permitting them to intervene in

7

the above captioned action, to participate fully in all future aspects of this proceeding as Petitioners and relators, and to join in the claims and relief requested in the Verified Petition filed by Gerald E. Lang.

Rule 24 of the *West Virginia Civil Rules of Procedure* permits intervention in both Intervention of Right and Permissive Interventions "[U]pon timely application." Neither Motion to Intervene was timely filed, as both were filed a mere two (2) days before the hearing on the Petition was to be conducted in Circuit Court. Obviously none of the existing parties have had sufficient time to consider the petitions of Sears and Logar or to prepare responses, nor for the Court to consider either Petition or any responses that should any have been filed.

Moreover, Rule 24 (b) provided that "[i]n exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Rule 24(b) W.VA. R. CIV. P. ANN. In the instant case, the Hearing Panel is scheduled to meet on April 27, 2009. Allowing time for responses and arguments regarding the Motions of Sears and Logar would unduly delay the proceedings in Circuit Court and make the issues before this Court moot.

As time is of the essence in the instant case, this Court finds that neither the Sears' Motion to Intervene nor the Logar's Motion to Intervene was timely filed and both Motions are hereby DENIED. However, given the similarity of the facts, Respondents should conclude that if Sears and Logar had filed petitions, this Court would have ruled consistently. Therefore, Respondents should elect to apply this Court's decision to Sears and Logar and any others similarly situated.

8

### D. WVU BOG and Magrath are necessary parties to this action.

Undoubtedly, the West Virginia University Board of Governors has an adverse interest in the case, as does Respondent Magrath because he is the ultimate supervisor of all the individual Respondents who are taking part in and conducting the underlying AIC due process proceeding. Therefore, they are necessary parties to this action and their Motion to Dismiss is DENIED.

### E. An inherent conflict of interest exists in the proceedings that deprive the Petitioner of his due process rights.

Petitioner Lang and other persons in the October 15, 2007 meeting would have understood that General Counsel's office would be representing them because their actions were taken in their official capacities on behalf the University. However, when communication between Garrison, Respondent McDiarmid, and General Counsel Macia having given legal advice, and continuing to give legal advice to persons under investigation for acts in which he was directly involved and of which he had personal knowledge, a conflict of interest chain of events began.

At all relevant times, Respondent Kerr, a member of General Counsel's staff, was under the direct and immediate supervision of Macia, and subsequently Respondent Brandt, and was a member of the office of General Counsel. Respondent Kerr, served as a member of the Screening Subcommittee and actively participated in the quasi-judicial "Stage I" due process review proceedings, which found that allegations of academic misconduct against Petitioner Lang and others had merit and decided that the case should advance to the discovery stage, "Stage II."

A conflict of interest existed at the time Respondent Kerr served as a member of the Screening Subcommittee and participated in the "Stage I" due process proceeding under the

9

AIC policies and procedures. There was no opportunity for Lang to waive any conflict of interest nor to object to Kerr's participation as a member of the Screening Subcommittee. The ethical disqualification of General Counsel Macia and every member of his legal staff, including Respondent Brandt and Respondent Kerr, was and is required under Rule 1.10 of the *West Virginia Rules of Professional Conduct*. Petitioner Lang and the others who were involved in the October 15, 2007 meeting had the right to expect that Mr. Macia was then acting as their lawyer in this specific matter and that his legal advice to them could naturally form the basis for their subsequent actions – the very same actions for which they are now being investigated and prosecuted for academic misconduct. For purposes of this analysis, Petitioner Lang and the others are either current or former clients of General Counsel Macia and his legal staff under Rules 1.7 or 1.9 of the *West Virginia Rules of Professional Conduct*. Therefore, the members of General Counsel's legal staff are ethically disqualified on the basis of a conflict of interest under Rule 1.10 of the *West Virginia Rules of Professional Conduct*.

Notwithstanding the issue of conflict of interest as set forth in the *West Virginia Rules of Professional Conduct*, the Policy itself defines "conflict of interest" as "[I]nterference of one person's interest with the interests of another person, where potential bias may occur due to prior or existing personal or professional relationships." *Policy and Procedures for Responding to Allegations of Academic Misconduct at West Virginia University*, pg. 29, April 10, 2000. It is further stated in the Policy that, "[I]n forming the committees and panels, reasonable precautions will be taken to avoid bias and real or apparent *conflict of interest*." *See Id.* at pg. 4. It is apparent that the spirit behind the Policy established by the University is to provide a fair and impartial process to any individual charged with allegations of academic

misconduct. Yet this spirit clearly has been vanquished by the actions taken by the Respondents in this matter.

The Respondents submit that the Petitioner is prohibited from now objecting to Respondent Kerr's involvement because the Petitioner did not exercise his right to object at the time proscribed by the Internal Rules. However, from both the affidavit of Respondent McDiarmid and the Petitioner's Response to the Motions to Dismiss, it is clear that Respondent Kerr was not a member of the Discovery Subcommittee.

Respondent Kerr was a member of step one (1) of the procedure, the Screening Subcommittee. The Policy does not provide the Petitioner with the opportunity or the right object to Respondent Kerr's participation on the Screening Subcommittee.

The Policy does provide for the right and the opportunity to object to the proposed members of the Discovery Subcommittee. However, Respondent Kerr was not a member of the Discovery Subcommittee, but acted as acted counsel to that committee and, as such, presented the Discovery Subcommittee's case to the Hearing Panel.

Likewise, the fact that Respondent McDiarmid, as a licensed lawyer and law professor, has worked in close connection with Respondents Kerr and Brandt, and General Counsel Macia throughout this AIC due process procedure in her position as Academic Integrity Officer, and due to the conflict of interest which requires immediate disqualification of all members of General Counsel offices, Respondent McDiarmid should be considered as also having a "real or apparent conflict of interest" under the AIC policy and under Rule 1.10 of the *West Virginia Rules of Professional Conduct* and the Policy. It is stated in the Policy that "[T]he Officer will ensure that the Panel is free of bias and real or apparent conflict of interests..." *See Policy* at pg. 10.

11

Another responsibility of the Academic Integrity Officer is "to ensure that inquiries, investigations, and hearings are conducted in a manner that will ensure fair treatment of the respondent, and confidentiality to the extent possible without compromising public health and safety or an unbiased and thorough investigation." *See Id.* at pg. 11. Respondent McDiarmid acted as the Chair of the Academic Integrity Committee, and in making appointments, "the Chair will ensure that these subcommittees are free of bias and real or apparent conflicts of interest, ..." *See Id.* at pg. 16. It is clear that Respondent McDiarmid cannot fulfill these responsibilities set forth in the Policy. Since, she too has a real and apparent appearance of unfairness and unethical conduct due to the blatant conflict of interest, which exists in this case.

Additionally, the Policy states that the Academic Integrity Officer is permitted to authorize departures from standard procedures "as long as the spirit of the University's policy is maintained." *See* Policy at pg. 13. This Court finds that the "spirit of the University's policy" is to ensure that every individual faced with allegations of academic misconduct is given a fair and impartial hearing, which is free from any form of bias or conflict of interest. Hence, the Respondents were able to institute alternative proceedings in order to protect the "spirit of the University's policy," and the Petitioner's interests, but elected not to do so.

## CONCLUSION

The Court finds that Respondents, acting individually and in concert, have acted in an arbitrary and capricious manner and have violated the Petitioner's constitutionally-protected due process rights in the manner in which they have conducted the investigation and handling of the complaint of academic misconduct filed against Lang and others.

APR-24-2029 16:39 From:MON CIR CLK          304+2917273          To:914123942555          P.13/13

This Court GRANTS Petitioner's request that a Writ of Prohibition issue against the Respondents, terminating the instant academic integrity proceeding and requiring Respondents to initiate, if they care to do so, alternative procedures to insure that Petitioner's due process rights are protected.

The Court hereby DENIES the Respondents' Motions to Dismiss.

While the Court did not permit Sears or Logar to intervene, the Court notes that they and others are parties to the same Academic Misconduct hearing as Lang. The interests of those individuals accused of wrongdoing in this matter are identical to Lang's interests. Having fully considered the circumstances of the accusations and the AIC procedures thus far implemented, the Court is of the opinion that the rights of all the accused have been violated as set forth herein above.

This Court urges the Respondents to likewise accept the parallels of these cases and to remedy those accused's rights without further duplicitous Court action.

It is so ORDERED this 24 day of April, 2009.

_Susan B. Tucker_
The Honorable Judge Susan B. Tucker

13

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CYRIL M. LOGAR, R. STEPHEN SEARS, | ) ) ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. |
| WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS, including members from 2008 throug | ) ) ) |
| _Defendant_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   West Virginia University Board of Governors
c/o Special Assistant to the Board of Governors
West Virginia University
P.O. Box 6201
Morgantown, WV 26506

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Robert J. Ridge, Esq.
Thorp Reed & Armstrong, LLP
301 Grant Street, 14th Floor
Pittsburgh, PA 15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_Cheryl Dean Riley, Clerk of Court_

Date:    12/03/2010

_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ❐  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

    ❐  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ❐  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ❐  I returned the summons unexecuted because _____ ; or

    ❐  Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____            _____
                                                           *Server's signature*

                                                         _____
                                                           *Printed name and title*


                                                         _____
                                                           *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CYRIL M. LOGAR,<br>R. STEPHEN SEARS,<br>_____<br>*Plaintiff*<br><br>v.<br><br>WEST VIRGINIA UNIVERSITY BOARD OF<br>GOVERNORS, including members from 2008 throug<br>_____<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Mary Roberta Brandt
Executive Officer for Social Justice
President's Office for Social Justice
B-1 Stewart Hall
Morgantown, WV  26506-6202

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you
are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ.
P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of
the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney,
whose name and address are:   Robert J. Ridge, Esq.
Thorp Reed & Armstrong, LLP
301 Grant Street, 14th Floor
Pittsburgh, PA  15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint.
You also must file your answer or motion with the court.

*Cheryl Dean Riley, Clerk of Court*

Date: _____12/03/2010_____                    _____
                                                                            *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09) Summons in a Civil Action (Page 2)

Civil Action No.

<div style="text-align:center">

**PROOF OF SERVICE**

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

</div>

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.


Date: _____

                                        _____
                                                    *Server's signature*

                                        _____
                                                    *Printed name and title*

                                        _____
                                                    *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CYRIL M. LOGAR,<br>R. STEPHEN SEARS,<br>*Plaintiff*<br><br>v.<br><br>WEST VIRGINIA UNIVERSITY BOARD OF<br>GOVERNORS, including members from 2008 throug<br>*Defendant* | )<br>)<br>)<br>)<br>)     Civil Action No.<br>)<br>)<br>) |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Beverly D. Kerr, Esq.
    Deputy General Counsel
    West Virginia University
    Legal Affairs Administration
    1000 Health Sciences South
    PO Box 9030
    Morgantown, WV 26506

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Robert J. Ridge, Esq.
    Thorp Reed & Armstrong, LLP
    301 Grant Street, 14th Floor
    Pittsburgh, PA 15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Cheryl Dean Riley, Clerk of Court*

Date: _____12/03/2010_____          _____
                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

     ☐  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

     ☐  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

     ☐  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

     ☐  I returned the summons unexecuted because _____ ; or

     ☐  Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____        _____

                                             *Server's signature*

                         _____

                                       *Printed name and title*

                         _____

                                            *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CYRIL M. LOGAR,<br>R. STEPHEN SEARS,<br>*Plaintiff*<br><br>v.<br><br>WEST VIRGINIA UNIVERSITY BOARD OF<br>GOVERNORS, including members from 2008 throug<br>*Defendant* | )<br>)<br>)<br>)  Civil Action No.<br>)<br>)<br>) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Marjorie A. McDiarmid
Professor
West Virginia University
203 Law Court
PO Box 6130
Morgantown, WV  26506

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Robert J. Ridge, Esq.
Thorp Reed & Armstrong, LLP
301 Grant Street, 14th Floor
Pittsburgh, PA  15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Cheryl Dean Riley, Clerk of Court*

Date:     12/03/2010

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*

was received by me on *(date)*                                    .

    ◻ I personally served the summons on the individual at *(place)*

                            on *(date)*                      ; or

    ◻ I left the summons at the individual's residence or usual place of abode with *(name)*

                            , a person of suitable age and discretion who resides there,

    on *(date)*                      , and mailed a copy to the individual's last known address; or

    ◻ I served the summons on *(name of individual)*                                              , who is

    designated by law to accept service of process on behalf of *(name of organization)*

                            on *(date)*                      ; or

    ◻ I returned the summons unexecuted because                                              ; or

    ◻ Other *(specify):*

My fees are $                  for travel and $                  for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date:

                                                *Server's signature*

                                                *Printed name and title*

                                                *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CYRIL M. LOGAR, R. STEPHEN SEARS, *Plaintiff* v. WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS, including members from 2008 throug *Defendant* | ) ) ) ) ) ) ) Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   James M. Garrison, Esq.
Spilman Thomas & Battle, PLLC
48 Donley Street, Suite 800
P.O. Box 615
Morgantown, WV  26507-0615

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Robert J. Ridge, Esq.
Thorp Reed & Armstrong, LLP
301 Grant Street, 14th Floor
Pittsburgh, PA  15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Cheryl Dean Riley, Clerk of Court*

Date:   _____12/03/2010_____                    _____
                                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____
was received by me on *(date)* _____ .

□ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

□ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

□ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

□ I returned the summons unexecuted because _____ ; or

□ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CYRIL M. LOGAR, R. STEPHEN SEARS, *Plaintiff* | ) ) ) |
| v. | ) Civil Action No. |
| WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS, including members from 2008 throug *Defendant* | ) ) ) ) |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  C. Peter McGrath
Binghamton University, SUNY
PO Box 6000
Bingham, NY  13902-6000

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Robert J. Ridge, Esq.
Thorp Reed & Armstrong, LLP
301 Grant Street, 14th Floor
Pittsburgh, PA  15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Cheryl Dean Riley, Clerk of Court*

Date:  _____12/03/2010_____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                              *Server's signature*

                                       _____
                                              *Printed name and title*


                                       _____
                                              *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CYRIL M. LOGAR, R. STEPHEN SEARS, | ) |
| *Plaintiff* | ) ) |
| v. | )      Civil Action No. |
| WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS, including members from 2008 throug | ) ) ) |
| *Defendant* | ) |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    James P. Clements
President
West Virginia University
President's Office
PO Box 6201
Morgantown, WV 26506

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Robert J. Ridge, Esq.
Thorp Reed & Armstrong, LLP
301 Grant Street, 14th Floor
Pittsburgh, PA 15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Cheryl Dean Riley, Clerk of Court*

Date: _____12/03/2010_____      _____

                                               *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                  *Server's signature*

                                            _____
                                                  *Printed name and title*


                                            _____
                                                  *Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| CYRIL M. LOGAR,<br>R. STEPHEN SEARS, | ) |
| *Plaintiff* | ) |
| v. | )     Civil Action No. |
| WEST VIRGINIA UNIVERSITY BOARD OF<br>GOVERNORS, including members from 2008 throug | ) |
| *Defendant* | ) |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*  E. Jane Martin
222 Zimmer Lane
Waynesburg, PA 15370

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Robert J. Ridge, Esq.
Thorp Reed & Armstrong, LLP
301 Grant Street, 14th Floor
Pittsburgh, PA 15219

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Cheryl Dean Riley, Clerk of Court*

Date: _____ 12/03/2010 _____        _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

     ☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

     ☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

     ☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

     ☐ I returned the summons unexecuted because _____ ; or

     ☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ _0.00_ .

I declare under penalty of perjury that this information is true.


Date: _____

                 _____
                             *Server's signature*

                 _____
                             *Printed name and title*


                 _____
                             *Server's address*

Additional information regarding attempted service, etc:

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CYRIL M. LOGAR,
R. STEPHEN SEARS,

        Plaintiffs,

                               Civil Action No.: 1:10-cv-201

WEST VIRGINIA UNIVESITY BOARD
OF GOVERNORS, including members from
2008 through the present, a West Virginia state
Board; MARY ROBERTA BRANDT, individually
and as former Vice President for
Legal Affairs and General Counsel at West
Virginia University and adjunct professor of law;
BEVERLY D. KERR, individually and as Deputy
General Counsel for West Virginia University;
MARJORIE A. MCDIARMID, individually and
as the Steptoe and Johnson Professor of Law and
Technology and Academic Integrity Officer for West
Virginia University; MICHAEL S. GARRISON,
Individually and as former President of West Virginia
University; C. PETER MCGRATH, individually and
as former interim President of West Virginia University;
JAMES P. CLEMENTS, individually and as current
President of West Virginia University; and E. JANE
MARTIN, individually and as former Provost of West
Virginia University,

        Defendants.

---

**SUPPLEMENT TO MOTIONS TO DISMISS FILED BY DEFENDANTS WEST
VIRGINIA UNIVERSITY BOARD OF GOVERNORS, C. PETER MCGRATH,
JAMES P. CLEMENTS, and E. JANE MARTIN**

---

COME NOW the Defendants, West Virginia University Board of Governors

("WVUBOG"), C. Peter McGrath, James P. Clements, and E. Jane Martin, by and through their

counsel, Stephen M. LaCagnin, Esquire, Wendy G. Adkins, Esquire, and Seth P. Hayes, Esquire,

1



of Jackson Kelly PLLC, to supplement Defendants' motions to dismiss. The sole purpose of this pleading is to advise the Court of the current status of a state court action concerning the same Academic Integrity proceedings underlying Plaintiffs' due process claims.

In their motions to dismiss and supporting memoranda, Defendants asserted that Plaintiffs' due process claims are premature because the Academic Integrity proceedings have yet to be completed. Doc. No. 26 at 12, Doc. No. 56 at 13. Plaintiffs responded that no administrative stages remain to be completed, relying on an order issued by the Circuit Court of Monongalia County. Doc. Nos. 36, 57 at 19. Plaintiffs had previously referenced a verified petition for writ of prohibition filed by Gerald Lang in the Circuit Court of Monongalia County (the "Lang matter") in their Complaint. See Compl. at ¶¶ 46-52. They had also attached an order issued by the state court on April 24, 2009 in the Lang matter and had quoted the findings set forth therein to support their due process claims. See Compl. at Ex. B.

Through Defendants' reply briefs, this Court was last advised that the state court had denied Defendants' motions for reconsideration and Defendants had appealed the Lang matter to the West Virginia Supreme Court of Appeals. Doc. No. 47 at 9; Doc. No. 63 at 9. Since the filing of Defendants' reply briefs, the West Virginia Supreme Court remanded the Lang matter to the Circuit Court of Monongalia County, and on July 15, 2011, the Circuit Court of Monongalia County issued an order vacating its prior orders (dated April 24, 2009 and January 24, 2011) and dismissing, with prejudice, the petition filed Mr. Lang. For the Court's consideration, Defendants have attached the state court's recent order in the Lang matter. *See Exhibit A.*

As set forth in their motions and supporting briefs, Defendants WVUBOG, Magrath, Clements, and Martin continue to request that this Court dismiss Plaintiffs' claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Respectfully Submitted,

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS, C. PETER MAGRATH,
JAMES P. CLEMENT, and E. JANE MARTIN,

By Counsel.


/s/ Wendy G. Adkins
Stephen M. LaCagnin, Esquire
W.Va. State Bar No.:  2118
Wendy G. Adkins, Esquire
W.Va. State Bar No.: 9412
Seth P. Hayes, Esquire
W.Va. State Bar No.: 10381
JACKSON KELLY PLLC
150 Clay Street, Suite 500
Morgantown, WV  26501
Phone: 304-284-4100
Fax: 304-284-4142

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CYRIL M. LOGAR,
R. STEPHEN SEARS,

      Plaintiffs,

                            Civil Action No.:  1:10-cv-201

WEST VIRGINIA UNIVESITY BOARD
OF GOVERNORS, including members from
2008 through the present, a West Virginia state
Board; MARY ROBERTA BRANDT, individually
and as former Vice President for
Legal Affairs and General Counsel at West
Virginia University and adjunct professor of law;
BEVERLY D. KERR, individually and as Deputy
General Counsel for West Virginia University;
MARJORIE A. MCDIARMID, individually and
as the Steptoe and Johnson Professor of Law and
Technology and Academic Integrity Officer for West
Virginia University; MICHAEL S. GARRISON,
Individually and as former President of West Virginia
University; C. PETER MCGRATH, individually and
as former interim President of West Virginia University;
JAMES P. CLEMENTS, individually and as current
President of West Virginia University; and E. JANE
MARTIN, individually and as former Provost of West
Virginia University,

      Defendants.

---

## CERTIFICATE OF SERVICE

---

      I, Wendy G. Adkins, do hereby certify that a copy of the foregoing **"SUPPLEMENT TO MOTIONS TO DISMISS CLAIMS FILED BY DEFENDANTS WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS, C. PETER MCGRATH, JAMES P. CLEMENTS, and E. JANE MARTIN"** was served on counsel of record electronically, or via U.S. Mail, postage pre-paid, as appropriate, this the 18 day of July, 2011.

Robert J. Ridge, Esquire
Daniel Tomassetti, Esquire
THORP REED & ARMSTRONG, LLP
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh, PA 15219
**Counsel for Cyril M. Logar**

John H. Tinney, Jr., Esquire
THE TINNEY LAW FIRM PLLC
222 Capitol Street, Suite 500
Charleston, WV 25301

Thomas A. Clare, P.C.
KIRKLAND &ELLIS LLP
655 15th Street, N.W., 12th Floor
Washington, D.C. 20005
**Counsel for R. Stephen Sears**

Debra H. Scudiere, Esquire
Kay Casto & Chaney PLLC
1085 Van Voorhis Road, Suite 100
Morgantown, WV 26505
**Counsel for Mary Roberta Brandt**

Scott A. Curnutte, Esquire
Post Office Box 1605
312 Railroad Avenue
Elkins, WV 26241
**Counsel for Marjorie A. McDiarmid**

Robert P. Fitzsimmons, Esquire
Robert J. Fitzsimmons, Esquire
Fitzsimmons Law Offices
1609 Warwood Avenue
Wheeling, WV 26003-7110
**Counsel for Michael S. Garrison**

/s/ Wendy G. Adkins

5

# EXHIBIT "A"

IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA
Division No. 1

STATE ex rel. GERALD E. LANG, Ph.D.,

Petitioner,

v.                                                                Petition No. 09-C-114

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS; a West Virginia state board;
C. PETER MAGRATH, President of
West Virginia University; MARY ROBERTA BRANDT
Vice President for Legal Affairs and General Counsel
at West Virginia University; BEVERLY D. KERR,
Deputy General Counsel for West Virginia University;
and MARJORIE ANNE McDIARMID,
Steptoe and Johnson Professor of Law and Technology
and Academic Integrity Officer for West Virginia University,

Respondents.

## AGREED ORDER VACATING *NUNC PRO TUNC*
## PRIOR ORDERS DATED APRIL 24, 2009 and JANUARY 24, 2011

This matter arises from a verified petition for writ of prohibition filed by Gerald E.

Lang on February 24, 2009. All Respondents moved to dismiss Lang's petition for writ of

prohibition. At a hearing held on April 22, 2009, this Court denied the motions to dismiss

and granted the petition for writ of prohibition. The oral ruling was memorialized in an

Order entered on April 24, 2009. All Respondents then sought to amend the April 24,

2009 judgment pursuant to West Virginia Rule of Civil Procedure 59(e). This Court

reaffirmed its prior ruling and denied the motions to amend the judgment through an Order

dated January 24, 2011.

This matter was appealed to the West Virginia Supreme Court of Appeals by all

Respondents in February 2011. Upon a joint motion by the parties, the West Virginia

1

Supreme Court of Appeals remanded the matter to this Court for further action. Pursuant to an agreement by the parties, they have jointly asked this Court to vacate, *nunc pro tunc,* its Orders dated April 24, 2009 and January 24, 2011. After full consideration of the parties' request, this Court **VACATES**, *nunc pro tunc,* its prior Orders dated April 24, 2009 and January 24, 2011.

Having been advised that all allegations and claims in this matter have been resolved by agreement of the parties, the Court hereby **DISMISSES WITH PREJUDICE** the entirety of this action, all parties to bear their own costs and attorney fees.

It is so ORDERED this 6th day of July, 2011.

_____
The Honorable Judge Susan B. Tucker

Jointly Submitted by:

_____
Stephen M. LaCagnin, Esquire
W.Va. State Bar No. 2118
Jackson Kelly PLLC
150 Clay Street, Suite 500
Morgantown, WV 26501
(304) 284-4108
*Counsel for Respondents West Virginia University Board of Governors and C. Peter Magrath*

STATE OF WEST VIRGINIA SS:

Circuit Clerk

2

J. Michael Benninger, Esquire
W.Va. State Bar No. 312
Wilson Frame Benninger & Metheney, PLLC
151 Walnut Street
Morgantown, W V 26505
(304) 292-9429
*Counsel for Petitioner Gerald E. Lang, Ph.D.*

Debra Scudiere, Esquire
W.Va. State Bar No. 1750
Kay Casto & Chaney PLLC
The United Center
1085 Van Voorhis Road, Suite 100
Morgantown, WV  26505
304 225-0970
*Counsel for Respondents Mary Roberta Brandt and Beverly D. Kerr*

Scott A. Curnutte, Esquire
W.Va. State Bar No. 5780
Curnutte Law
PO Box 1605
Elkins, WV 26241-1605
(304) 636-5904
*Counsel for Respondent Marjorie Anne McDiarmid*

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CYRIL M. LOGAR,
R. STEPHEN SEARS,

     Plaintiffs,

                          Civil Action No.: 1:10-cv-201

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS, including members from
2008 through the present, a West Virginia state
Board; MARY ROBERTA BRANDT, individually
and as former Vice President for
Legal Affairs and General Counsel at West
Virginia University and adjunct professor of law;
BEVERLY D. KERR, individually and as Deputy
General Counsel for West Virginia University;
MARJORIE A. MCDIARMID, individually and
as the Steptoe and Johnson Professor of Law and
Technology and Academic Integrity Officer for West
Virginia University; MICHAEL S. GARRISON,
Individually and as former President of West Virginia
University; C. PETER MAGRATH, individually and
as former interim President of West Virginia University;
JAMES P. CLEMENTS, individually and as current
President of West Virginia University; and E. JANE
MARTIN, individually and as former Provost of West
Virginia University,

     Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS CLAIMS
AGAINST DEFENDANTS WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS,
C. PETER MAGRATH, AND JAMES P. CLEMENTS PURSUANT TO RULE 12(b)(6)**

---

COME NOW the Defendants, West Virginia University Board of Governors

("WVUBOG"), C. Peter Magrath, incorrectly identified as C. Peter McGrath in Plaintiffs'

complaint, and James P. Clements, by and through their counsel, Stephen M. LaCagnin, Esquire,



Wendy G. Adkins, Esquire, and Seth P. Hayes, Esquire, of Jackson Kelly PLLC, and move to dismiss Plaintiffs' claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Specifically:

- Plaintiffs' claims against Defendants WVUBOG, Magrath, and Clements are time-barred;

- Plaintiffs fail to allege any claims whatsoever against Defendants WVUBOG, Magrath, and Clements in their complaint;

- Plaintiffs fail to establish a procedural or substantive due process claim against Defendants WVUBOG, Magrath, and Clements upon which relief can be granted; and

- Defendants WVUBOG, Clements, and Magrath are immune as to Plaintiffs' claims pursuant to the Eleventh Amendment.

In support of their motion, these Defendants incorporate the following memorandum of law.

## I.    Relevant Background

Plaintiffs R. Stephen Sears and Cyril M. Logar served as Dean and Associate Dean, respectively, of the College of Business and Economics at West Virginia University ("WVU") in 2007. Compl. at ¶¶ 1-2.    In October 2007, Plaintiffs participated in an investigation to determine whether a particular student, identified in the complaint as Student A, earned an eMBA degree at WVU. Id. at ¶¶ 14-23. As a result of the investigation, Student A was retroactively awarded an eMBA degree. Id.

In May 2008, Defendant Michael S. Garrison, former president of WVU, initiated an academic misconduct investigation of the persons involved in the decision to retroactively award an eMBA degree to Student A.   Id. at ¶ 33. WVU has formal policies and procedures for responding to allegations of academic misconduct. Id. at Exhibit A. Under these policies and procedures, allegations of academic misconduct are addressed through four stages: review, discovery, hearing, and decision.   Id.   A Screening Subcommittee "conducts a preliminary

exploration of the facts in the case – an inquiry – to decide whether a full-fledged investigation is warranted." Id. A Discovery Subcommittee "conducts a thorough investigation and forms an opinion about whether the preponderance of the evidence is sufficient to warrant a hearing." Id. The Screening Subcommittee and the Discovery Committee in this matter concluded Plaintiffs committed academic misconduct. Id. at ¶¶ 37-46. Plaintiffs do not dispute the findings of the those subcommittees; rather, they contend the participation of Defendant Beverly A. Kerr in the screening and discovery stages of the Academic Integrity Process resulted in a conflict of interest which violated their due process rights. Id. at ¶¶64-68. An order issued by the Circuit Court of Monongalia County prevented the Academic Integrity Process from being completed.  Compl. at ¶ 52. While that order was pending for reconsideration, Plaintiffs filed this complaint.

## II.    Legal Standard

In assessing a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must accept the factual allegations contained in the complaint as true. See Erikson v. Pardus, 551 U.S. 89, 94 (2007)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)); see also Advanced Health Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 143 (4th Cir. 1990). The purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; it is not a procedure for resolving a contest about the facts or the merits of the case. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 294 (3d ed.2007).

Recently, the United States Supreme Court abrogated the longstanding "no set of facts" standard for motions to dismiss first enunciated in Conley v. Gibson, 355 U.S. 41, 45-46, (1957). In Bell Atlantic Corp. v. Twombly, the Supreme Court held that a complaint in a civil action arising under the Sherman Act must contain "plausible grounds" for its claim—that is, the claim

3

must include "enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." 550 U.S. at 546. The Supreme Court has extended the Twombly standard to all civil actions. Ashcroft v. Iqbal, 556 U.S. --, --, 129 S. Ct. 1937 (2009). In Iqbal, the Court held that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." 556 U.S. at --, 129 S. Ct. at 1949.

The Supreme Court further clarified that under Twombly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. Iqbal, 129 S. Ct. at 1949. Also, courts "are [no longer] bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1949-50 (quotation marks omitted); see also Walker v. Prince George's County, Md., 575 F.3d 426, 431 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" Iqbal, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

**III.    Plaintiffs' § 1983 complaint is time-barred.**

Plaintiffs' complaint is time-barred. Because there is no statute of limitations provided in 42 U.S.C. § 1983, the United States Court of Appeal for the Fourth Circuit applies the forum state's most similar statute of limitations, generally the statute applicable to personal injury actions. See Fayemi v. Offerman, 99 F. App'x 480 (4th Cir. 2004)(citing Owens v. Okure, 488 U.S. 235 (1989) and Wilson v. Garcia, 471 U.S. 261, 276 (1985). In West Virginia, a two-year statute of limitations applies to personal injury actions. W. Va. Code § 55-2-12 (2010). Thus, a two-year statute of limitations applies to Plaintiffs' due process claims.

4

Plaintiffs allege the Screening Subcommittee was also investigating former General Counsel Alex Macia's involvement in the decision to retroactively award Student A an eMBA degree. Plaintiffs contend that Defendant Kerr's involvement in the Screening Subcommittee therefore created a conflict of interest in the Academic Integrity Process because she was a member of the Screening Subcommittee and was employed by WVU's General Counsel's office. Compl. at ¶ 37. This alleged conflict of interest is the crux of Plaintiffs' due process claims against Defendants WVUBOG, Macgrath and Clements and thus, the focal point for evaluating compliance with the statute of limitations.

The date the cause of action accrues is determined under federal law. See id. (citing National Adver. Co. v. City of Raleigh, 947 F.2d 1158, 1162 (4th Cir.1991)). Under federal law, a cause of action accrues and the statute of limitations commences "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Id. (citing Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 955 (4th Cir.1995)). Thus, the dispositive question is when sufficient facts were available to reveal the conflict of interest alleged in the complaint.

The facts on which Plaintiffs now rely were available to them by no later than July 17, 2008. In Paragraph 37 of the complaint, Plaintiffs state the Screening Subcommittee issued its report on July 17, 2008. Compl. at ¶ 37. Plaintiffs rely on the Screening Subcommittee's July 17, 2008 report to demonstrate the alleged conflict of interest. Specifically, Plaintiffs allege that the Screening Subcommittee: (1) reviewed documents provided by persons in the General Counsel's office; (2) absolved former General Counsel Alex Macia from any findings of academic misconduct; and (3) ignored or downplayed Macia's involvement in Student A's investigation. Id. at ¶¶ 37-39. Accordingly, Plaintiffs knew or should have known of the alleged

5

conflict of interest giving rise to their due process claims on July 17, 2008, the date the Screening Subcommittee issued its report. Thus, Plaintiffs' § 1983 complaint, as filed on December 3, 2010, is time-barred.

## IV.   Plaintiffs fail to allege <u>any</u> claims against Defendants WVBOG, Clements, or Magrath in their complaint.

Plaintiffs identify Defendants WVUBOG, Magrath, and Clements in the caption of their complaint. See Compl. The complaint next identifies these Defendants as "Parties" to Plaintiffs' civil action. See id. at ¶¶ 3, 8, and 9. Importantly, however, the complaint contains no allegations specific to Defendants WVUBOG, Magrath, or Clements. The Fourth Circuit has held that when a complaint fails to implicate specific allegations against all named defendants, those defendants not included in the specific allegations of the complaint are entitled to dismissal under Rule 12(b)(6).

In Weller v. Department of Social Services of Baltimore, 901 F.2d 387 (4th Cir. 1990), the plaintiff named several county officials as defendants in his procedural due process claim against the City of Baltimore. While the plaintiff included numerous defendants in the caption of his complaint, he failed to include factual allegations in his complaint specific to all named defendants. The district court dismissed the plaintiff's complaint against all such defendants and the United States Court of Appeals for the Fourth Circuit affirmed. Id. at 397. The Fourth Circuit stated:

> It seems clear that the single due process claim does not implicate all named defendants. For example, a careful review of the complaint reveals no allegations against Benjamin L. Brown or Richard L. Hamilton, and we hold that these defendants were properly dismissed.

Id.

6

Here, Plaintiffs' complaint fails to specify how Defendants WVUBOG, Clements, or Magrath allegedly violated Plaintiffs' due process rights. In fact, Plaintiffs' complaint does not contain a single factual allegation specific to Defendants WVUBOG, Clements, or Magrath. As Plaintiffs' complaint fails to implicate any claim whatsoever against Defendants WVUBOG, Clements, or Magrath, they should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Twombly, 550 U.S. at 546; Iqbal, 129 S.Ct. at 1949; Weller, 901 F.2d at 397.

**V.     Plaintiffs' complaint fails to state a procedural due process claim.**

To state a procedural due process claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish three elements: (1) that he has a life, liberty, or property interest protected by Due Process Clause of Fourteenth Amendment of the United States Constitution; (2) that he was deprived of this protected interest within the meaning of the Due Process Clause; and (3) that the state did not afford him adequate procedural rights prior to depriving him of the protected interest. Zinermon v. Burch, 494 U.S. 113 (1990); Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988). Plaintiffs' complaint lacks sufficient allegations to meet each of the requisite elements. Therefore, when the complaint is viewed in the light most favorable to the Plaintiffs, it fails to state a procedural due process claim.

**A.     Plaintiffs fail to sufficiently plead a protected property interest.**

Plaintiffs allege that they have been deprived of certain property rights: (1) loss of employment/professional status, and (2) loss of salary and benefits. Compl. at ¶ 64. Plaintiffs' allegations establish, at most, a unilateral expectation of continued employment. See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)(to claim a property interest protected

7

by the Fourteenth Amendment, a person must have more than a unilateral expectation of continued employment.) Therefore, Plaintiffs fail to allege a protected property interest.

A person must have a legitimate claim of entitlement to continued employment to establish a protected property interest. Id. In the context of public education employment, a protected property interest is established by state law or an employment contract which provides for entitlement to continued employment. Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 308 n.14 (4th Cir. 2006); Royster v. Bd. of Trs., 774 F.2d 618, 620-21 (4th Cir. 1985). The protected property interest in employment does not extend to the right to possess and retain a particular job or to perform particular services. Parkman v. Univ. of South Carolina, 44 F. App'x 606 (4th Cir. 2002)(citing Fields v. Durham, 909 F.2d 94 (4th Cir. 1990)). For example, transfer of a tenured professor from one department to another without change in rank or pay does not implicate any property interest protected by the Due Process Clause. Parkman, 44 F. App'x at 616 (citing Huang v. Bd. of Governors, 902 F.2d 1134 (4th Cir. 1990)). Rather, the property interest is more generally in continued employment, and no deprivation exists so long as the employee receives full compensation and benefits due under state law or the employment contract. Parkman, 44 F. App'x at 616-17.

Plaintiff Logar continues to be employed as a tenured faculty member at WVU, Compl. at ¶ 1, although he no longer holds the position of Associate Dean of the College of Business & Economics. Id. Plaintiff Sears once held the position of a tenured faculty member as well as the Dean of the College of Business and Economics. Compl. at ¶ 2. The complaint, however, is silent as to any state law or employment contract giving rise to a legitimate claim of entitlement by Plaintiffs to continued employment in the position of Dean or Associate Dean of the College of Business and Economics. It is also silent as to any state law or employment contract giving

rise to a legitimate claim of entitlement by either of the Plaintiffs to continued employment as a tenured faculty member. Plaintiffs' conclusory statement that they had a "protected property interest" in their positions, without specific factual allegations to support their allegations, is insufficient under Twombly. See Twombly, 550 U.S. at 546.

Plaintiffs also allege that the policy and procedures provided by the Defendants in the Academic Integrity Process give rise to a property interest as they had expectation that Defendants would comply with those policies and procedures." Compl. at ¶ 63. The mere fact that a state has established certain procedures does not mean that the procedures thereby become property or liberty interests entitled to federal constitutional protection under the due process clause. Hill v. Jackson, 64 F.3d 163 (4th Cir. 1995). Thus, Plaintiffs fail to allege a protected property interest in their employment at WVU.

## B.     Plaintiffs fail to plead a liberty interest.

"Plaintiffs allege that they have deprived of certain liberty interests: (1) damage to their reputations and (2) loss of consulting and other professional opportunities that would have produced significant future income." Compl. at ¶ 64. While a person can have a liberty interest in preserving his "good name, reputation, honor or integrity," a liberty interest in one's reputation is implicated only under certain circumstances.     Bishop v. Wood, 426 U.S. 341 (1977); Paul v. Davis, 424 U.S. 693 (1976); Roth, 408 U.S. at 573-74. To succeed on a liberty interest claim, an employee must prove four elements: (1) that the employer's statements were made in the course of a discharge or significant demotion;[1] (2) that the employer's remarks

---

[1] To implicate a liberty interest, some damage to a plaintiff's employment status must have resulted from publication of reasons for the adverse employment action. Parkman, 44 F. App'x at 617-18 (citing Johnson v. Morris, 903 F.2d 996, 999 (4th Cir. 1990)). If a plaintiff remains employed by his current employer, then a plaintiff suffers no damage to his employment status and therefore cannot complain that he is unemployable. Id.

9

constitute a charge of a serious character defect;[2] (3) that the employer's remarks were public, and (4) that the employer's remarks were false.  Ridpath, 447 F.3d at 309-313(citing Robertson v. Rogers, 679 F.2d 1090, 1092 (4th Cir. 1982)); Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 n.5 (4th Cir. 1988); Johnson v. Morris, 903 F.2d 996, 999 (4th Cir. 1990).  As they fail to plead facts to meet the requisite elements, Plaintiffs fail to state a liberty interest protected by due process.

Although they do not provide copies of the reports issued by the Screening Subcommittee and the Discovery Subcommittee with their Complaint, Plaintiffs quote certain findings made by each committee concerning their involvement with the Student A investigation. Compl. at ¶¶ 38-39, 42-44.  Significantly, however, Plaintiffs do not allege any connection between these findings and any adverse employment action taken through the Academic Integrity Process. Specifically, Plaintiff Logar remains employed as a tenured faculty member at WVU.   Id. at ¶ 1. Further, although Plaintiff Logar alleges he "lost" his position as Associate Dean of the College of Business and Economics and Plaintiff Sears alleges he "lost" his position as Dean of the College of Business and Economics and is no longer a tenured faculty member at WVU,[3] Plaintiffs do not allege WVU took any specific adverse employment action against them in conjunction with the findings of the Screening and Discovery Subcommittees.   Id. at ¶¶ 57, 59.

As to publication of the statement or findings of the Screening and Discovery Subcommittees, Plaintiffs allege that "[t]he entire matter regarding Student and Plaintiff's involvement has been highly publicized by local, regional, and national media since October

---

[2] Allegations of incompetence do not implicate serious character defects as contemplated by due process protections. Rather, serious character defects involve allegations of dishonesty and immorality. Ridpath, 447 F.3d at 308-09; Robertson v. Rogers, 679 F.2d 1090 (4th Cir. 1982).
[3] Although not pled in the complaint, Dean Sears cannot refute the fact he announced his intention to resign as Dean of the College of Business and Economics in April 2008, one month prior to the formation of the Academic Integrity Process.

2007." Id. at ¶ 55. The "highly publicized proceedings" referenced in the Complaint refer only to the Student A investigation and the subsequent investigation initiated by former Provost Gerald Lang to review the Executive MBA (eMBA) Program records. Id. at ¶¶ 15, 23-26, 30-31, 55-56. The complaint contains no specific allegations that any specific findings or statements made by the Screening or Discovery Subcommittees in the Academic Integrity Process have been made public.

Finally, the Complaint fails to allege that the findings or statements made by the Screening and Discovery Subcommittees are false. Rather, the complaint appears to challenge the accuracy of the findings made by the Screening and Discovery Subcommittees concerning Alex Macia and Defendant Michael S. Garrison. Id. at ¶¶ 38, 39, 43. At no point does Plaintiffs' complaint allege that any findings made concerning Plaintiffs Sears or Logar were false. Therefore, Plaintiffs' complaint does not contain sufficient allegations to establish a protected liberty interest.

**C.  Plaintiffs fail to plead deprivation of a protected property or liberty interest.**

The complaint alleges that Plaintiff Logar "lost" his position as associate dean and Plaintiff Sears "lost" his positions as dean and as a tenured faculty member. Compl. at ¶¶ 57, 59. The complaint does not specify how Plaintiffs "lost" these positions, and in particular, does not allege that they were discharged, as opposed to having resigned their positions. As their complaint lacks these types of factual allegations, Plaintiffs fail to plead a specific adverse employment action which is required to demonstrate a deprivation of a protected property or liberty interest.

11

Assuming *arguendo* that an adverse employment action occurred and such action was not a discharge, this Court must determine if such a resignation was voluntary.[4] Stone, 855 F.2d at 172-74; see also Miller v. Hamm, No. CCB-10-243, 2011 WL 9185, *7-8 (D. Md. Jan. 3, 2011)(*attached*). If the employee resigned of his own free will - even though prompted to do so by events set in motion by his employer - the employee relinquished his property interest voluntarily and was not deprived of it by the state. Id. As Plaintiffs' complaint lacks any allegations to demonstrate a discharge or an involuntary resignation, Plaintiffs fail to allege an actual deprivation of a property or liberty interest.

**D.      Plaintiffs' allegations of inadequate procedure are premature.**

Plaintiffs allege that, "[b]y investigating and bringing charges of academic misconduct . . . while a clear and flagrant conflict existed with WVU's Office of General Counsel" Defendants WVBOG, Clements, and Macgrath violated their due process rights. Compl. at ¶ 62. They also allege that Defendants violated their own policy and procedures for the Academic Integrity Process "by failing to ensure that the process was free of conflicts of interest and was conducted in a fair and impartial manner." Id. at 63. As the Academic Integrity Process is not complete, Plaintiffs' allegations speak only to the first two stages of the process. Each stage of the Academic Integrity Process, however, cannot be reviewed in isolation. Plaintiffs must first take

---

[4] Resignation must be so involuntary that it amounted to a constructive discharge to trigger protections by due process clause. Id. The Fourth Circuit has identified two circumstances: (1) employer's misrepresentation or deception and (2) forced by the employer's duress or coercion. Stone, 855 F.2d at 172-74. With respect to misrepresentation or deception, the subjective belief of the employee is not the test. Id. A plaintiff must demonstrate reasonable reliance on employer's misrepresentation. Id. If an employee is required to choose between comparably unpleasant alternatives, this choice does not give rise to duress or coercion. Id. A court should consider: (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation. Id.

advantage of all remedies provided through the Academic Integrity Process and any internal procedures to remedy any alleged conflict identified by Plaintiffs. Only then can this Court review the process in its entirety to determine whether Plaintiffs' due process rights have been violated. Thus, Plaintiffs' allegations of inadequate procedure are premature.

To determine whether a procedural due process violation is ripe for review, courts must consult the entire panoply of pre-deprivation and post-deprivation processes provided by the state.[5]   Zinermon v. Burch, 494 U.S. 113 (1990); Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 535 (1985). The Constitutionally-preferred pre-deprivation process includes a hearing, but that pre-deprivation hearing need not constitute a full evidentiary hearing that definitively resolves the propriety of the discharge so long as it serves as an initial check against mistaken decisions — a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. Loudermill, 470 U.S. 538-39, 545-46. Pre-deprivation procedures are the initial check against mistaken decisions, but they need not definitively resolve the propriety of the adverse employment action. Id. Rather, any alleged defects in pre-deprivation procedures can be remedied by the post-deprivation procedures offered by the state.   Id.   Thus, an administrative process must be reviewed as a whole in light of the specific due process violations alleged by a plaintiff.

---

[5] Zinermon and Loudermill applied the balancing test of Mathews v. Eldridge, 424 U.S. 319, 335 (1976) as it sets forth the proper standard by which to judge adequacy of procedure. Mathews sets forth three factors that must be balanced: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safe-guards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews, 424 U.S. at 335.

Where a governmental actor provides apparently adequate procedural remedies but the plaintiff has not availed himself of those remedies, no procedural due process violation has occurred. Alvin v. Suzuki, 227 F.3d 107, 116-17 (3d Cir. 2000)(citing Zinermon, 494 U.S. at 126). The general rule is that exhaustion of state remedies is not a requirement for § 1983 claims. See Patsy v. Bd. of Regents of Fla., 457 U.S. 496 (1982). The United States Court of Appeals for the Third Circuit, however, has held that when a plaintiff alleges an administrative process is procedurally inadequate, the plaintiff must nonetheless complete all available administrative procedures to determine whether the alleged defect actually results in harm. Alvin, 227 F.3d at 116. The constitutional right to due process does not permit one to forego administrative procedures that may remedy any defect in the initial procedures without demonstrating that the post-deprivation procedures are inadequate. See Reilly v. City of Atlantic City, 532 F.3d 216, 234-37 (3d Cir. 2008); McDaniels v. Flick, 59 F.3d 446, 448-60 (3d Cir. 1995). Only when access to the procedure is absolutely blocked or the procedure is a "sham" can a plaintiff forgo additional remedies. Alvin, 227 F.3d at 118-19.

Plaintiffs have made the entire "Policy and Procedures for Responding to Allegations of Academic Misconduct at West Virginia University" a part of their complaint. Compl. at Ex. A. Under the policy, an allegation of academic misconduct is addressed through four stages: review, discovery, hearing, and decision. Id. As it relates to the Plaintiffs, it is undisputed that the review and discovery stages are complete as to the allegations of academic misconduct against them. Compl. at ¶ 46. It is also undisputed that the hearing and decision stages have not been completed. Thus, the pre-deprivation process offered by WVU has not yet been completed, precluding the commencement of any post-deprivation process available to them in state court. The complaint lacks any allegations that Plaintiffs are absolutely blocked from the available

14

procedure or that the procedure is a "sham." Alvin, 227 F.3d at 118-19. Thus, Plaintiffs' procedural due process claim is premature.

Plaintiffs have yet to appear before a hearing panel and receive a final determination by the deciding official. The hearing panel consists of at least five members and Plaintiffs have an opportunity to raise objections to any member of the panel. Compl. at Ex. A. Before the hearing panel, Plaintiffs may present evidence and call and cross examine witnesses. Id. They may also be represented by counsel, if they so choose. Id. Once the hearing panel hears the evidence and makes a determination, Plaintiffs have an opportunity to make comments in response to the hearing panel's determination. Id. The final report of the hearing panel and Plaintiffs' written comments are then forwarded to the deciding official who imposes the appropriate sanction or undertakes diligent efforts to restore Plaintiffs' reputation. Id. After the deciding official takes some action, Plaintiffs have an automatic right to appeal to the West Virginia Employees Grievance Board. W. Va. Code § 6C-2-1.

Plaintiffs' primary allegation is that a conflict of interest[6] existed due to the participation of an attorney from WVU's General Counsel's office in the Academic Integrity proceedings. Compl. at ¶¶ 36-37, 41, 45, 62. Even if this Court views the allegations of conflict of interest or bias in a light most favorable to Plaintiffs, the effect of that conflict of interest or bias, if any, cannot be alleged, yet alone determined by this Court or a jury, until the administrative process

---

[6] Strong presumption of "honesty and integrity" exists when assessing whether the administrative adjudicators are impartial. Withrow v. Larkin, 421 U.S. 35 (1975). Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not, however, disqualify a decision-maker. Id.; see also United States v. Morgan, 313 U.S. 409 (1941). A showing that administrative adjudicators were biased may establish a lack of procedural due process, but mere participation in earlier decisions only tangentially related to the current adjudication does not constitute an impermissible conflict of interest, unless the employee can produce evidence that bias in fact infected the resolution of his case. See Greer v. Amesqua, 212 F.3d 358 (7th Cir. 2000)(citing Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482 (1976)).

reaches a final decision. The complaint lacks any allegations as to how participation by an attorney from General Counsel's office in the Academic Integrity proceedings infected the resolution of their case. Plaintiffs are not in a position to make such allegations as their Academic Integrity proceedings have not come to any final resolution. Even if the alleged conflict has damaged Plaintiffs' reputation, the hearing panel's ultimate finding may be that of no academic misconduct. Thus, the remaining stages of the Academic Integrity process provide mechanisms through which any potential conflict of interest or bias can be adequately remedied, and those mechanisms must be utilized before this Court can review the procedure for due process violations. Accordingly, Plaintiffs' allegations of an inadequate process are premature and cannot support a viable procedural due process claim.

**VI.** **Plaintiffs' complaint fails to state a substantive due process claim.**

The United States Constitution's substantive due process protections extend only to certain fundamental rights so implicit in the concept of ordered liberty that no amount of process can justify infringement. Reno v. Flores, 507 U.S. 292 (1993); Palko v. Connecticut, 302 U.S. 319, 325 (1937). Substantive due process is a far narrower concept than procedural due process. Substantive due process is an absolute check on certain governmental actions notwithstanding "the fairness of the procedures used to implement them." Love v. Pepersack, 47 F.3d 120 (4th Cir. 1995); Weller, 901 F.2d at 391 (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)). In the absence of a fundamental right, a plaintiff may show that a governmental actor's behavior in depriving him of the interest in question was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998); Palka v. Shelton, 623 F.3d 447, 454 (7th Cir.2010).

"Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." See Harrah Indep. Sch. Dist. v. Martin, 440 U.S. 194, 198 (1978) (contrasting interest related to employment with traditional interests protected by substantive due process, such as procreation, marriage, and family life).[7]

Plaintiffs appear to assert a loss of property right based on loss of employment status. However, continued employment is not recognized as a fundamental right protected by substantive due process. Plaintiffs contend that Defendants acted "arbitrarily and capriciously" because they allegedly investigated charges of academic conduct while a purportedly "clear and flagrant conflict of interest existed." Compl. at ¶ 67. Plaintiffs significantly rely on the fact that WVU's policies and procedures expressly offer "reasonable precautions" to avoid bias and real or apparent conflict of interest. Compl. at Ex. A. The mere fact that a state has established certain procedures does not mean that those procedures thereby become substantive liberty interests entitled to federal constitutional protection under due process clause. Hill, 64 F.3d at 163. Plaintiffs' complaint contains no allegations of conduct "so egregious, so outrageous, that it

---

[7] See, e.g., Palka, 623 F.3d at 453 (stating that substantive due process claims are limited to fundamental rights and wrongful termination of public employment is not actionable as a violation of substantive due process unless the employee also alleges the defendant violated some other constitutional right or that state remedies were inadequate); Silva v. Bieluch, 351 F.3d 1045, 1047 (11th Cir. 2003)("Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection"); Singleton v. Cecil, 176 F.3d 419, 425-26 (8th Cir. 1999) (en banc) ("a public employee's interest in continued employment with a governmental employer is not so 'fundamental' as to be protected by substantive due process"); McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994) (en banc) ("employment rights are not 'fundamental' rights created by the Constitution"); Sutton v. Cleveland Bd. of Educ., 958 F.2d 1339, 1350-51 (6th Cir. 1992)("Absent the infringement of some 'fundamental' right," however, this court has held that "the termination of public employment does not constitute a denial of substantive due process."); Huang, 902 F.2d at 1142 n.10 (professor's interest in position in university department "is essentially a state law contract right, not a fundamental interest embodied in the Constitution").

may fairly be said to shock the contemporary conscience." See County of Sacramento, 523 U.S. at 847; Palka, 623 F.3d at 454. Therefore, Plaintiffs' complaint fails to sufficiently state a substantive due process claim.

## VII.   Defendant WVUBOG and Defendants Clements and Magrath in their official capacities are entitled to 11th Amendment Immunity.

The Eleventh Amendment to the United States Constitution grants sovereign immunity to states from suits brought by private citizens in federal court. Specifically, the Eleventh Amendment prohibits "any suit . . . against one of the United States by citizens of another State." U.S. Const. amend. XI. This provision also provides immunity to state agencies, see Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984), and, subject to an exception where injunctive relief is sought, to state officials acting in their official capacities. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). It is undisputed that WVUBOG is an agency of the State of West Virginia. It is also undisputed that Defendant Magrath, as interim President of WVU, and Defendant Clements, as the current President of WVU, are state officials entitled to Eleventh Amendment immunity. See syl. pt. I, W. Va. Univ. Bd. of Trs. v. Graf, 516 S.E.2d 741 (W. Va. 1998) ("[t]he Board of Governors of West Virginia University is a State agency").

### A.   WVUBOG.

WVUBOG is a state agency[8] and is immune from Plaintiffs' due process claims. See

---

[8] The West Virginia Board of Governors existed as the primary governing authority prior to the 1969 creation of the West Virginia Board of Regents. See W. Va. Code § 18-26-1 (1969). In 1989, the West Virginia Legislature abolished the Board of Regents and divided its powers between the University of West Virginia Board of Trustees, to govern the West Virginia University system, and the Board of Directors of The State College System, to govern the state colleges, community colleges, and other post-secondary education systems. See generally, Univ. of W. Va. Bd. of Trustees ex rel. W. Va. Univ. v. Graf, 516 S.E.2d 741 (1998); City of Morgantown v. Ducker, 168 S.E.2d 298 (1969). In 2000, West Virginia Legislature abolished the University of West Virginia Board of Trustees and the Board of Directors of The State College System created an institutional board of governors for each higher education institution

18

Hughes-Bechtol, Inc. v. W. Va. Bd. of Regents, 737 F.2d 540 (6th Cir.1984) (holding that West Virginia Board of Regents was an arm of the State of West Virginia); see also Kondos v. W. Va. Bd. of Regents, 318 F. Supp. 394 (S.D. W. Va. 1970), aff'd, 441 F.2d 1172 (4th Cir.1971) (holding that West Virginia Board of Regents was an arm of the State of West Virginia); see also W. Va. Univ. Bd. of Gov. v. Rodriguez, 543 F. Supp. 2d 526, 535 (N.D. W. Va. 2008) ("this Court holds that West Virginia University and its Board of Governors are arms and alter egos of the State of West Virginia . . . .").[9]

WVUBOG is therefore immune from suit as to Plaintiffs' Fourteenth Amendment due process claims. Plaintiffs fail to state a claim against WVUBOG upon which relief can be granted and it should be dismissed from this civil action.

## B.   Defendants Magrath and Clements in their official capacities.

The Eleventh Amendment prohibits suits for money damages against states and state officials; it does not bar suits against state officials for prospective injunctive relief. Ex Parte Young, 209 U.S. 123 (1908). This narrow exception to Eleventh Amendment immunity announced in Ex Parte Young applies where the plaintiff "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 496 (4th Cir.2005) (internal citations omitted).

Plaintiffs allege an ongoing violation of federal constitutional due process rights. See

---

in West Virginia, an example of which is Defendant WVUBOG. See W. Va. Code § 18B-1 B-1 (2000); W. Va. Bd. of Governors v. W. Va. Higher Educ. Policy Comm'n, 653 S.E.2d 649, 652 (W. Va. 2007).

[9] In Rodriguez, the United States District Court for the Northern District of West Virginia thoroughly analyzed the overwhelming precedent establishing that public universities and their governing boards are considered "arms of the State" and therefore entitled to Eleventh Amendment immunity. 543 F. Supp. 2d at 535.

Compl. at ¶¶ 65(b), 68(b). As relief, they ask this Court to enter any appropriate prospective declaratory relief. Id. However, to the extent Plaintiffs seek money damages against Defendants Magrath and Clements in their official capacities, the recovery of such damages is prohibited by the Eleventh Amendment. See Edelman v. Jordan, 415 U.S. 651, 668 (1974) (holding that a federal court cannot order a state official to remedy past violations of federal law by paying funds out of the state treasury as such relief "is in practical effect indistinguishable . . . from an award of damages against the State."). Accordingly, to the extent Plaintiffs' complaint seeks compensatory damages against Defendants Magrath and Clements in their official capacities, those claims must be dismissed.

## VIII.   Plaintiffs fail to plead any claims against Defendants Clements and Magrath in their individual capacities upon which relief can be granted.

To the extent this Court determines Plaintiffs have sufficiently pled colorable Fourteenth Amendment claims against Defendants Magrath and Clements, this Court should dismiss Plaintiffs' individual capacity claims for failure to state a claim upon which relief can be granted. Official capacity suits "generally represent only another way of pleading an action against an entity of which the officer is an agent." Hafer v. Melo, 502 U.S. 21, 25 (1991)(internal quotations omitted). "Suits against state officials in their official capacity should be treated as suits against the State. Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation." Id. (internal citations omitted)(emphasis added).

Defendant Magrath was employed as interim President of WVU effective August 1, 2008. Defendant Clements began serving as President of WVU on June 30, 2009. Neither Defendant Clements nor Defendant Magrath was employed at WVU when the investigation

20

concerning Student A occurred.[10]  Neither Defendant Magrath nor Defendant Clements was in any way affiliated with WVU when the Academic Integrity Process at issue was implemented.[11] Moreover, and most importantly, Plaintiffs' complaint fails to include a single factual allegation against Defendants Magrath or Clements in any capacity.

Plaintiffs' failure to include a single factual allegation in their complaint specific to Defendants Magrath and Clements evidences Plaintiffs' intent to include them as Defendants solely due to their official positions.  See id.  This Court should dismiss all claims against Defendants Magrath and Clements in their individual capacities for failure to state a claim upon which relief can be granted.

## IX.    Defendants Magrath and Clements are entitled to qualified immunity.

In the event this Court determines Plaintiffs' complaint sufficiently pleads a claim against Clements and Magrath in their individual capacities, both defendants are entitled to qualified immunity.  Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 230 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  There is a two-pronged test for resolving qualified immunity claims.  First, a court "must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Id. at 815-16.  If the plaintiff satisfies the first step, "the court must decide whether the right at issue was 'clearly established' at the time of [the] alleged misconduct." Id. at 816. (citation omitted).

---

[10] Plaintiffs' complaint states the initial media inquiry into Student A and the decisions that were made concerning Student A occurred between October 11, 2007 and October 23, 2007. Compl. at ¶¶ 14-23.

[11] Plaintiffs' complaint states that Defendant Garrison requested an Academic Integrity Committee look into the potential academic misconduct of Plaintiffs on May 30, 2008 – seven days prior to his resignation. Compl. at ¶¶ 32-34.

In determining whether the right at issue was "clearly established," courts must determine whether the defendant had "fair notice that her conduct was unlawful." Brosseau v. Haugen, 543 U.S. 194, 198 (2004). The reasonableness of the defendant's conduct "is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." Id. "Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law, not one of 'legal facts.'" Elder v. Holloway, 510 U.S. 510, 516 (1994).

Plaintiffs' claims, even if true, fail to make out a violation of a constitutional right. As discussed in Section III and IV, supra, Plaintiffs fail to plead sufficient facts to make out a violation of a constitutional right. Moreover, Plaintiffs do not include any specific allegations against Defendants Magrath or Clements. At best, Plaintiffs' allegations against them can be construed as alleging that an Academic Integrity proceeding against Plaintiffs was ongoing at the same institution where Defendants Magrath and Clements served as university presidents. There is no case law establishing that presiding over an institution while an administrative procedure is ongoing is a violation of a clearly established right. See Brosseau, 543 U.S. at 200 (holding that an absence of case law on point is evidence that a constitutional right was not "clearly established"). Accordingly, Defendants Magrath and Clements, in their individual capacities, are entitled to qualified immunity and Plaintiffs' claims against them should be dismissed.

## X.   Conclusion

Plaintiffs fail to state a cause of action against Defendants WVUBOG, Magrath, and Clements upon which relief can be granted. Plaintiffs' claims are time-barred under the

22

applicable statute of limitations. Additionally, Plaintiffs' failure to include any factual allegations specific to Defendants WVUBOG, Magrath, and Clements is procedurally deficient under Twombly and its progeny. Further, Defendants WVUBOG, Clements, and Magrath are immune from Plaintiffs' claims under the Eleventh Amendment of the United States Constitution. For these reasons, Plaintiffs' claims against Defendants WVUBOG, Magrath, and Clements should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Respectfully Submitted,

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS, C. PETER MAGRATH,
and JAMES P. CLEMENTS,

By Counsel,


/s/ Seth P. Hayes
Stephen M. LaCagnin, Esquire
W.Va. State Bar No.: 2118
Wendy G. Adkins, Esquire
W.Va. State Bar No.: 9412
Seth P. Hayes, Esquire
W.Va. State Bar No.: 10381
JACKSON KELLY PLLC
150 Clay Street, Suite 500
Morgantown, WV 26501
Phone: 304-284-4100
Fax: 304-284-4142

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CYRIL M. LOGAR and,
R. STEPHEN SEARS,
　　　　　　　Plaintiffs,

v.　　　　　　　　　　　　　　　　　　　Civil Action　1:10-CV-201

WEST VIRGINIA UNIVERSITY BOARD OF
GOVERNORS, including members from 2008
through the present, a West Virginia state board;
MARY ROBERTA BRANDT, individually and
as former Vice President for Legal Affairs and
General Counsel at West Virginia University and
adjunct professor of law; BEVERLY D. KERR,
individually and as Deputy General Counsel for
West Virginia University; MARJORIE A.
MCDIARMID, individually and as the Steptoe
and Johnson Professor of Law and Technology
and Academic Integrity Officer for West Virginia
University; MICHAEL S. GARRISON, individually
and as former President of West Virginia University;
C. PETER MCGRATH, individually and as former
interim President of West Virginia University;
JAMES P. CLEMENTS, individually and as current
President of West Virginia University; and E. JANE
MARTIN, individually and as former Provost of West
Virginia University,
　　　　　　　Defendants.

## BRIEF IN SUPPORT OF MOTION TO DISMISS

**I.　Summary of Argument.**

A.　The Plaintiffs' claims are barred by the statute of limitations.

　　1.　The statute of limitations applicable to the *Complaint* is one year because the Plaintiffs' causes of action would not survive at common law

　　2.　The Plaintiffs' claims in their *Complaint* filed 3 December 2010.

　　　　a.　The Plaintiffs' claims for defamation are barred by the statute of limitations because they accrued no later than 24 April 2008.

　　　　b.　The Plaintiffs' due process claims are barred by the statute of limitations because they accrued no later than 17 July 2008.


EXHIBIT
4

B.     Professor McDiarmid is entitled to qualified immunity.

**II.    Background.**

As they have disclosed in their *Complaint*--and in their motions in intervene in state court[1]--the Plaintiffs are respondents in a proceeding involving allegations of academic misconduct.  Their case is between the second and third stages of a four stage process.  That matter has been stayed by a writ of prohibition entered by the Circuit Court of Monongalia County, West Virginia, since 24 April 2009.[2]

West Virginia University has adopted a careful, detailed procedure for investigating and resolving allegations of academic misconduct.  The most recent version of that procedure is delineated in the *Policy and Procedures for Responding to Allegations of Academic Misconduct at West Virginia University* (the Policy), adopted 10 April 2000.[3]  The Policy was adopted in part because it is required by federal law for institutions receiving research funds from the federal government.  *See, e.g.*, 42 CFR 93.108 (Office of Science & Technology Policy of 6 December 2000); 42 CFR 93.300 (Bureau of Public Health); 48 CFR 952.235-71(d)(4) (Department of Energy); 48 CFR 1252.235-70(b)(1) (Department of Transportation); and 45 CFR 689.2(h) and 45 CFR 689.4(4) (National Science Foundation).

West Virginia University's Policy is a considerably expanded version of the recommendations delineated in the various federal regulations dealing with the subject, and West Virginia University has chosen to apply its procedure to a broader range of academic misconduct than required by federal law.

---

[1] *Complaint*, Dkt. # 3, ¶¶ 47 & 48.

[2] *Complaint*, Dkt. # 3, ¶ 49.

[3] *Complaint*, Dkt. # 3, Exhibit A.

2

Defendant Marjorie McDiarmid is the Academic Integrity Officer for West Virginia University and the Chair of the Academic Integrity Committee for West Virginia University as those roles are defined in the Policy.

The Policy sets up a four-stage process for cases involving allegations of academic misconduct: screening subcommittee, discovery subcommittee, hearing panel, and consideration by the Deciding Official.

Upon receipt of a complaint, the screening subcommittee conducts an initial inquiry:

> The purpose of the Screening Subcommittee's inquiry is to make a preliminary evaluation of the available evidence and, if appropriate, the testimony of the respondent, complainant, and key witnesses to determine whether there is sufficient evidence of possible academic misconduct to warrant a full-fledged investigation. The purpose of the inquiry is *not* to reach a final conclusion about whether misconduct definitely occurred or who was responsible.[4]

If the screening subcommittee finds there is sufficient evidence of possible academic misconduct to warrant a full-fledged investigation, a discovery subcommittee is convened to conduct that investigation:

> If an investigation is warranted, the Chair of the Academic Integrity Committee will form a Discovery Subcommittee to conduct a thorough investigation and form an opinion about whether the preponderance of the evidence is sufficient to warrant a hearing. If the evidence is sufficient, the Subcommittee calls for a hearing....[5]

Then, if the discovery subcommittee finds the preponderance of the evidence is sufficient to conduct a hearing, a hearing panel is convened:

> The Hearing Panel will act as impartial judges, hearing the evidence and arguments presented by the Discovery Subcommittee and the respondent, and then deciding whether the respondent committed misconduct as charged.[6]

---

[4] *Complaint*, Dkt. # 3, Exhibit A, page 18 (emphasis in original).

[5] *Complaint*, Dkt. # 3, Exhibit A, page 19.

[6] *Complaint*, Dkt. # 3, Exhibit A, page 23.

Finally, if the hearing panel determines that the respondent committed academic misconduct, disposition is considered by the Deciding Official (Petitioner Lang's former role):

1.      The Deciding Official should have no substantive involvement in any review, inquiry, investigation, or hearing related to the allegation of misconduct.

2.      At the conclusion of the proceedings, the Deciding Official will receive the pertinent report written by the Screening Subcommittee, the Discovery Subcommittee, or the Hearing Panel, as well as any written comments about the report provided by the respondent. The Deciding Official will review and evaluate the report and comments, and determine whether to impose sanctions and whether to take other appropriate administrative actions pertinent to the case or with respect to other matters uncovered by the proceedings. The Official may consult with the Academic Integrity Officer, the Chair of the Academic Integrity Committee, or other appropriate individuals in reaching a decision.

3.      If academic misconduct has been found, the Deciding Official may impose a range of sanctions....[7]

On 27 May 2008, Professor McDiarmid, as Academic Integrity Officer for West Virginia University, received a complaint alleging academic misconduct; that complaint was reduced to writing and received 30 May 2008.[8] Pursuant to the Policy, Professor McDiarmid referred the complaint to the Screening Subcommittee. As the Plaintiffs knew--at the very latest upon receipt of the Screening Subcommittee Report 17 July 2008--Defendant Beverly Kerr participated as a non-voting member.

Pursuant to the Policy, "the Academic Integrity Committee's legal counsel will serve as [a] non-voting ex officio member[],"[9] and Defendant Beverly Kerr therefore served in that capacity. The other members of the Discovery Subcommittee are selected according to a process delineated in the Policy. Before making the final appointments, however, the Chair of the

---

[7] *Complaint*, Dkt. # 3, Exhibit A, pages 23-24.

[8] *Complaint*, Dkt. # 3, ¶¶ 32 & 33.

[9] *Complaint*, Dkt. # 3, Exhibit A, page 19

4

Academic Integrity Committee is required to send the respondent a list of the proposed

membership of the Discovery Subcommittee to the respondent who then has the opportunity to

raise any objections.  Crucially, the Plaintiffs raised no objection whatsoever to the involvement

of Defendant Kerr.

Likewise, the members of the Hearing Panel are selected according to a process

delineated in the Policy, and the respondent is afforded the opportunity to interpose objections.

The Plaintiffs were provided the list of the proposed membership.  Again, they did not raise any

objection whatsoever to the involvement of Defendant Kerr.

## III.    Argument.

### A.    The Plaintiffs' claims are barred by the statute of limitations.

The Plaintiffs have expressly predicated the entirety of their *Complaint* upon 42 U.S.C. §

1983,[10] and claim that West Virginia is the proper venue.[11]

Since Congress did not establish a federal statute of limitations for § 1983 actions, the

applicable time period must be borrowed from the most analogous state statute of limitations.

*Wilson v. Garcia*, 471 U.S. 261, 276-80 (1985); *National Advertising Co. v. City of Raleigh*, 947

F.2d 1158, 1161 (4th Cir. 1991) (*quoting Bireline v. Seagondollar*, 567 F.2d 260, 262 (4th Cir.

1977)).  "Because § 1983 claims are best characterized as personal injury actions, a State's

personal injury statute of limitations should be applied to all § 1983 claims." *Owens v. Okure*,

488 U.S. 235, 241 (1989) (internal citations omitted). "Where state law provides multiple statutes

---

[10]  *Complaint*, Dkt. # 3, ¶ 12.

[11]  *Complaint*, Dkt. # 3, ¶ 13.

of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." *Id.* at 249-50.

### 1.    The statute of limitations applicable to the *Complaint* is one year because the Plaintiffs' causes of action would not survive at common law.

In West Virginia, the residual statute of limitations is West Virginia Code § 55-2-12:

Every personal action for which no limitation is otherwise prescribed shall be brought:

(a)    Within two years next after the right to bring the same shall have accrued, if it be for damage to property;

(b)    within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries; and

(c)    within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.

As discussed *infra*, taking the *Complaint* in the light most favorable to the Plaintiffs, they appear to be complaining they have been injured by: 1) the publicity of "Student A and Plaintiffs' involvement," and 2) the participation of Defendant Kerr in the Academic Integrity proceedings. Both claims are the kind which would not have survived the death of the plaintiffs at common law. Accordingly, the applicable statute of limitations is one year: not because both claims are intentional torts, but because neither claim would have survived the death of the plaintiffs at common law.

In *Owens v. Okure*, 488 U.S. 235 (1989), the United States Supreme Court attempted to clarify some of the ambiguity created by *Wilson v. Garcia*, 471 U.S. 261(1985), and rejected the rule which some circuits had created that courts should apply the statute of limitations for intentional torts. Instead, the Court declared, "[w]e accordingly hold that where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983

claims should borrow the general or residual statute for personal injury actions." West Virginia has multiple statutes of limitations for personal injuries, and even has multiple residual statutes of limitations: three are articulated in W.VA. CODE § 55-2-12 alone. That is why this Court should apply the most analogous residual statute of limitations: the one year limit for actions which would not survive at common law.

Courts in both the Northern District of West Virginia and the Southern District of West Virginia have applied the one-year statute of limitations in § 1983 cases involving defamation, false arrest, and malicious prosecution under the same theory. On the other hand, there are also decisions from those courts as well as decisions without analysis from the Fourth Circuit which apply the two year statute of limitations in W.VA. CODE § 55-2-12. *See also, Rodgers v. Corporation of Harpers Ferry*, 179 W.Va. 637, 371 S.E.2d 358 (1988) (decided before *Owens v. Okure*, 488 U.S. 235 (1989)).

Even though the one year statute of limitations is the one which should be applied in this case, it does not in fact matter whether the statute of limitations is one year or two years: the Plaintiffs' claims are barred in either case.

**2.      The Plaintiffs' claims in their *Complaint* filed 3 December 2010.**

Taking the *Complaint* in the light most favorable to the Plaintiffs, they appear to be complaining they have been injured by: 1) the publicity of "Student A and Plaintiffs' involvement," and 2) the participation of Defendant Kerr in the Academic Integrity proceedings:

> 55.      The entire matter regarding Student A and Plaintiffs' involvement has been highly publicized by local, regional, and national media since October 2007. Since that time, thousands of articles, stories, and other references to this matter have been published, many of which identify Plaintiffs by name. These include national media outlets like the Associated Press, USA Today, the New York Times and msnbc.com.

7

56.    Due to the highly-publicized proceedings and the absence of due process, Plaintiffs have been deprived of property and liberty interests in their employment at WVU.

....

[Count 1: Procedural Due Process]

62.    By investigating and bringing charges of academic misconduct against Plaintiffs and others while a clear and flagrant conflict of interest existed with WVU's Office of General Counsel, Defendants knowingly and willfully violated Plaintiffs' Due Process rights guaranteed by the Fourteenth Amendment of the United States Constitution and Article III, Section II of the West Virginia Constitution.

....

[Count 2: Substantive Due Process]

67.    By investigating and bringing charges of academic misconduct against Plaintiffs and others while a clear and flagrant conflict of interest existed with WVU's Office of General Counsel, Defendants arbitrarily and capriciously violated Plaintiffs' substantive due process rights guaranteed by the Fourteenth Amendment of the United States Constitution.

### a.    The Plaintiffs' claims for defamation are barred by the statute of limitations because they accrued no later than 24 April 2008.

At no point in their *Complaint* do the Plaintiffs allege that Professor McDiarmid did anything whatsoever to publicize their involvement in "the entire matter regarding Student A," or their involvement in the academic misconduct proceedings. More to the point--for purposes of considering whether the *Complaint* is timely--the Plaintiffs allege, "[t]he entire matter regarding Student A and Plaintiffs' involvement has been highly publicized by local, regional, and national media since October 2007,"[12] and attribute their alleged damages to that publicity.[13] Even though they acknowledge the publicity of the matter beginning in October 2007, the only claim the

---

[12] *Complaint*, Dkt. # 3, ¶ 55.

[13] *Complaint*, Dkt. # 3, ¶ 56.

Plaintiffs make about the involvement of any of the Defendants in that publicity is their claim that on or about 24 April 2008, the WVU Board of Governors publicly disclosed the Report of the Special Investigative Panel for Review of Executive MBA Program Records.[14]

By their own admissions, then, the Plaintiffs knew about the publicity regarding Student A and Plaintiffs' involvement since October 2007,"[15] and that the WVU Board of Governors allegedly disclosed the Report of the Special Investigative Panel for Review of Executive MBA Program Records on or about 24 April 2008.[16]  In both instances, and regardless of whether the applicable statute of limitations is one year or two years, the Plaintiffs' claims made in their *Complaint* filed 3 December 2010 are time-barred because they knew by 24 April 2008 at the very latest about their alleged injury.

> **b.    The Plaintiffs' due process claims are barred by the statute of limitations because they accrued no later than 17 July 2008.**

The only other claim made by the Plaintiffs is that they were damaged by the participation of Defendant Kerr in the academic misconduct process.[17]  As they admit in their *Complaint*, the Plaintiffs knew on 15 October 2007 that General Counsel Alexander Macia participated in a meeting concerning Student A, because they also participated.[18]  The  Plaintiffs also acknowledge in their *Complaint* that they knew on or about 17 July 2008--when the Screening Subcommittee Report was released to them--about the participation of Defendant Kerr in the Screening Subcommittee.[19]

---

[14]  *Complaint*, Dkt. # 3, ¶ 41.

[15]  *Complaint*, Dkt. # 3, ¶ 55.

[16]  *Complaint*, Dkt. # 3, ¶ 41.

[17]  *Complaint*, Dkt. # 3, ¶¶ 20 & 21.

[18]  *Complaint*, Dkt. # 3, ¶¶ 62 & 67.

[19]  *Complaint*, Dkt. # 3, ¶ 37.

Regardless of whether the applicable statute of limitations is one year or two years, the

Plaintiffs' claims made in their *Complaint* filed 3 December 2010 are time-barred because they

knew by 17 July 2008 about their alleged injury.

**B.     Professor McDiarmid is entitled to qualified immunity.**

The Plaintiffs have expressly sued Professor McDiarmid in her individual capacity, and

she is entitled to qualified immunity.  The United States Supreme Court has held that a court

should consider a qualified immunity defense at the earliest possible stage of the litigation:

> [B]ecause "[t]he entitlement is an immunity from suit, rather than a mere defense
> to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), we repeatedly have
> stressed the importance of resolving immunity questions at the earliest possible
> stage in litigation.

> *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (additional citations omitted).

In *Hodge v. Jones*, 31 F.3d 157 (4th Cir. 1994) (*cert. denied*, 115 S.Ct. 581), the United

States Court of Appeals for the Fourth Circuit considered a case in which the plaintiffs

complained that the defendants violated their due process rights by maintaining a record of

alleged child abuse and thereby damaged their reputations and impacted their security clearances.

In language it has repeatedly cited in the years since, the Fourth Circuit articulated the standard

for qualified immunity as follows:

> "[T]he 'contours of the right' must have been so conclusively drawn as to leave
> no doubt that the challenged action was unconstitutional." (*quoting Anderson*, 483
> U.S. at 640, 107 S.Ct. at 3039)) .... qualified immunity protects "all but the plainly
> incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S.
> 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

> *Hodge*, 31 F.3d at 168.

As articulated *supra*, taking the *Complaint* in the light most favorable to the Plaintiffs,

they appear to be complaining they have been injured by: 1) the publicity of "Student A and

10

Plaintiffs' involvement," and 2) the participation of Defendant Kerr in the Academic Integrity proceedings.

With respect to the damage they allege from publicity, the Plaintiffs do not allege--because they cannot allege--that Professor McDiarmid is responsible for, involved in, or in any way related to, the publicity. Accordingly, even if defamation was cognizable as a claim under 42 U.S.C. § 1983 (which the Fourth Circuit has repeatedly held it is not, *see e.g.*, *Hodge*, 31 F.3d 157), Professor McDiarmid did not cause the Plaintiffs any damage.

With respect to the alleged denial of due process, the Plaintiffs make a procedural due process claim (Count 1) and a substantive due process claim (Count 2). Assuming, *arguendo*, that the Plaintiffs are entitled to some due process protections in connection with the academic misconduct proceedings, they fail to appreciate the parameters of the process which is due: they are not entitled to the full trial-type procedures this country has deemed necessary for the protection of criminal defendants. The Plaintiffs have not pointed to any constitutional or statutory right "so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." *Hodge*, 31 F.3d at 168. The generalized, conclusory assertions of the Plaintiffs in their Complaint are not sufficient: as the United States Supreme Court held in *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the determination must be made "in light of the specific context of the case, not as a broad general proposition."

With respect to Count 2, substantive due process protects only those specific substantive liberty interests that are generally recognized as basic or fundamental to our way of life, and substantive due process rights are created only by the Constitution of the United States. *Bowers v. Hardwick*, 478 U.S. 186, 194-95 (1986); *Edwards v. Johnson City Health Dep't.*, 885 F.2d 1215, 1219 (4th Cir. 1989). In fact, even in that context the United States Supreme Court has

11

held that substantive due process is to be narrowly applied. In *Albright v. Oliver*, 510 U.S. 266 (1994), for example, the United States Supreme Court considered a § 1983 case in which the plaintiff claimed he had a substantive due process right to be free from criminal prosecution except upon probable cause. The Supreme Court began its analysis by quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992): "the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open ended." And, it pointed out that "the protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity," and the claim to be free from prosecution except on the basis of probable cause is markedly different. The Supreme Court concluded that there is no substantive due process right to be free from criminal prosecution except upon probable cause.

Even taking substantial liberties with the *Complaint*, the Plaintiffs have not claimed a substantive due process right of even remotely comparable seriousness with the right to be free from criminal prosecution except upon probable cause, and yet even that right was not sufficient for the Supreme Court to consider substantive due process treatment. Again, the Plaintiffs have not pointed to any constitutional or statutory right "so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." *Hodge*, 31 F.3d at 168.

Accordingly, Professor McDiarmid is entitled to qualified immunity.

IV.    **CONCLUSION**

For the foregoing reasons, the *Complaint* must be dismissed for failure to state a claim upon which relief can be granted.

DEFENDANT MARJORIE MCDIARMID,
BY COUNSEL,

/s/ Scott Curnutte
SCOTT CURNUTTE, W.VA. BAR # 5780
CURNUTTE LAW OFFICE
POST OFFICE BOX 1605
ELKINS, WEST VIRGINIA 26241
(304) 636-5907  (FACSIMILE)
(304) 636-5904 (TELEPHONE)
COUNSEL FOR DEFENDANT MARJORIE MCDIARMID

13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CYRIL M. LOGAR and,
R. STEPHEN SEARS,
        Plaintiffs,

v.                                  Civil Action   1:10-CV-201

WEST VIRGINIA UNIVERSITY BOARD OF
GOVERNORS, including members from 2008
through the present, a West Virginia state board;
MARY ROBERTA BRANDT, individually and
as former Vice President for Legal Affairs and
General Counsel at West Virginia University and
adjunct professor of law; BEVERLY D. KERR,
individually and as Deputy General Counsel for
West Virginia University; MARJORIE A.
MCDIARMID, individually and as the Steptoe
and Johnson Professor of Law and Technology
and Academic Integrity Officer for West Virginia
University; MICHAEL S. GARRISON, individually
and as former President of West Virginia University;
C. PETER MCGRATH, individually and as former
interim President of West Virginia University;
JAMES P. CLEMENTS, individually and as current
President of West Virginia University; and E. JANE
MARTIN, individually and as former Provost of West
Virginia University,
        Defendants.

**CERTIFICATE OF SERVICE OF**
**BRIEF IN SUPPORT OF MOTION TO DISMISS**

      I certify I have duly served the foregoing *Brief in Support of Motion to Dismiss* by using

the CM/ECF system, which will send notification of such filing to counsel of record.

      Dated 31 January 2011.

/s/ Scott Curnutte
SCOTT CURNUTTE, W.VA. BAR # 5780

14

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

WEST VIRGINIA UNIVERSITY BOARD     :
OF GOVERNORS AND C. PETER MAGRATH,     :
Respondents below,     :
    :
Petitioners on Appeal,     :
    :
    : Supreme Court No.: 11-0350
v.     : Circuit Court No.: 09-C-114
    :
GERALD E. LANG, Ph.D., Petitioner,     :
and Realtor Below,     :
    :
Respondent on Appeal,     :

---

MARY ROBERTA BRANDT and     :
BEVERLY D. KERR, respondents below,     :
    :
Petitioners on Appeal,     :
    :
    : Supreme Court No.: 11-0320
v.     : Circuit Court No.: 09-C-114
    :
GERALD E. LANG, Ph.D., Petitioner,     :
and Realtor Below,     :
    :
Respondent on Appeal,     :

---

MARJORIE ANNE MCDIARMID, respondent below, :
    :
Petitioner on Appeal,     :
    :
    : Supreme Court No.: 11-0345
v.     : Circuit Court No.: 09-C-114
    :
GERALD E. LANG, Ph.D., Petitioner,     :
and Realtor Below,     :
    :
Respondent on Appeal,     :

1

EXHIBIT
5

## CONFIDENTIAL SETTLEMENT AGREEMENT AND
## RELEASE OF CLAIMS

Now, Witness the following Agreement entered into on this ___*30*___ day of ___*June*___, 2011:

### RECITALS

WHEREAS, Appeal Respondent Gerald E. Lang (hereinafter "Lang") served as provost at West Virginia University (hereinafter "WVU") between 1995 and 2008;

WHEREAS, in his role as provost, Lang called for the creation of a team of independent educators to investigate, audit and attest to the accuracy of the decision to retroactively award a degree to a certain eMBA student in the Fall of 2007. The Special Investigative Panel for Review of eMBA Program Records released a report dated April 21, 2008;

WHEREAS, following his receipt of the Special Investigative Panel's report, Dr. Lang voluntarily resigned as provost at WVU on April 28, 2008;

WHEREAS, after receiving a complaint of academic misconduct directed toward the persons involved in the decision to retroactively award an eMBA degree to a particular student in the Fall of 2007, Academic Integrity Officer, Marjorie A. McDiarmid (hereinafter "McDiarmid"), initiated proceedings pursuant to the "Policy and Procedures for Responding to Allegations of Academic Misconduct at West Virginia University" in May 2008;

2

WHEREAS, based on the findings of the Screening and Discovery Subcommittees and pursuant to the Academic Integrity Policy, a Hearing Panel was scheduled to hear the charges of academic misconduct against Lang between March 16 and 20, 2009;

WHEREAS, on February 24, 2009, Lang sought a writ of prohibition in the Circuit Court of Monongalia County, Civil Action No. 09-C-114, to terminate the academic integrity proceedings;

WHEREAS, the Circuit Court of Monongalia County issued an Order dated April 24, 2009 denying motions to dismiss filed by the respondents and granting Lang's writ of prohibition;

WHEREAS, the Circuit Court of Monongalia County issued an Order dated January 24, 2011, denying motions to amend the April 24, 2009 judgment filed by the respondents;

WHEREAS, the West Virginia University Board of Governors (hereinafter "WVUBOG") and C. Peter Magrath (hereinafter "Magrath") appealed the circuit court's orders, and their appeal was docketed by the West Virginia Supreme Court of Appeals as No. 11-0350;

WHEREAS, Mary Roberta Brandt (hereinafter "Brandt") and Beverly D. Kerr (hereinafter "Kerr") appealed the circuit court's orders, and their appeal was docketed by the West Virginia Supreme Court of Appeals as No. 11-0320;

WHEREAS, McDiarmid appealed the circuit court's orders, and her appeal was docketed by the West Virginia Supreme Court of Appeals as No. 11-0345; and

WHEREAS, the parties have reached an agreement on all matters related in any way to and/or concerning the underlying Academic Integrity proceedings pending at WVU, the writ of prohibition pending in the Circuit Court of Monongalia County (Civil Action No. 09-C-114), and the appeals (Nos. 11-0350; 11-0320; 11-0345) pending before the West Virginia Supreme Court of Appeals.

## AGREEMENT AND RELEASE OF CLAIMS

1)      Lang shall execute a voluntary resolution statement of the underlying Academic Integrity proceedings acknowledging his role in the decision to award an eMBA degree to a certain student in Fall 2007. In accordance with the "Policy and Procedures for Responding to Allegations of Academic Misconduct at West Virginia University," McDiarmid shall forward Lang's voluntary resolution statement to the Deciding Official for a final disposition.

2)      Upon remand by the West Virginia Supreme Court of Appeals to the Circuit Court of Monongalia County, all parties agree to ask the Circuit Court to vacate, *nunc pro tunc,* its Orders dated April 24, 2009 and January 24, 2011 and to dismiss, with prejudice, the matter of Gerald E. Lang, Ph.D., v. West Virginia University Board of Governors, et al, Civil Action No. 09-C-114. This Confidential Settlement Agreement and Release of Claims is contingent upon the entry of such order by the Circuit Court of Monongalia County.

3)      All parties agree to bear their respective attorneys' fees and costs arising from the actions of their own counsel in connection with the pending litigation, this

4

Agreement, and the matters and documents referred to herein and all related matters, except for the attorneys' fees and costs incurred by parties being provided a defense by West Virginia University.

    4)    In consideration of the terms set forth in this Confidential Settlement Agreement and Release of Claims, Lang hereby completely and fully releases and forever discharges the WVUBOG, West Virginia University and/or their respective officers, employees, agents and/or assigns, Magrath, Brandt, Kerr and McDiarmid from any and all past, present or future claims, demands, obligations, actions, causes of action, rights, damages, costs, loss of services, indemnity, contribution, expenses and compensation of any nature whatsoever, whether based in tort, contract, constitutional law, statutory law, or other theory of recovery, which Lang now has or may otherwise acquire, on account of or which may in any way arise out of the Academic Integrity proceedings as described in the recitals above; notwithstanding the foregoing, Lang does not waive any claim or right of action for any wrongs which could occur after the execution of this agreement. It is understood and agreed by Lang that the foregoing shall include, without limitation, any and all known and unknown claims for loss of past or future wages and benefits, damage to reputation, emotional distress, mental anguish, pain and suffering, annoyance, aggravation, inconvenience, and any and all other damages recoverable at law, which Lang may have against WVUBOG, Magrath, Brandt, Kerr and McDiarmid on account of or which may in any way arise out of the Academic Integrity proceedings as described in the recitals above.

5)      In consideration of the terms set forth in this Confidential Settlement Agreement and Release of Claims, the Academic Integrity proceedings currently pending against Lang concerning the award of an eMBA degree to a certain student in October 2007 will be fully resolved and terminated. No new Academic Integrity proceedings concerning the award of an eMBA degree to a certain student in October 2007 will be instituted against Lang.

6)      All of the parties to this Settlement Agreement and Release of Claims agree to keep the settlement agreement and its terms and conditions confidential to the extent allowable by law and shall not disclose its terms, conditions or exhibits to any person except as necessary to enforce the provisions. The voluntary resolution statement executed by Lang and final disposition issued by the Deciding Official shall maintained in accordance with the "Policy and Procedures for Responding to Allegations of Academic Misconduct at West Virginia University." No party, however, is required to resist or otherwise refuse to obey any applicable law or an order issued by a court of law requiring production of settlement information or documents.

7)      This Confidential Settlement Agreement and Release of Claims shall be binding on the past, present and future officers, directors, stockholders, insurers, attorneys, agents, servants, employees, representatives, subsidiaries, parent companies, affiliates, partners, predecessors, heirs, successors in interest, assigns of the parties, and all other persons, firms or corporations, with whom any of the parties may have been, are now, or may hereafter be affiliated.

6

8) All parties acknowledge that they have had the advice of counsel with regard to entering into this Confidential Settlement Agreement and Release of Claims, and that further, they have full authority to enter into this agreement and release, both individually, and on behalf of any state entities.

9) The validity, performance, and enforcement of this Confidential Settlement Agreement and Release of Claims shall be governed by, and construed and interpreted in accordance with, the laws of the State of West Virginia.

10) This Confidential Settlement Agreement and Release of Claims, which consists of ten (10) pages, shall become effective immediately upon the execution of the Agreement by all parties and the entry by the Circuit Court of Monongalia County of an order vacating *nunc pro tunc* its prior orders dated April 24, 2009 and January 24, 2011 and dismissing this suit with prejudice. It is hereby mutually agreed that this Agreement shall be executed simultaneously in six (6) counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one (1) counterpart.

***

7

_____

GERALD E. LANG

STATE OF WEST VIRGINIA,

COUNTY OF Monongalia , to-wit:

On this 30th day of June , 2011, personally before me appeared Gerald E. Lang, known to me to be the same person described in and who executed the above Confidential Settlement Agreement and Release of Claims, and he acknowledged to me that he executed the same.

My commission expires: June 5, 2021

_____

Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
HELEN L. KORMUS
200 Rolling Hills Village, Morgantown, WV 26505
My Commission Expires June 5, 2021

_____

MARJORIE ANNE MCDIARMID

STATE OF WEST VIRGINIA,

COUNTY OF Monongalia to-wit:

On this 19th day of July , 2011, personally before me appeared Marjorie Anne McDiarmid, known to me to be the same person described in and who executed the above Confidential Settlement Agreement and Release of Claims, and she acknowledged to me that she executed the same.

My commission expires: September 29, 2018

8

_Notary Public_

_Mary Roberta Brandt_

MARY ROBERTA BRANDT

STATE OF WEST VIRGINIA,

COUNTY OF Monongalia , to-wit:

On this 20th day of July , 2011, personally before me appeared Mary Roberta Brandt, known to me to be the same person described in and who executed the above Confidential Settlement Agreement and Release of Claims, and she acknowledged to me that she executed the same.

My commission expires:     2-24-2016                              .

_Notary Public_

_Beverly D. Kerr_

BEVERLY D. KERR

STATE OF WEST VIRGINIA,

COUNTY OF Monongalia , to-wit:

On this 20th day of July , 2011, personally before me appeared Beverly D. Kerr, known to me to be the same person described in and who executed the above Confidential Settlement Agreement and Release of Claims, and she acknowledged to me that she executed the same.

My commission expires:     2-24-2016                              .

_Notary Public_

9

*C. Peter Magrath*

C. PETER MAGRATH

STATE OF ~~WEST VIRGINIA~~, NEW YORK

COUNTY OF BROOME , to-wit:

JANET A. RANUCCI
Notary Public, State of New York
No. 6036720
Qualified in Broome County
My Commission Expires Feb. 7, 20 14

On this 21st day of July , 2011, personally before me appeared
C. Peter Magrath, known to me to be the same person described in and who executed the
above Confidential Settlement Agreement and Release of Claims, and he acknowledged
to me that he executed the same.

My commission expires: FEBRUARY 7th, 2014

*Janet A. Ranucci*

Notary Public

*Nancy E. Weese*

WEST VIRGINIA UNIVERSITY BOARD OF GOVERNORS

Its: Vice President Administration and Finance

STATE OF WEST VIRGINIA,

COUNTY OF MONONGALIA, to-wit:

On this 21st day of July , 2011, personally before me appeared
Nancy E. Weese Jr. , the VP Admin and Finance for WEST VIRGINIA
UNIVERSITY BOARD OF GOVERNORS, known to me to be the same person
described in and who executed the above Confidential Settlement Agreement and Release
of Claims, and that person acknowledged to me that they executed the same.

My commission expires: 11-18-2018

*Carol E. Murray*

Notary Public

10

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
Carol E. Murray
408 Pond Road
Morgantown, WV 26508
My Commission Exp. Nov. 18, 2018

# IN THE CIRCUIT COURT OF MONONGALIA COUNTY, WEST VIRGINIA

STATE *ex rel* GERALD E. LANG, Ph.D.,

      Petitioner and Relator,

v.

WEST VIRGINIA UNIVERSITY BOARD
OF GOVERNORS, a West Virginia state
board; C. PETER MAGRATH, President of
West Virginia University; MARY ROBERTA
BRANDT, Vice President for Legal Affairs
and General Counsel at West Virginia
University; BEVERLY D. KERR, Deputy
General Counsel for West Virginia University;
and MARJORIE M. McDIARMID, Steptoe
and Johnson Professor of Law and Technology
and Academic Integrity Officer for West
Virginia University,

      Defendants.

Civil Action No. 09-C-114
Judge Susan B. Tucker

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July 2011, I caused a copy of the foregoing

Renewed Motion to Intervene and Motion to Alter or Amend Judgment Under Rule 59(e) By R.

Stephen Sears and Cyril M. Logar to be served upon the following counsel of record via U.S.

Mail:

Debra H. Scudiere
Kay Casto & Chaney PLLC
The United Center
1085 Van Voorhis Road, Suite 100
Morgantown, WV 26505
*Counsel for Defendants Mary*
*Roberta Brandt and Beverly D. Kerr*

Stephen M. LaCagnin
Wendy G. Adkins
Seth P. Hayes
Jackson Kelly PLLC
150 Clay Street, Suite 500
Morgantown, WV 26501
*Counsel for Defendants WVU Board of*
*Governors and C. Peter Magrath*

Scott Curnutte
Curnutte Law Office
Post Office Box 1605
Elkins, West Virginia  26241
*Counsel for Defendant Marjorie McDiarmid*

Respectfully submitted:

Wesley M. Jarrell II (W. Va. Bar No. 10544)

2